UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF TEXAS
LAREDO DIVISION

| | | |
|---|---|---|
| MARIA GARCIA, as dependent administrator of and on behalf of the ESTATE OF CHRISTOPHER TORRES-GARCIA, and CHRISTOPHER TORRES-GARCIA's heir(s)-at-law and wrongful death beneficiaries; | § § § § § § § | CIVIL ACTION NO. _____ |
| Plaintiff, | § § | JURY DEMANDED |
| v. | § § | |
| WEBB COUNTY, TEXAS; | § § | |
| Defendant. | § § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

> **Deathly ill pre-trial detainee Christopher Torres-Garcia horribly suffered and died an unnecessary and preventable death from sepsis during incarceration in the Webb County jail as a result of Webb County's policies, practices, and customs. Webb County was fully aware of issues with sepsis in its jail, and it had even been sued more than once for sepsis-related deaths. Unfortunately, it appears not to have caused Webb County to implement necessary life-saving policies.**



## Table of Contents

I.    Introductory Allegations ...................................................................................... 4

    A.    Parties ................................................................................................... 4

    B.    Jurisdiction and Venue ........................................................................ 5

II.   Factual Allegations ......................................................................................... 5

    A.    Preliminary Statements ....................................................................... 5

    B.    Christopher's Suffering and Death in the Webb County Jail .......................... 6

        1.    Texas Rangers Investigation ....................................................... 7

        2.    Custodial Death Report (Filed with Attorney General) ...................... 10

        3.    Medical Records ....................................................................... 11

            a.    EMS Records ................................................................. 11

            b.    Autopsy Report ............................................................. 11

        4.    Statements/Interviews of Witnesses ........................................... 13

            a.    Aguilera, Jessica - Jailer ................................................. 13

            b.    Elizondo, Ramiro - LVN ................................................. 14

            c.    Gonzalez, Ivan - Jailer ................................................... 18

            d.    Molina, Oscar S. - Jailer ................................................. 20

            e.    Rivera, Javier – EMT/Paramedic ..................................... 21

            f.    Sarquiz-Ortega, Mariana - RN ......................................... 22

    C.    Liability of Webb County ................................................................... 24

        1.    Introduction .............................................................................. 24

        2.    Sepsis   ..................................................................................... 26

            a.    Well-Known Risk in Jails ................................................ 26

            b.    Webb County Sued for Virtually Identical Sepsis Death ........ 30

        3.    Webb County Policies, Practices, and Customs ................................ 35

        4.    TCJS Records Demonstrating County Practices and/or Customs ....... 39

        5.    Suffering and Death of Other Detainees ...................................... 41

III.  Causes of Action ............................................................................................ 46

    A.    Fourteenth Amendment Due Process Claims Under 42 U.S.C. § 1983: Objective Reasonableness Pursuant to *Kingsley v. Hendrickson* .................. 46

    B.    Remedies for Violation of Constitutional Rights................................... 48

    C.    Cause of Action Against Webb County Under 42 U.S.C. § 1983 for Violation of Constitutional Rights ................................................... 48

IV.   Concluding Allegations and Prayer ...................................................................51

    A.    Conditions Precedent .......................................................................51

    B.    Use of Documents at Trial or Pretrial Proceedings ........................51

    C.    Jury Demand ....................................................................................51

    D.    Prayer ..............................................................................................51

TO THE HONORABLE UNITED STATES DISTRICT COURT:

Plaintiff files this complaint and for cause of action will show the following.

I.      Introductory Allegations

A.      Parties

1.      Maria Garcia ("Ms. Garcia") sues as the dependent administrator of the Estate of Christopher Torres-Garcia, Deceased.  Christopher Torres-Garcia is referred to in this pleading at times as "Christopher" or "Mr. Torres-Garcia."  Maria Garcia, when asserting claims in this lawsuit as the dependent administrator, does so in that capacity on behalf of all wrongful death beneficiaries (including herself [mother of Christopher Torres-Garcia], Lorenzo Torres [father of Christopher Torres-Garcia], and Nancy P. Garcia [Christopher Torres-Garcia's wife]). All people in the immediately preceding sentence are collectively referred to herein as the "Wrongful Death Beneficiaries." Ms. Garcia asserts claims on behalf of and seeks all wrongful death and other damages available under law to the Wrongful Death Beneficiaries.  She also sues in that capacity asserting claims on behalf of the estate and all of Mr. Torres-Garcia's heir(s) (currently likely Nancy P. Garcia [Christopher Torres-Garcia's wife]). All people in the immediately preceding sentence are collectively referred to herein as the "Claimant Heirs."  Ms. Garcia asserts claims on behalf of and seeks all survival and other damages available under law to the Claimant Heirs. Maria Garcia qualified in November 2023 as dependent administrator in Cause Number 2023PB4000049L2, in the County Court at Law No. 2 of Webb County, Texas, in a case styled *Estate of Christopher Torres-Garcia, Deceased.*

2.      Defendant Webb County, Texas ("Webb County" or "the County") is a Texas county.  Webb County may be served with process pursuant to Federal Rule of Civil Procedure 4(j)(2) by serving its chief executive officer, Honorable County Judge Tano Tijerina, at 1000

Houston St., 3rd Floor, Laredo, Texas 78040, or wherever Honorable County Judge Tano Tijerina may be found.  Service on such person is also consistent with the manner prescribed by Texas law for serving a summons or like process on a county as a Defendant, as set forth in Texas Civil Practice and Remedies Code Section 17.024(a).  The County acted or failed to act at all relevant times through its employees, agents, representatives, jailers, and/or chief policymakers, all of whom acted under color of state law at all relevant times, and is liable for such actions and/or failure to act to the extent allowed by law (including but not necessarily limited to law applicable to claims pursuant to 42 U.S.C. § 1983).  The County's policies, practices, and/or customs were moving forces behind and caused, were proximate causes of, and were producing causes of constitutional violations and resulting damages (including death) referenced in this pleading.

B.    Jurisdiction and Venue

3.    The court has original subject matter jurisdiction over this lawsuit according to 28 U.S.C. § 1331 and 1343(4), because this suit presents a federal question and seeks relief pursuant to federal statute(s) providing for the protection of civil rights.  This suit arises under the United States Constitution and 42 U.S.C. § 1983.  The court has personal jurisdiction over County because it is a Texas county. Venue is proper in the Laredo Division of the United States District Court for the Southern District of Texas pursuant to 28 U.S.C. § 1391(b)(2). A substantial part of the events or omissions giving rise to claims in this lawsuit occurred in Laredo, Texas, which is in the Laredo Division of the United States District Court for the Southern District of Texas.

II.    Factual Allegations

A.    Preliminary Statements

4.    Plaintiff provides in factual allegations sections below the general substance of certain factual allegations.  Plaintiff does not intend that those sections provide in detail, or

necessarily in chronological order, any or all allegations. Rather, Plaintiff intends that those sections provide Defendant sufficient fair notice of the general nature and substance of Plaintiff's allegations, and further demonstrate that Plaintiff's claims have facial plausibility. Whenever Plaintiff pleads factual allegations "upon information and belief," Plaintiff is pleading that the specified factual contentions have evidentiary support or will likely have evidentiary support after a reasonable opportunity for further investigation or discovery. Moreover, where Plaintiff quotes a document, conversation, or recording verbatim, or provide a person's name, Plaintiff has done Plaintiff's best to do so accurately and without any typographical errors. However, some typographical errors may still exist.

5.      Plaintiff pleads facts which give rise to, and thus assert, conditions of confinement claims. Conditions of confinement claims require no deliberate indifference on behalf of a governmental entity or governmental actor. In the alternative, Plaintiff pleads facts which give rise to episodic acts and/or omissions claims. Regardless, pursuant to United States Supreme Court authority, Plaintiff need not assert in this pleading specific constitutional claims but rather must merely plead facts which give rise to constitutional claims. Plaintiff thus asks that the court apply the correct legal theories to the facts pled.

6.      Plaintiff is not pleading Plaintiff's "best case" and will only be able to do so after conducting discovery. Plaintiff does not intend to "stand" on this pleading but will seek leave to amend as further facts are developed, or in the event any court determines that Plaintiff's live pleading is any manner deficient.

B.      Christopher's Suffering and Death in the Webb County Jail

7.      Christopher was booked into the Webb County jail on December 1, 2021, as a known injected heroin user. He would die one week later from sepsis due to infected injection

sites.  If had he been taken to an emergency department of a local hospital, his life would have been saved.  Upon information and belief, Christopher had an infection during the entire week, which progressed at a rate which would have allowed him to receive this needed lifesaving medical treatment.  However, as a result of Webb County's failure to train employees regarding sepsis recognition, failure to assure that blood tests of drug users such as Christopher were conducted to identify sepsis, and failure to generally train employees about sepsis at all, in addition to other policies, practices, and/or customs below, Christopher never received that lifesaving medical care.  Christopher's issue was not unknown to Webb County, as Webb County had been sued more than once before Christopher's death regarding sepsis deaths.  In fact, at least one such death was the result of sepsis arising from infected needle injection sites.  Significant funds were paid to settle those cases. Yet Webb County still apparently failed to implement appropriate policies and/or procedures regarding detainees with serious infections.

### 1.    Texas Rangers Investigation

8.    The Texas Rangers investigated the decedent's death.  The purpose of a Texas Rangers investigation regarding a custodial death, such as the decedent's, is to determine whether there was any criminal responsibility for what occurred.  Texas Rangers do not determine whether there is civil liability for violation of a person's constitutional rights, such as that alleged in this case.  Therefore, the Texas Rangers' determination as to whether to turn the case over to a grand jury and recommended prosecution does not determine whether Defendant is liable for the decedent's death.

9.    Texas Ranger Tyler Williamson was the lead criminal investigator. Ranger Williamson originally learned about Christopher's death from Texas Ranger Lieutenant Randy Garcia, and he also learned that his jail point of contact was acting Jail Commander Joe Hernandez.

10.    Ranger Williamson was told by acting Jail Commander Hernandez that Christopher had received detoxification treatment and, on December 8, 2021, at approximately 11:30 AM, he complained of chest pain. He also learned from acting Jail Commander Hernandez that Chris was allegedly "cleared" by medical staff and taken back to his cell.  However, upon information and belief, any medical review was simply a cursory review designed to simply return Christopher to his cell.  Webb County, even after being sued more than once for sepsis deaths, continued to turn a blind eye to the serious problem of sepsis in its jail.  It failed and refused to implement appropriate policies regarding sepsis recognition and treatment, as more fully referenced in this pleading below.

11.    Acting Jail Commander Joe Hernandez also told Ranger Williamson that, at approximately 2:00 PM on December 8, 2021, during roll call, a jailer saw that Christopher was unsteady on his feet and removed him from his cell. He was also told that, while Christopher was being taken to medical, he passed out. Finally, he was told that Christopher was transported to a Laredo hospital, where he later died.

12.    Ranger Williamson also met with Webb County Medical Examiner's office Investigator Sable Miller. Investigator Miller informed Ranger Williamson of several things regarding Christopher's death, including that a Laredo Medical Center physician had pronounced Christopher deceased at approximately 4:15 PM on December 8, 2021. He also learned that Christopher's first "code" was at approximately 2:15 PM at the Laredo Medical Center.  Ranger Williamson also learned that the Webb County Medical Examiner's office took possession of Christopher's body at approximately 7:42 PM.

13.    After Ranger Williamson met with Investigator Miller, the two of them observed the autopsy of Christopher. At the completion of the autopsy, Webb County Medical Examiner

Dr. Corinne Stern said that Christopher had "infected injection sites due to intravenous drug use" that caused Christopher to become septic and develop pneumonia. Upon information and belief, had more than a cursory medical evaluation been conducted earlier that day, Christopher's pneumonia was apparent. Moreover, upon information and belief, it was apparent for quite some time that Christopher had pneumonia. As with Webb County's failure to implement appropriate policies regarding sepsis recognition, upon information and belief, it likewise failed to train at all, or implement policies regarding, pneumonia recognition. Such recognition is vitally important (as with sepsis) because pneumonia can be the last stage of a serious underlying illness.

14.     Ranger Williamson also learned from reviewing Webb County jail documents that Christopher, when he was allegedly "evaluated" by medical personnel at the jail at approximately 11:30 AM on December 8, 2021, said that he was unable to breathe, was scared because of an abscess he had on his arm/shoulder area, and felt the infection was getting to the bone. The purported medical evaluator was deliberately indifferent to Christopher's known serious medical needs, pain, suffering, and mental anguish, and simply sent him back to his cell to die. Ranger Williamson also learned that, after no one took any action to help Christopher after that alleged "evaluation." Just a little over roughly two hours later, at approximately 1:40 PM, Christopher had rapid breathing, a heart rate of 245, and an oxygen saturation level of 65%. He further learned, when reviewing observation sheets and the jail logbook, that for the 6:00 AM to 2:00 PM shift on December 8, 2021, for Cell 110, the cell in which Christopher was incarcerated, "no information pertaining to events were documented in the logbook." He also learned, contrary to Webb County records, that Christopher was not hospitalized for a drug overdose on November 29, 2021.

15.     Upon information and belief, during the earlier alleged "evaluation," which Plaintiff alleges was substantively no evaluation at all, Christopher had a highly-elevated heart rate

and a deadly low oxygen saturation level, despite whatever medical records indicate to the contrary.  A normal heart rate should not generally exceed 100 beats per minute, and a normal oxygen saturation level should be at least 95% to 96%, and preferably closer to 100%.

16.    Ranger Williamson also learned, from reviewing Laredo Fire Department documents, that the Laredo Fire Department received the initial call about Christopher at 1:31 PM. Further, Laredo Fire Department EMS personnel arrived on the scene at 1:38 PM, noting that Christopher was already cold to the touch.

### 2.    Custodial Death Report (Filed with Attorney General)

17.    The Webb County Sheriff's Department filed a custodial death report with the Attorney General of Texas.  The custodial death report was drafted by Jose Hernandez, an employee of Webb County, Texas. The report listed Martin Cuellar as sheriff.  The report further indicated that Christopher was only 34 years old at the time of his death, and it admitted that Christopher "died from sepsis due to infected drug injection sites." The report listed as the address where the event caused Christopher's death occurred as 1700 East Saunders, Laredo, Texas, 78041. Christopher's entry into the jail was listed as being at 4:07 PM on December 1st, 2021, and charges against Christopher were listed as being "filed." Thus, Christopher was a pretrial detainee.

18.    The report admitted a number of things about Christopher, such that Christopher would not have been any problem to anyone wanting to provide healthcare to him. The report admits that Christopher did not barricade himself or initiate a standoff; physically attempt to or assault officers; verbally threaten others, including law enforcement officers; attempt to gain possession of any officer's weapon; resist being handcuffed or arrested; gain possession of an officer's weapon; or escape or attempt to escape or flee custody. The report indicates that Christopher was pronounced deceased, at Laredo Medical Center, by a Dr. Luis Pellicia.

3.    Medical Records

a.    EMS Records

19.    As indicated elsewhere in this pleading, City of Laredo EMS responded to the jail for the final medical crisis concluding in Christopher's death. Records indicate as the primary impression, acute respiratory distress (dyspnea), and as a secondary impression, respiratory failure. The flow chart indicates that Sergio Guzman and Jose Dominguez treated Christopher. Christopher's mental status was listed as "unresponsive." His skin was cold and cyanotic (blueish/purple due to lack of oxygen). Lower left lung and lower right lung breath sounds were absent. Upper left and upper right lung breath sounds were decreased.

20.    The narrative portion of the report indicated in part that, upon EMS personal arrival, Christopher was lying supine on the floor "obviously cyanotic and cold to touch." It further indicated in part that Christopher was an IV drug user and had finished his methadone treatment. Thus, upon information and belief, Christopher complied with all medical recommendations and orders related to his care while he was incarcerated in the Webb County jail during the last week of his life. Christopher did not want to be sick, did not want to die, and did not refuse any necessary medical care. The narrative also indicated that Christopher was too cold for a pulse oximeter reading, and EMS personnel could not obtain a blood pressure reading. Christopher was transported to Laredo Medical Center via an ambulance running lights and sirens.

b.    Autopsy Report

21.    An autopsy of Christopher was conducted by the Webb County Medical Examiner's Office by Corinne E. Stern, D.O., Chief Medical Examiner. The autopsy report had a section entitled Pathologic Diagnosis. That section indicated that Christopher had sepsis, indicated in part by subcutaneous abscesses involving bilateral arms and right forearm, and a history of intravenous

drug use. This showed that, to anyone who had been trained at all in the Webb County jail, these abscesses would have been visible and a cause for alarm. That section also indicated that Christopher had bilateral pleural effusions, 150 mL left and 150 mL right. Dr. Stern listed as her opinion, "This 34-year-old Hispanic male, Christopher Torres Garcia, died from sepsis due to infected drug injection sites."

22.    The external examination section of the autopsy report indicated in part that Christopher's "extremities were remarkable for abscesses of the bilateral shoulders. The skin over and surrounding the abscesses was erythematous and indurated. Incisions into the abscess revealed abundant light brown puss. In addition, there was a subcutaneous abscess present on the volar surface of the right forearm . . . There were multiple puncture sites noted on the bilateral lateral shoulders." The respiratory system section of the autopsy report read in part, "The pulmonary parenchyma was red-purple, exuding marked amounts of blood and frothy fluid; no focal lesions were noted."

23.    The Webb County Medical Examiner also produced an investigator report by Sable Miller. The report indicated in part that Investigator Miller received a call from an emergency department nurse about an unresponsive male in a trauma room at the hospital. The nurse, named Gabby, indicated to Investigator Miller that Christopher had been transported via to Laredo Medical Center via EMS from the Webb County Jail at 2:06 PM. The RN stated in part that Christopher had been complaining about arm pain and ultimately had a seizure and collapsed. Further, according to a jailer, Christopher was breathing but not lucid or alert. After arriving at the hospital, a CT scan indicated bilateral pleural effusions. An emergency room physician then inserted bilateral chest tubes and collected 300 milliliters from each "side" (lung). 300 milliliters

is equivalent to a little over 10 ounces, or the equivalent of all of the liquid in a nearly full soft drink can.

24.    The Webb County Medical Examiner investigator also reviewed jail paperwork related to Christopher's incarceration. That paperwork indicated that Christopher used heroin daily and had last used heroin the morning his incarceration began (December 1, 2021). Further, the paperwork indicated that Christopher had an infected arm.

### 4.    Statements/Interviews of Witnesses

#### a.    Aguilera, Jessica - Jailer

25.    Jailer Jessica Aguilera completed an incident report regarding Christopher's final medical crisis resulting in his death. She indicated that, on December 8, 2021, at approximately 1:15 PM, she was conducting a roll call and security check in Cell 110 when a detainee told her that Christopher was not feeling well. Christopher then said that he was not feeling well and had anxiety and chest pains. Jailer Aguilera saw Christopher get up from his mattress and walk toward Jailer Gonzalez to go to medical. Jailer Aguilera, while involved with something else related to roll call and security check, was not looking in Christopher's direction she then heard a noise and looked up to see Christopher on the floor. Jailer Aguilera then went to medical to get a wheelchair and told Jailer Rivera and RN Sarquiz-Ortega that medical assistance was needed in booking due to a detainee on the floor. When Jailer Aguilera got to booking with the wheelchair, she saw Jailers Gonzalez and Molina trying to pick up Christopher from the floor. She told them to get Christopher's head so that it would not hit the floor. She then saw medical interacting with Christopher and thus continued with her roll call duties. She admitted that she incorrectly wrote on an observation sheet that this occurrence occurred at 1:30 PM instead of 1:15 PM.

b.    Elizondo, Ramiro - LVN

26.    Webb County employee and licensed vocational nurse Ramiro Elizondo provided a recorded oral statement after and as a result of Christopher's death.  LVN Elizondo indicated that he heard a medical call for Christopher.  LVN Elizondo was referencing the final medical episode, on the afternoon of December 8, 2021, concluding in Christopher's transport to and ultimate pronunciation of death at Laredo Medical Center.  When LVN Elizondo arrived at the scene, Christopher was already in a wheelchair. He saw Christopher being taken to a medical area after seeing RN Mariana Sarquiz-Ortega and Javier Rivera with Christopher. Once they arrived at medical, LVN Elizondo saw Javier "go inside."  RN Sarquiz-Ortega stayed with LVN Elizondo. LVN Elizondo, seeing Christopher turn purple, said to RN Sarquiz-Ortega that they should put Christopher onto the floor.  They then obtained oxygen, and someone called for EMS.  LVN Elizondo indicated that he assessed Christopher, and that his heart was in tachycardia. "Tachycardia" means an increased heart rate.  LVN Elizondo said that RN Sarquiz-Ortega was nervous, and that LVN Elizondo said to RN Sarquiz-Ortega not to get nervous because RN Sarquiz-Ortega would not be able to help Christopher.  That an LVN was advising an RN as to what might or might not help Christopher spoke volumes about the lack of training and appropriate policies for not only IV drug users generally, but detainees with sepsis and pneumonia specifically. As indicated elsewhere in this pleading, RN Sarquiz-Ortega had not received any training regarding recognizing subcutaneous abscesses common with IV drug users and which could result in sepsis and death.

27.    RN Sarquiz-Ortega then left, apparently to call EMS, and then returned to Christopher and LVN Elizondo. RN Sarquiz-Ortega asked whether she should get the AED machine, but LVN Elizondo said that Christopher's heart was pumping. They placed the pads onto Christopher, and the machine indicated that they should start compressions. LVN Elizondo said

not to start compressions, because using his stethoscope, he could hear that Christopher's heart was still beating in tachycardia. LVN Elizondo thus said that they should not begin compressions because Christopher would go into arrhythmia and cardiac arrest, which would cause even more issues. Around that time, paramedics arrived.

28.    Upon further questioning, LVN Elizondo indicated that Christopher had initially been in a wheelchair about three or four minutes and was turning purple (cyanotic).  LVN Elizondo confirmed that it was his understanding that this indicated that Christopher's body was not receiving oxygen.  LVN Elizondo also confirmed that, before providing oxygen to Christopher, Christopher was not talking at all to LVN Elizondo or anyone else.  LVN Elizondo also indicated that he was not in the medical department when Christopher had been taken to the medical department that morning was instead upstairs dispensing medication.

29.    LVN Elizondo also indicated that RN Sarquiz-Ortega was new to the jail. LVN Elizondo further indicated that he was an LVN and a supervisor in the Webb County jail medical department.  LVN Elizondo confirmed that, other than the timeframe when he interacted with Christopher as indicated above, he did not recall having any interaction with Christopher.

30.    LVN Elizondo also confirmed what should be (if training and education of employees had taken place) typical, usual, and customary jail knowledge regarding infection and sepsis.  LVN Elizondo indicated that all heroin addicts usually have ulcers or abscesses. He said that an abscess could be a small wound that is draining pus. He also said, "Those are more dangerous because all the pus accumulates between the layers of the skin. Those are the ones that kill you. So you start them on antibiotics immediately." He said that pus accumulates to the inside of the skin, between skin layers, and that "those are even worse." Mr. Elizondo also said that the majority of heroin addicts use skin-pop heroin. Thus, they develop abscesses.

31.    LVN Elizondo further said that, if one takes such a person to a physician, and the physician does not order blood work, one would not know whether the person were septic. While a blood test is vitally important to diagnose sepsis, despite LVN Elizondo's assertion, there are other well-known signs and symptoms of sepsis development. All competent health care providers, including every emergency department in every hospital in the United States, are fully aware of sepsis, it signs, and its symptoms. Regardless, LVN Elizondo also said that, if someone at the jail sends such a person to the hospital for clearance, the hospital (likely referencing Laredo Medical Center) would typically just send the person back to the jail. LVN Elizondo said that the jail would send such a person to a hospital so that the hospital could do blood work to learn if the person is septic or not, but that the hospital just would not do it. LVN Elizondo said that such an occurrence happened "a lot of times." LVN Elizondo said that he would tell the hospital that he was sending a detainee for blood work. He would receive a response similar to, "You're the doctor? I'm the doctor." Apparently, upon information and belief, the jail would just ignore the need to obtain such a blood test and repopulate the detainee into the jail.

32.    LVN Elizondo further discussed the need for blood work to determine if a person was septic. LVN Elizondo said that one would need to do a complete blood count (CBC). LVN Elizondo said that he would speak with a doctor at the local hospital and try to have detainees he sent for clearance to have a CBC taken. This would allow the jail to know when a detainee was septic. He also indicated, in response to a question, that such happens with heroin addicts quite often. LVN Elizondo further indicated that if they were able to obtain CBCs for heroin addicts, "Then [they] might be able to save more lives."

33.    LVN Elizondo also said that, with a normal booking medical clearance, a CBC would not be conducted. LVN Elizondo seemed to further express his frustration and concern,

because the jail would "want a clearance" and would thus send a detainee to the hospital. They would then return with antibiotics - "That's it."  LVN Elizando was expressing his opinion, based upon his medical training and experience, that antibiotics in such a situation would be ineffective and thus constitute no medical treatment at all for the life-threatening medical situation.  LVN Elizondo further said, "No blood work. No. . . .  That's all they do." This would be in a situation in which a person had an open abscess.

34.    LVN Elizondo indicated that he was trying to do something about the jail's known issue with heroin addicts and sepsis. He said, "I'm speaking with administration so we can pursue more on that. You know what? we asked for a clearance. We want a CBC done. That way, we'll find out if you're septic or not."  LVN Elizondo indicated that he had been a nurse for about 33 years in Webb County. He indicated that he used to be ICU-certified and ER-certified, but that was approximately 30 years before.

35.    LVN Elizondo also confirmed that no medical clearance had been requested for Christopher. He also indicated that Carmen Mendez was the "medical" person who saw Christopher when he was brought into the jail.

36.    LVN Elizondo also spoke a bit more about RN Sarquiz-Ortega.  He indicated that RN Sarquiz-Ortega "had some question marks in her head," apparently about Christopher's death. Mariana said that she told her cousin, who is a physician in the Valley.  LVN Elizondo said that the cousin-physician said that LVN Elizondo was right about presumably what should have occurred, a CBC test, and which did not occur. LVN Elizondo said, "That made me feel real good." While LVN Elizondo was correct, unfortunately that belated correctness did not save Christopher's life.  If Webb County had had in place a policy to obtain such a CBC, Christopher's suffering would have been minimized, and his life would have been saved.

<u>c.      Gonzalez, Ivan - Jailer</u>

37.     Webb County employee Ivan Gonzalez provided an oral recorded statement related to and as a result of Christopher's death. Jailer Gonzalez indicated that, on the day Christopher was transported to the hospital and ultimately passed away, he was working the 6:00 AM to 2:00 PM shift as the booking officer. His booking officer duties included housing, intake, booking, and releasing. Mr. Gonzalez indicated that, in the booking area, there were also detox cells over which Mr. Gonzalez was in charge. Mr. Gonzalez recalled Christopher being in "close observation" Cell 110.  Unfortunately, designated "close observation" or not, Christopher did not receive needed medical attention.   Mr. Gonzalez indicated that Christopher had just completed "detox" and was in Cell 110 for medical observation.

38.     Mr. Gonzalez also spoke a bit about Webb County Jail policy regarding detainee observations in such a medical observation cell. Mr. Gonzalez indicated that the obligation was to look into the window of the cell and just be sure that the "inmate was alive."  Mr. Gonzalez also indicated that they were not using a logbook on the day that Christopher suffered his medical emergency. He said, "We try to use it, but we get busy, then we forget to do it."

39.     Mr. Gonzalez indicated that he had interacted with Christopher twice, both in medical situations. He said that the first occurrence was around 10:00 AM or 10:30 AM on December 8, 2021. Mr. Gonzalez said that he could hear a judge on a speaker, when they were doing probable cause court. Christopher came up to Mr. Gonzalez and said that he was not feeling good. Mr. Gonzalez saw a friend of his, Jailer Oscar Molina, walking past the corner of the gate. Mr. Gonzalez then asked Mr. Molina to take Christopher to medical. After court concluded,  Mr. Molina returned with Christopher and said, "Naw, he's good. Medical cleared him." Mr. Gonzalez admitted that Christopher did look sick to him, and that he was sitting down, kind of hunched over.

40.     The second incident related by Mr. Gonzalez, involving Christopher, was when Christopher came out while jailers were doing a roll call.  This was the final medical event unfortunately concluding with Christopher's death.  Christopher told Mr. Gonzalez that his chest hurt. Mr. Gonzalez recalls this occurrence being at approximately 1:20 PM or 1:30 PM. Mr. Gonzalez indicated that he would take Christopher to medical. He also indicated that he told others at the scene, "We got to take him to medical, because no matter what, even though he's faking or not, his chest hurts. We got to take him medical."  This, combined with no reasonable medical evaluation earlier in the day, shows a focus on "checking boxes" rather than substantively doing something about a serious medical condition.  Mr. Gonzalez then put handcuffs on Christopher. Christopher said, "Sir, why do I feel like this?" Mr. Gonzalez responded, "It's probably because the drugs you take." Then, as soon as Christopher was handcuffed, Christopher fell back quickly. Christopher hit the concrete floor hard, as described by Mr. Gonzalez. Mr. Gonzalez said, "He lost it." Mr. Gonzalez was indicating that Christopher had "kind of passed out."

41.     Mr. Gonzalez obtained a wheelchair, and he and Mr. Molina tried to stand Christopher up. They attempted to seat Christopher in the wheelchair with some difficulty. Christopher had stiffened up.

42.     They took Christopher to the medical department, and Mr. Gonzalez recalls Christopher's pulse being 245. Mr. Gonzalez indicated that he did not remember completely what happened, but it was getting pretty much a "dangerous area." Mr. Gonzalez then asked a nurse whether he should put Christopher on the floor, and the nurse responded, "Yes." Mr. Gonzalez put Christopher on the floor, because they were about to begin CPR. Mr. Gonzalez indicated that the head nurse said to one of the younger nurses that they could not do CPR until Christopher's heart stopped, because it might change the natural rhythm of Christopher's heartbeat. Mr. Gonzalez

recalls that EMS arrived not too long after that occurrence. Mr. Gonzalez also recalled that Christopher was not conversing with anyone after he said, "Why am I feeling this way?" Mr. Gonzalez also confirmed in response to questioning that it was "quite common" that they were so busy that they would not document anything in the logbook. Upon further questioning, Mr. Gonzalez admitted that Christopher's hands were getting purple at the time of the second December 8, 2021 occurrence when he requested medical care.

43. Jailer Gonzalez completed an inmate incident report which provided additional detail regarding his roughly 1:30 PM, December 8th, 2021, interaction with Christopher. He wrote that, as he entered the cell in which Christopher was incarcerated, Christopher told him that he did not feel good and that his chest hurt. Jailer Gonzalez told Christopher to get up so that he could take him to medical. Christopher was slow to get up, stumbled to the door, and sat down in front of the cell door. Jailer Gonzalez told Christopher again to get up so that he could take him to medical. Christopher got up and faced the Jailer Gonzalez, so that the Jailer Gonzalez could place handcuffs onto Christopher. As Jailer Gonzalez placed one cuff onto Christopher, Christopher bent his head backwards and fell straight back. The jailer heard a loud "thud" sound, and Christopher seemed to be dazed. The jailer walked over to Christopher, and it looked like Christopher was having a seizure. Jailer Gonzalez then told Jailer Jessica Aguilera to go get medical. Medical arrived and decided to call and have Christopher taken to the hospital.

### d.    Molina, Oscar S. - Jailer

44. Webb County employee Oscar S. Molina provided a written statement related to Christopher's death. Jailer Molina wrote that, on Wednesday, December 8, 2021, at approximately 9:30 AM, while he was working at the Webb County Jail booking area, when conducting observation rounds regarding Cell 110, he saw Christopher. Christopher was complaining that he

was feeling anxious and not feeling good. He thus took Christopher to medical for any further action. He asked Mr. Rivera about what Christopher was feeling, and Mr. Rivera said that it was part of drug withdrawals and that he could not give Christopher anything for his anxiety. Upon information and belief, the assertion that Christopher could not be provided with any medication was false and a demonstration of deliberate indifference.  Christopher had previously successfully completed the drug withdrawal protocol.

45.    Jailer Molina also saw Christopher again at approximately 1:17 PM on the same date, outside of Cell 110.  Christopher was allegedly sitting down.  Mr. Gonzalez told Jailer Molina that Christopher was complaining about having chest pains. Jailer Molina intended to continue making his observation rounds and suddenly heard a loud noise behind him. He then saw Christopher on the floor. He and Jailer Gonzalez picked up Christopher to take him to medical. During the escort to medical, Christopher collapsed to the floor again.

e.    Rivera, Javier – EMT/Paramedic

46.    Ranger Williamson also interviewed Javi Rivera regarding and as a result of Christopher's death. Mr. Rivera was apparently an EMT/Paramedic. Mr. Rivera recalled seeing Christopher on the morning of the day on which the medical event resulting in his death occurred, by his recollection at approximately 11:00 AM.  He alleges to have "evaluated" Christopher because Christopher was complaining of left arm pain and a lot of anxiety. Mr. Rivera saw that Christopher's arm was swollen.  As asserted elsewhere in this pleading, upon information and belief, this was substantively no evaluation at all.  Christopher's vital signs just a few hours later are indicative, upon information and belief, that vital signs recorded for this encounter were likely false.

47.     Mr. Rivera recalled the second time that he saw Christopher that day.  It was after Christopher had apparently already suffered the medical emergency concluding in his death.  Upon further questioning, regarding the first occurrence, the Ranger read notes indicating that Christopher had complained of shortness of breath and being unable to breathe, that he was sweating, was scared, that he had pain in his left arm or shoulder area, and that the infection was getting to his bone.  Thus, likely as a result of Christopher's death, Mr. Rivera attempted to minimize information he had received during the initial encounter with Christopher.  Mr. Rivera, upon information and belief, consistent with Webb County policy, practice, and/or custom, was deliberately indifferent to Christopher's known life-threatening medical needs including through possible falsification of medical records.

f.     Sarquiz-Ortega, Mariana - RN

48.     Mariana Sarquiz-Ortega provided an oral statement related to and as a result of Christopher's death. Ms. Sarquiz-Ortega was a registered nurse, and she was working the 6:00 AM to 2:00 PM shift on the day that Christopher had the medical emergency concluding in his death (December 8, 2021). RN Sarquiz-Ortega recalls that she was working in the medical area of the Webb County jail on that day. She also recalls that Christopher was being held in a detox cell in the booking area, but that he had completed detox two days before. She also recalled providing antibiotics to Christopher.

49.     RN Sarquiz-Ortega also remembered that a day before, Christopher had not been very verbal. He had, however, shown her his arm and said that it was infected. She said that Christopher was not really understanding her when she asked him to lift his arm so that she could see it. RN Sarquiz-Ortega indicated that Christopher's arm looked normal. Upon information and belief, this was false. RN Sarquiz-Ortega admitted that she knew that Christopher was a heroin

addict. She also admitted that she did not even touch his arm – at all. RN Sarquiz-Ortega indicated that she started Christopher on antibiotics.

50.    Upon information and belief, Christopher had a significant altered mental status as a result of the infection raging in his system, and which was materially untreated.  Further, RN Sarquiz-Ortega's purported evaluation of Christopher amounted to no evaluation at all.  One cannot examine another person's arm for signs of infection, including abscesses, without touching it at all.  Upon information and belief, giving short shrift to Christopher's medical condition was consistent with Webb County policies, practices, and customs.

51.    Upon further questioning, RN Sarquiz-Ortega admitted that, when she asked Christopher to move his arm, and he apparently was not understanding her request, that she wasn't sure what was going on with Christopher "mentally."  RN Sarquiz-Ortega indicated that she was asking Christopher to move his arm one way, and yet he was twisting it another way. She admitted that she "couldn't really see the whole thing." She said that she then went to talk to LVN Rivera about an abscess, because she was a new nurse, only being at the jail for five months. Thus, she had not seen abscesses unless they were open and leaking. She indicated that LVN Rivera was her supervisor.

52.    RN Sarquiz-Ortega then in substance admitted that she did not know how to determine whether a detainee had an abscess. She asked her supervisor, "How can you see an abscess?" He then explained it to her. She then responded to her supervisor, "Because this one wasn't even that red actually. He was telling me that he thought it was infected, the inmate." She indicated that she could not recall Christopher's exact words but that he said that he felt that he had shot up wrong and that it was going to get infected. Rivera explained to RN Sarquiz-Ortega about looking for abscesses, what to look for if it's "warm and stuff." She admitted that she again never

touched Christopher's arm. Thus, she conducted no medical examination at all. RN Sarquiz-Ortega's supervisor indicated that Christopher likely did not have cellulitis, but probably had an abscess, because he was a heroin addict. RN Sarquiz-Ortega recalled those occurrences being between roughly 8:30 AM and 10:00 AM. Although she was not sure of the time, she was certain that these occurrences occurred before lunch.

53.    RN Sarquiz-Ortega also spoke about the day that Christopher suffered the medical emergency concluding with his death (December 8, 2021). She recalled a call about a detainee falling down. Her recollection was that it was she and Mr. Rivera who answered the call. She obtained a pulse oximeter, and she saw that Christopher was very agitated. He said that he could not breathe, and he was breathing rapidly. She put the pulse oximeter onto Christopher and was unable to obtain a reading. She was also unable to obtain a blood pressure reading using a blood pressure cuff. She also could not hear a heartbeat on the blood pressure cuff, but the pulse oximeter picked up a heart rate of 245. She said this was tachycardic. RN Sarquiz-Ortega indicated that tachycardic means a person's heart is beating really quickly. She said that a normal heartbeat is in the range of 60 to 100, and that a person is tachycardic if the person's heartbeat exceeds 100. She further said, "He was at 245. That's extremely tachy. First time I've seen that. And then the oximeter where it picks up oxygen as well, that one was at 60 or 65. It's on my notes as well. 60 or 65. And that's hypoxemia, lower than what needs to be. Your needs to be a 98, maybe you can get away with a 96. Anything lower needs medical attention." RN Sarquiz-Ortega admitted that what she had just stated was not in her notes.

### C.    Liability of Webb County

#### 1.    Introduction

54.     Plaintiff sets forth in this section of the pleading additional facts and allegations supporting liability claims against the County pursuant to *Monell v. Department of Soc. Svcs.,* 436 U.S. 658 (1978) and/or other applicable law.  It is Plaintiff's intent that all facts asserted in this pleading relating to policies, practices, and/or customs of the County support such liability claims, and not just facts and allegations set forth in this section.  Such policies, practices, and/or customs alleged in this pleading, individually and/or working together, and whether supporting episodic acts and omission and/or conditions of confinement claims, were moving forces behind and caused the constitutional violations and damages (including death) referenced herein.  These policies, practices, and/or customs are pled individually and alternatively.  The County knew, when the County incarcerated the decedent, that its personnel, policies, practices, and/or customs were such that it  could or would not meet constitutional obligations to protect the decedent, including but not necessarily limited to through provision of medical care. Further, consistent action and inaction by a number of Webb County employees and/or agents, specifically with regard to the decedent, confirms policies, practices, and/or customs in this complaint.  The County made decisions about policy and practice which it implemented through its commissioner's court, its sheriff, its jail administrator, and/or through such widespread practice and/or custom that such practice and/or custom became the policy of the County as it related to its jail. Regardless, the Fifth Circuit Court of Appeals has made it clear that Plaintiff need not allege at the pleading stage the identity of chief policymakers.

55.     There were several policies, practices, and/or customs of the County which were moving forces behind, caused, were producing causes of, and/or proximately caused the decedent's suffering and death, and other damages referenced in this pleading. The County made deliberate decisions, acting in a deliberately indifferent (potentially applied only to any episodic act claims

but not to alleged conditions of confinement claims) and/or objectively unreasonable manner, when implementing and/or allowing such policies, practices, and/or customs to exist. Further, when the County implemented and/or consciously allowed such policies, practices, and/or customs to exist, it knew with certainty that the result would be serious injury or illness, suffering, and/or death.

### 2.    Sepsis

#### a.    Well-Known Risk in Jails

56.    The occurrence of sepsis in a detainee is a well-known and common risk to detainees with infections generally, and even more so for those detainees who engage in illegal IV drug use. Defendant was aware of this risk not only generally, but even more specifically as a result of day-in, day-out interaction with detainees, as well as prior lawsuits regarding detainee deaths and the resulting requirement that significant funds were paid to settle those lawsuits. Upon information and belief, the Defendant was also aware of signs and symptoms of sepsis referenced in this "sepsis" section of this pleading.

57.    Sepsis is a global public health problem, resulting in more than three million hospitalizations per year. Over 5.3 million people die every year from sepsis. It is the tenth leading cause of death in the United States, and the number of deaths from sepsis each year is more than the total number of deaths caused by prostate cancer, breast cancer, and AIDS combined. More people are hospitalized in the United States for sepsis each year than are those who are hospitalized for acute myocardial infarction (a heart attack). Thus, medical professionals are more familiar with deadly sepsis than they are with heart attacks. The occurrence of sepsis is so well-known in the worldwide medical community that 90% of physicians believe that sepsis results in a significant financial burden on the healthcare system in their respective countries. However,

sepsis, properly treated, can be cured. In fact, nearly three-fourths of those receiving treatment survive.

58.    Sepsis is a life-threatening organ dysfunction syndrome caused by a person's bodily response to a particular infection. If sepsis is untreated, it can lead to septic shock and death. More generally, sepsis is a severe inflammatory response to infection. This has been known since the days of the Ancient Greeks. Thus, significant inflammation connected with a potential infection would cause all competent healthcare providers to immediately seek emergency medical treatment in an appropriate facility.

59.    A delay in sepsis diagnosis, and ultimately treatment, is connected with a significantly increased likelihood of death. Thus, if any signs of sepsis are present, a healthcare provider, and/or jailer incarcerating someone involuntarily, must take swift action to obtain needed medical treatment.

60.    According to the Mayo Clinic, to be diagnosed with sepsis, a person must exhibit at least two of the following symptoms plus a probable or confirmed infection:

- body temperature above 101 degrees Fahrenheit or below 96.8 degrees Fahrenheit;
- heart rate higher than ninety beats per minute; and/or
- respiratory rate higher than twenty breaths per minute.

Severe sepsis would occur if, in addition to two of the above-referenced symptoms, a person has at least one of the following signs and symptoms:

- significantly decreased urine output;
- abrupt change in mental status;
- decrease in platelet count;
- difficulty breathing;
- abnormal heart pumping function; and/or
- abdominal pain.

Finally, a person would have septic shock when the person has the signs and symptoms of severe sepsis and in addition extremely low blood pressure that does not adequately respond to simple fluid replacement.

61.    The Centers for Disease Control and Prevention ("CDC") lists four types of infections that are often linked with sepsis:

- lungs (pneumonia);
- kidney (urinary tract infection);
- skin; and/or
- gut.

The CDC also writes that an infection occurs when germs enter a person's body and multiply. When the infection is not resolved, it can cause sepsis.  Moreover, the CDC writes that, to properly address sepsis, one must know the symptoms.  Further, "ACT FAST.  Get medical care IMMEDIATELY when an infection is not getting better or if it gets worse."  The CDC indicates that there is no single symptom of sepsis, but that symptoms can include a combination of any of the following:

- confusion or disorientation;
- shortness of breath;
- high heart rate;
- fever, or shivering, or feeling very cold;
- extreme pain or discomfort;
- clammy or sweaty skin.

62.    The Sepsis Alliance notes that, according to a study published in 2014, 2.6 percent of people in the United States over the age of 13 years inject themselves with drugs.  Further, people who do so are at risk for a number of illnesses, including Hepatitis and HIV.  Nevertheless, writes Sepsis Alliance, whether such people use drugs occasionally or are addicted to them, each time they inject a drug, they increase their risk of contracting infections and developing sepsis.

This is well-known in the jail and corrections community, and, upon information and belief, specifically by Defendant.  Defendant was also aware that several types of infection can be caused by injecting bacteria from used or dirty needles, or by failing to clean the skin before an injection (as would be common with illegal IV drug users.

      63.    Moreover, the most common infection affecting people who inject drugs is cellulitis.  Cellulitis is a type of infection that affects the skin and underlying tissue, and it causes redness and pain to advance up an affected limb.  When people inject IV drugs, they are at risk of cellulitis from bacteria and even fungi.  Ultimately, proper recognition and diagnosis of sepsis is a race against time and one which, if lost, results in death.

      64.    Laredo Physician Rafael Deliz, a pulmonologist and the medical director of Doctors Hospital Intensive Care Unit, spoke during an interview about sepsis.  Dr. Deliz said:

> . . . [S]epsis is a . . . dysregulated responses.  "Dysregulated" means its out of control and the body reacts with excessive response to an invasion of an infectious organism like a bacteria, a virus.  It's a high cause of death in the United States, more than even cancer.
>
>       *      *      *
>
> [Some of the signs of sepsis] that worry that cause that are a high respiration above 22 per minute.  If you are breathing more than 22 times a minute, that's a sign of sepsis.  If you have dizziness and you're sweating, and you feel very weak, that's another sign of sepsis because it may be that you have low blood pressure and that's another sign of sepsis, low blood pressure.  The other sign is altered mental status.  When you talk to somebody who has an infection, and he's talking incoherently, and he doesn't sound like the person he's 100% there, that's a dangerous sign of sepsis.  These three signs are the most important signs in the medical literature after review of one-million (1,000,000) medical records in ten years in major institutions in the United States.
>
>       *      *      *
>
> [Sepsis is] an extreme emergency.  When you have sepsis, you have to receive an antibiotic within thirty minutes or less.  Most of the time we don't have that time frame, but if you feel that you are very sick and you have pain in your body, you're coughing, and you're dizzy, and you're breathing very fast, blood pressure is low, you have to call the 9-1-1, and in the hospital, they have to take blood cultures.

They have to culture your urine, your phlegm, and start antibiotics immediately because for hour you delay the treatment the mortality increases 10-5% per hour. If you wait too late at least the unfortunate case of some patients arriving at the hospital, the mortality increases significantly so the earlier you intervene, the higher the success.

*     *     *

[M]y recommendation is don't delay the process.  Unfortunately, there are cases I see in the Intensive Care Unit that they don't survive are the patients that delay the process.  They feel sick, and their stubbornness or not going to be in a hospital caused them a serious, life-threatening illness. . . . It's a life-threatening condition, so don't delay the process.  That's my message today, don't delay the process.  If you don't feel okay, with fever, dizziness, you see your relative as talking incoherently, immediately you have to send the patient to the emergency room.

*     *     *

At Doctors Hospital, we have a sepsis protocol, and we are perfection in this process for the last two years according to the Surviving Sepsis Guidelines according to the Society of Critical Care Medicine.  We have very good numbers about sepsis.  For example, in the patients that entered the hospital, we have a high percentage of blood cultures and immediate antibiotic use, higher than the others in the nation.  In good compliance with the recommendations of the . . . organizations in this field, we have an intensive care unit with well-trained nurses and staff.  We do rounds every day on sepsis patients – multidisciplinary with every specialty, nursing, respiratory therapy, nutritionists, pharmacy, the medical director.  Everybody's a team work trying to make the patient healthier, making him to survive.  We are ready for these types of complications.

Thus, the decedent was in a great community (Laredo) in which he could have obtained lifesaving medical treatment.  As a result of deliberate indifference or one or more natural persons, and/or the policies, practices, and customs of the Webb County jail, the Decedent did not receive such care early enough to ameliorate his suffering and prevent his death.

### b.     Webb County Sued for Virtually Identical Sepsis Death

65.     There was a virtually identical death in the Webb County jail in 2015, and for which Webb County was sued.  A number of depositions were taken in that case and, ultimately, a significant amount was paid to settle the case.  Webb County unfortunately did not modify its

conduct, and Christopher suffered and died as a result.  The prior death was of Mario Alberto Andrade Jr.

66.    Mario was arrested and ultimately jailed in the Webb County jail on November 20, 2015.  A Webb County jail EMT medically screened Mario.  He noticed that Mario had slurred speech.  He took Mario's heart rate and noted that it was 132 beats per minute at rest, a grossly increased vital sign.  As an EMT trained to assess, manage, and stabilize acute emergencies, he knew that substantial tachycardia at rest required immediate investigation to determine the cause of the abnormality because a markedly elevated heart rate could be indicative of a life-threatening physical condition.  He knew that tachycardia could indicate a drug overdose, a dangerous cardiac arrhythmia, or a thyroid storm.  Most importantly, he knew as an EMT that he was not qualified to assess or diagnose a potentially threatening medical condition, and that Mario should be seen immediately by an emergency physician at a local hospital to determine the cause of the elevated heart rate.

67.    The EMT ignored the tachycardia, as well as the slurred speech and confusion Mario was already noted to have.  He also ignored the unsteady gait Mario can be observed to have from jail security video.  As an EMT, he knew that the combination of symptoms exhibited by Mario was in need of medical attention and should be transported to a hospital for appropriate assessment and medical care to take place.  He ignored these indicators of a substantial risk of serious harm to Mario's physical health and refused to seek further medical assistance for Mario. Instead, the EMT placed Mario on a fifteen-minute observation for twenty-four hours so that he could be re-evaluated.  He did so even though having knowledge as an EMT that simply putting someone on observation, without obtaining emergency medical intervention, was insufficient to actually alleviate a significant medical problem.  The EMT made a conscious choice not to ask

that Mario be admitted to a hospital but instead allowed him to stay in a cell, without any medical treatment whatsoever, until the following day.

68.     Webb County's criminal investigation custodial death report ended with in part, "The Medical Examiner's Autopsy Report read that this 30-year-old Hispanic male, Mario Alberto Andrade, died from probable sepsis arising from a skin infection, most likely an infected injection site.  He had been consuming cocaine prior to his death."  Mario's death was fully preventable, if only Webb County's policies, practices, and customs had resulted in Mario receiving life-saving medical treatment for sepsis at a Laredo hospital.

69.     The custodial death report filed by the Webb County Sheriff's Office with the Texas State Attorney General indicates that Mario was initially in custody at the jail at 5:00 p.m. on November 20, 2015 and ultimately was pronounced deceased approximately two days, seven hours later between 12:09 a.m. and 12:19 a.m. on November 23, 2015.  Ironically, Mario died at the place that he should have been taken in the beginning – Laredo Medical Center.  The custodial death report also indicates that Mario was found in his cell at approximately 11:30 p.m. on Sunday, November 22, 2015.  Thus, due to Mario being non-responsive at the time life-saving methods were finally used, he likely died some time earlier.  The report also indicates that Mario, upon entry to the jail, was "intoxicated."

70.     Webb County Chief Medical Examiner Corinne E. Stern provided the written opinion that Mario "died from probable sepsis arising from a skin infection, most likely an infected injection site."  The autopsy was performed at or about 1:00 p.m. on November 23, 2015.  Dr. Stern wrote, "There was a visible edema of the right knee with erythema of the skin of the left thigh and posterior knee."  In sepsis, tissue edema can develop.  "Edema" is swelling caused by excess fluid trapped in a body's tissues.  Erythema means reddening of the skin, usually occurring

in patches.  Dr. Stern also wrote, "Needle injection sites were present on the right posterior thigh."
Upon information and belief, Mario used no illegal drugs during incarceration at the jail.

71.    Webb County was sued as a result of Mario's death, and the case was vigorously
litigated.  A number of depositions were taken, and Webb County ultimately settled the case before
trial.  Plaintiff references to the PACER case file, and documents included in it, to show additional
knowledge gained by Webb County through litigation of that case and which is relevant to claims
in this case.

72.     Depositions taken in the lawsuit filed regarding the death of Mario Andrade, Jr.
revealed the total lack of knowledge, education, and training about sepsis in the Webb County jail.
Maria Vaillancourt Russell, a Webb County employee, testified that she did not know the meaning
of the word "sepsis." She further testified that she did not have any idea as to what sepsis was.
Webb County employee Hortencia Avalos testified similarly. When asked whether she knew what
the word "sepsis" meant, her response was simply, "No." She had also not been trained at the Webb
County jail regarding even detainees who might have a cold or flu and how they are to handle
them.

73.    Webb County employee Julio Arriaga testified similarly. He knew about the word
"sepsis," and he had seen a sign about sepsis in an emergency room at a hospital while he was
waiting for a detainee who had been treated. Regardless of that knowledge, he testified that there
had never been any training provided to him by Webb County or the Webb County jail regarding
sepsis. Perhaps even more troubling, Captain Jaime Magana, when asked about any policies
regarding recognizing sepsis in detainees in the jail, responded in part that unless a detainee himself
told medical staff, "I have this. I have that," in substance that they would just all be treated the
same way. He also testified in substance that any "voiced" medical conditions or medical concerns

would be treated. He moreover testified that Webb County did not have in place any policies to help its jail employees recognize when an inmate had sepsis or recognize when an inmate had an infection.

74.    A medical defendant in that case, Orlando Villanueva, likewise testified during a deposition. Mr. Villanueva was aware of sepsis, as he had taken paramedic courses and had gone through EMT training. He understood, only through his medical training and not as a result of any training provided by Webb County, that sepsis would present certain symptoms. He also admitted that if a person has some kind of infection, and some sepsis symptoms, it is important to watch for development of sepsis. He also testified that based on his education, experience, training, and background, a hospital is the appropriate setting to treat sepsis. A hospital would do so through IV antibiotics. He also admitted that since he had worked at the Webb County jail, there had not been any written policy of which he was aware regarding sepsis. He further admitted that the Webb County jail did not provide to him, or to his knowledge, anyone else at the jail, training regarding sepsis. He further admitted, consistent with a statement provided in this case, that sepsis requires blood work in order to determine whether it is active in a patient. When asked whether sepsis is a medical emergency, his one-word response was, "Yes."

75.    Defendant-physician Arturo Garza-Gongora also testified in that case. He testified that he had seen plenty of people, when he worked in an emergency department of a hospital, that either had sepsis when they appeared or developed sepsis once they got to the hospital. He described sepsis as a derangement of the body in response to an infection. He said that the body reacts to an infection and produces a cascade of events that causes a person's body to react to an infection that should not be there, whether bacterial or otherwise.

76.     He also agreed that sepsis was a medical emergency, and that if a person is sick for a period of time, and has sepsis, it increases the chance of death. He also said that, when he determines in his office that a person has sepsis, he calls "911" to send the person to the emergency room.

77.     He agreed that a person that has sepsis needs to be taken to a local emergency room at a hospital as soon as possible. He testified that treatment for sepsis included administration of antibiotics, replacement of fluids. There were also people that, when he worked in an emergency department, who had sepsis, and who received treatment, did not die. He also admitted that, at the time of Mr. Andrade's death, the Webb County jail did not have any sepsis-specific policies. Further, at the time of that death, there was no protocol to recognize sepsis or treat sepsis at the Webb County jail.

78.     These depositions were taken in late March 2021. Upon information and belief, the county commissioners, county judge, sheriff, and jail administrator became aware shortly afterward of material information described above.

3.     Webb County Policies, Practices, and Customs

79.     Plaintiff lists beneath this heading the County's policies, practices, and/or customs which Plaintiff alleges, potentially at times upon information and belief, caused, proximately caused, were producing causes of, and/or were moving forces behind all damages referenced in this pleading, including the decedent's death. Thus, the County is liable for all such damages. These policies, practices, and/or customs worked individually, and/or in the alternative together, to cause the decedent's death and all other damages asserted in this pleading. Plaintiff pleads conditions of confinement claims arising from policies, practices, and/or customs. Deliberate indifference is not an element of, or a requirement to prove, conditions of confinement claims. In

the alternative, Plaintiff pleads episodic act and/or omission claims arising from policies, practices, and/or customs. Plaintiff pleads, to the extent necessary, that deliberate indifference underlying episodic act and/or omission claims, upon information and belief, occurred with regard to relevant actors. Regardless, Plaintiff asks that the court apply the correct law to the facts pled, as required by United States Supreme Court precedent.

80.      One or more courts have recognized that it is exceedingly rare that a Plaintiff will have access to or personal knowledge of specific details regarding the existence or absence of a defendant's internal policies or training procedures before discovery. Thus, at the pleading stage, a plaintiff is merely required to put a governmental entity or private corporation on fair notice of the grounds for which it is being sued. Federal courts must rely on summary judgment to weed out unmeritorious claims. Plaintiff thus pleads the following policies, practices, and customs, which give rise to conditions of confinement claims, or in the alternative episodic act and/or omission claims:

- Webb County failed to monitor or in the alternative had inadequate monitoring of detainees.  This was evidenced in part by one witness's assertion, described above, that the policy in the jail regarding "close observation" medical cells was simply to look in and make sure that a "inmate was alive."  Thus, an issue would arise only after an inmate was actually deceased or so close to being deceased that it was evident that medical issues had progressed to an irreversible point.  This policy was also evidenced by a log book not being used, as described in this pleading.

- Upon information and belief, Webb County failed to reprimand and/or take remedial action against employees and/or agents as a result of action and/or inaction related to the decedent's suffering and death, thus confirming that the policies, practices, and/or customs which led to such suffering and death were in fact *de facto* policies of Webb County.

- Webb County, while knowing that detainees needed immediate emergency medical care, would continue incarcerating such detainees in lieu of obtaining such needed care.

- Webb County, in the alternative, while monitoring detainees, failed to take action based upon material information obtained during such monitoring regarding serious health issues. This was due in part, as may be true with other potential policies, practices, and/or customs, to attempt to save costs.

- Webb County would take actions designed to save Webb County costs, by failing and/or refusing to transport to a local emergency room detainees who vitally needed emergency medical care.

- Webb County failed to provide and/or delayed providing medical treatment to detainees.

- Upon information and belief, Webb County may haave treated detainees without apparent health insurance, Medicare coverage, or Medicaid coverage differently than those with such coverage. Webb County knew that Christopher would be unable to pay for any healthcare treatment he received while incarcerated. Christopher completed a Texas Health and Human Services application for healthcare assistance, indicating that he had no money in his commissary or jail account. He also indicated that he had received no income the month prior to incarceration, which would include, according to the form, government checks, money from work, money from charging room and board, cash gifts, loans, and contributions from relatives and/or others, as well as loans themselves. Christopher also completed a form entitled County Indigent Health Care Program Case Record Information Release, in which the pre-printed portion indicates that Christopher was granting permission for the County Indigent Healthcare Program to obtain information which may have a bearing on his eligibility for financial assistance.

- Upon information and belief, Webb County may have only contacted EMS and/or transported a person to a local hospital if the person appeared to be near death or had become nonresponsive.

- Upon information and belief, Webb County employees may not have responded, or in the alternative not responded appropriately, to serious medical and/or mental health situations which were visible and apparent through a video feed.

- The Webb County jail has had a long-term relationship with Arturo G. Garza-Gongora, M.D., for detainee medical services. A written agreement between Dr. Garza-Gongora and Webb County, effective at the time of Christopher's death, indicated that the doctor would make visits to the jail only on Monday and Wednesday of each week, for two hours, beginning at 1:00 PM and concluding at 3:00 PM "for the purpose of providing all

necessary medical services to adult inmates." The hours could vary based upon the number of detainees to be serviced, and that physician would be on call 24 hours per day. However, upon information and belief, based upon the typical number of detainees in the Webb County Jail at any given time, this schedule and the services of only one physician were woefully inadequate. A 2022 jail census regarding the Webb County Jail contained information regarding a number of statistics and issues. It showed, for January 2022, the month following Christopher's death, that the average number of detainees generally housed in the jail each day was 435.7, and the average number of detainees kept in holding cells each day was 24.9. The contract also provided that Dr. Garza-Gongora would assist Webb County in guidance and preparation of the annual medical budget. The contract acknowledged that Dr. Garza-Gongora was to attempt to reduce costs to Webb County in situations where a detainee would qualify or had existing medical coverage by third party payors such as private insurance, Medicare, or Medicaid. Webb County would pay, and the physician would be entitled to reimbursement for, all hospital bills, ambulance services, and other reasonable necessary expenses for services rendered.

- Upon information and belief, Webb County had no policy and provided no training regarding recognition of pneumonia in detainees and, after making such recognition, how to take appropriate actions (such as transporting a person to the emergency department of the local hospital).

- Upon information and belief, Webb County had no policy and provided no training regarding recognition of sepsis in detainees and, after making such recognition, how to take appropriate actions (such as transporting a person to the emergency department of the local hospital).

- Upon information and belief, Webb County had no policy and provided no training regarding recognition of IV drug user–specific healthcare issues and, after making such recognition, taking appropriate actions.

- Upon information and belief, Webb County had no policy and provided no training regarding obtaining blood tests for detainees who were known IV drug users, and/or had known infections, and, after obtaining such blood tests, taking appropriate actions (such as transporting a person to the emergency department of the local hospital).

- Upon information and belief, Webb County had a policy of not obtaining a medical clearance at a local hospital for known heroin/IV drug users, such as Christopher.

- Upon information and belief, Webb County had a custom or practice, but not a written policy, to simply take detainees to "medical" when they complained, not conduct any evaluation of any substance, and then return

such detainees to their cells, just so that figurative "boxes could be checked."

- Upon information and belief, Webb County may have had a custom or practice, but not a written policy, to not conduct evaluations of detainees with serious medical issues but instead simply to provide medication based upon standing orders and not based on a detainee's specific medical needs. This would result in subtantively no medical treatment at all. Some evidence of this is the failure of RN Sarquiz-Ortega to even touch Christopher's arm when she was supposedly medically evaluating him.

### 4.    TCJS Records Demonstrating County Practices and/or Customs

81.    TCJS reports and documents regarding inspections of County's jail further demonstrate these and other policies, practices, and/or customs which, when applied individually and/or working together, caused, were proximate causes of, producing causes of, and/or were moving forces behind damages (including death) asserted in this pleading. Upon information and belief, at least one county commissioners represntative, the sheriff, the county judge, and the Webb County jail administrator would receive copies of and/or notifications regarding the substance of inspection reports evidencing Texas Commission on Jail Standards inspections.

82.    On August 1, 2011, the Texas Commission on Jail Standards (TCJS) inspected the Webb County Jail. As a result, the TCJS determined that deficiencies existed. Webb County was urged to give areas of non-compliance its serious and immediate consideration, and to promptly initiate and complete appropriate corrective measures. TCJS notified Webb County that its failure to initiate and complete corrective measures after receiving the notice of non-compliance could result in issuance of a remedial order.

83.    TCJS, when reviewing records, determined that Webb County was not completing the entire screening form for all detainees immediately upon admission to the jail. Moreover, information and records received and reviewed by TCJS received from Webb County officials

revealed that Webb County was not completing face-to-face observations of all detainees at least once every hour, and at least every 30 minutes in areas in which inmates were known to be assaultive, potentially suicidal, mentally ill, or who had demonstrated bizarre behavior. By way of example, detainee Trevino was placed on a 15-minute watch by medical personnel. However, there were several instances where there were up to 25 minutes between checks of Mr. Trevino.

84.    The TCJS inspected the Webb County jail again from June 4 through 6, 2018. When reviewing medication administration forms, TCJS inspectors found that detainees were not signing for medication when received or refused. A TCJS inspector also noticed that, on occasion, jail staff did not consistently complete the health screening form by signing the bottom of the form, and moreover did not consistently answer the Continuity of Care Query (CCQ) questions as required. A CCQ determines if a detainee has received inpatient mental health assistance previously.

85.    The TCJS inspected the Webb County jail again from May 7 through 8, 2019. While reviewing the Webb County suicide prevention plan, the inspector learned that Webb County jail administration were not providing annual training according to the approved plan. The inspector recommended a plan of action to train all employees in accordance with the approved plan, and administration had to email to the Inspector a roster of training of all floor officers within the following 30 days. The inspector also noted and recommended that jail administration implement a plan of action to correct a number of sanitation issues.

86.    On August 29, 2022, the TCJS sent a letter to the Webb County judge and Webb County sheriff. That letter indicated that TCJS was notifying the Webb County that the Webb County jail failed to comply with minimum standards under Texas law. TCJS indicated that a review of video recordings submitted after a custodial death in the Webb County jail revealed that observation rounds were not conducted as required by minimum jail standards. Webb County Jail

Administration had to submit a corrective plan of action to the inspector, as well as another inspector, within 30 days. That corrective plan of action had to include training for jail staff.

### 5.    Suffering and Death of Other Detainees

87.    Other suffering and death in the Webb County jail support *Monell* liability. On November 5, 2015, only fifteen days before Mario Andrade, Jr. beginning his short incarceration at the Webb County jail, Gary Spaulding was screened by medical staff upon being admitted to the jail.  Notably, as with Mario, the screening occurred after 5:00 p.m.  Mr. Spaulding indicated that he was an alcoholic, and he requested detox.  He, allegedly, like Mario (according to Webb County documents), was placed under fifteen-minute "observation" for signs and symptoms of alcohol withdrawal.  Mr. Spaulding passed away in a cell at the Webb County jail approximately twenty-five hours after initially being incarcerated.  Upon information and belief, as with Mario, the jail's fifteen-minute alleged "observations" of Mr. Spaulding were insufficient to treat what were clearly serious and life-threatening medical needs.  Upon information and belief, Webb County was doing its "rubber stamp" monitoring, without taking any action to assist Mr. Spaulding.  This put Webb County on notice that it should immediately change its practices and procedures regarding mere "observations" of inmates with known serious medical needs and/or who were under the influence of alcohol or another mind-altering substance.  Upon information and belief, Webb County took no action to change its policies and procedures after the death of Mr. Spaulding.

88.    Only five days before Mario arrived at the Laredo County jail – on Sunday, November 15, 2015 – an inmate hung himself (ultimately dying a few days later).  According to a custodial death report, filed by the Webb County Sheriff's Office with the Texas State Attorney

General, Louis Alberto Bravo-Garcia, just a few years older than Mario, being 34 years old at the time of his death, attempted suicide by hanging.

89.    Jail mental health notes created approximately one month before, which were apparently the last time notes were taken for Mr. Bravo-Garcia, indicated that Webb County Sheriff's Office Mental Health Specialist Jose Louis Macias recommended that Mr. Bravo-Garcia be cleared to re-classify (still being on fifteen-minute "observations"). Texas Rangers investigated the death and receiving conflicting information from Webb County jail employees about whether Mr. Bravo-Garcia was on suicide watch.

90.    A Texas Ranger was told that Mr. Bravo-Garcia was not on suicide watch due to not having a clipboard beside the window to his cell with an observation sheet attached to it. A Texas Ranger was also told that Mr. Bravo-Garcia was on suicide watch at a prior time, but that he was not on suicide watch at the time he attempted to kill himself. LVN Chavarri, a Webb County jail employee, told a Texas Ranger that he read Mr. Bravo-Garcia's chart and believed that Mr. Bravo-Garcia should have been on suicide watch. Further, providing additional conflicting information, Correctional Officer Esquinca told a Texas Ranger that Mr. Bravo-Garcia was not on fifteen-minute observations to his knowledge. Corporal Flores stated that LVN Chavarri said that Mr. Bravo-Garcia was not on observation, but then later said that Mr. Garcia was on observation.

91.    The Texas Rangers report paints a picture of a jail with a total lack of communication. Sergeant Ramos affirmed as much to the Texas Ranger, indicating he felt like there was a communication issue due to Mr. Bravo-Garcia being removed from suicide watch but still being on observation watch. Mario was taken, involuntarily, into this dangerous situation. Webb County had a duty and obligation to protect him, provide reasonable medical care, and not to punish him as a pretrial detainee by forcing him to die in a cell, alone, and untreated.

92.    Mr. Spaulding's and Mr. Bravo-Garcia's deaths were not isolated incidents, but instead were preceded by incidents in the Webb County jail going back for years.  On November 5, 2002, Webb County and Webb County Sheriff Juan Garza were sued as a result of the death of Juan Saldivar.  Upon information and belief, the Sheriff and people in the Sheriff's department, thus being employees at Webb County, had been provided with detailed information regarding the flow of illegal drugs into the Webb County jail through corrections officers and other employees.  Upon information and belief, Mr. Saldivar was provided with drugs in the Webb County jail which resulted in and caused his death.  Despite this knowledge, upon information and belief, Webb County failed to implement policies and procedures, provide sufficient training to employees, and provide a high enough level of medical personnel (and also appropriate staffing) to address the death of inmates related to drug use.

93.    On December 30, 2004, Webb County and Webb County Sheriff Juan Garza were sued as a result of the death of Jorge Alberto Meza.  Upon information and belief, Mr. Meza was provided with illegal drugs, while being incarcerated in the Webb County jail, and which lead to and caused his death.  Webb County should have implemented appropriate policies and procedures to observe inmates who, like Mario, appeared intoxicated and/or high as a result of substance use and/or abuse.  Upon information and belief, as a result of Mr. Meza's death, policies sufficient to avoid Mario's death were not implemented.  Upon information and belief, Webb County became well-aware of risks to drug-using inmates, including infection and sepsis, years before Mario was involuntarily incarcerated.  Thus, at the time of Mario's incarceration, Webb County was fully aware of policies, procedures, and practices that it needed to have in place.

94.    On April 28, 2011, a little more than four years prior to Mario's incarceration at the Webb County jail, Webb County was sued as a result of the death of Rodolfo Moreno, Jr.

Case 5:23-cv-00137     Document 1     Filed on 12/01/23 in TXSD     Page 44 of 53

Allegations in paragraphs regarding this incident are pled upon information and belief. On or about April 28, 2009, the day before Mr. Moreno died, his parents visited him at the Webb County jail. Mr. Moreno had called earlier that day to tell his parents that he will feeling ill. His parents noticed when visiting him that he was incoherent and looked very ill. Mr. Moreno looked dazed and kept swaying back and forth. His eyes were also rolled back in his head. They were concerned for their son, because he could not even sit up straight when they were visiting with him. Mr. Moreno's mother called the guard on duty and explained that her son looked ill. She also asked that her son be checked out medically. The guard told Mr. Moreno's mother that he would be looked at by Webb County medical staff. Mr. Moreno's mother was assured that her son would be provided with care, and Mr. Moreno's parents left the jail.

95.     Mr. Moreno's mother called the jail nurse to be sure that her son was receiving treatment. She was told by a purported registered nurse in charge, Mr. Elizondo, that her son simply had tonsillitis. She was told not to call back because her son was fine. However, the following day, Mr. Moreno's mother received a call from a federal agent and was told that her son had died. This description of the facts leading to Mr. Moreno's death shows more than a high level of incompetence, but instead deliberate indifference to Mr. Moreno's serious medical needs.

96.     On November 24, 2015, Luis Bravo-Garcia passed away days after a suicide attempt. He was found attempting to hang himself in his cell on November 15 and was taken to the hospital for treatment. Still in critical condition, his family elected to remove him from life support, and he was pronounced deceased.

97.     On September 6, 2016, Pedro Cadena, Jr. died after suffering from a seizure in his detox cell. The report states that Mr. Cadena appeared to be in good health on arrival at the jail, but requested to be put in detox, where he would "randomly choose to participate in taking

Plaintiff's Original Complaint – Page 44 of 53

medication for detox." Once jailers discovered Mr. Cadena seizing in his cell, he was taken to the hospital where he suffered a cardiac arrest and was pronounced deceased.

98.    On December 15, 2016, Federico Reyes was found after hanging himself in his cell. Jailers began life-saving measures on Mr. Reyes, but he was ultimately pronounced deceased at the hospital. The report states that Mr. Reyes was placed in a protective segregation cell, but also states that he exhibited no signs of medical or mental health issues.

99.    On July 14, 2018, a medical emergency was called for Pedro Serna after it was discovered that he was not breathing and was unresponsive. Despite efforts, Mr. Serna was pronounced deceased at the hospital. His cause of death was attributed to liver cirrhosis and hepatitis C.

100.    On July 13, 2018, Luis Barrientos was taken to medical after showing signs of extreme weakness—defecating on himself and becoming unable to stand or walk on his own. He collapsed again on the way to medical and was taken to the hospital, where he was pronounced deceased. His official cause of death was sepsis secondary to acute endocarditis and pneumonitis. Webb County settled a lawsuit against it for $1,325,000.00 arising out of the death of Mr. Barrientos. According to a news article referencing the settlement, Mr. Barrientos "died of a treatable infection while in pre-trial detention at the jail after his medical needs were ignored for days." This allegation was from a legal advocacy organization. The lawsuit was filed well before Christopher's death, in May 2020, on behalf of Mr. Barrientos' mother. Mr. Barrientos had been booked into the jail long before that date, such booking occurring on June 26, 2018.

101.    Mr. Barrientos allegedly told jailers that he had chest pain and needed medical attention, and yet failed to receive the attention he needed. As had happened years before, and as happened with Christopher, an autopsy report revealed that Mr. Barrientos died from sepsis.

According to a statement or press release by Public Justice during the discovery phase in the lawsuit, it was revealed that Webb County destroyed key evidence, including videos and observation logs, which would have shown jailers who were responsible for monitoring Mr. Barrientos in the days leading to his death. Less than Twenty-Four hours after Mr. Barrientos' death, another detainee in the same cell also died of a medical condition.

102.    On October 1, 2021, Ashley Castro was found unresponsive on the floor of her cell. Life-saving measures were attempted by jailers and responding EMS personnel until Ms. Castro was pronounced deceased. The report states that Ms. Castro died from complications of COVID.

103.    On April 28, 2022, Brian McQuarrie died following several incidents resulting in injuries while incarcerated. The report does not indicate if Mr. McQuarrie was housed in a single cell, but states that he exhibited mental health issues, as well as answering "unknown" as to whether or not he exhibited any medical issues. His cause of death was determined to be due to deliberately impacting food in his airway, leading to choking.

104.    On May 12, 2023, Jorge Duenas was found unresponsive in his cell over three hours after covering his cell with a blanket. He was later pronounced deceased, with the autopsy citing aortic dissection as his cause of death. The report notes that Mr. Duenas exhibited signs of medical problems on entry to the jail, but it does not appear that he was on any kind of medical watch.

III.    Causes of Action

A.    Fourteenth Amendment Due Process Claims Under 42 U.S.C. § 1983: Objective Reasonableness Pursuant to *Kingsley v. Hendrickson*

105.    In *Kingsley v. Hendrickson,* 135 S. Ct. 2466 (2015), a pretrial detainee sued several jail officers alleging that they violated the Fourteenth Amendment's Due Process Clause by using excessive force against him. *Id*. at 2470. The Court determined the following issue: "whether, to

prove an excessive force claim, a pretrial detainee must show that the officers were *subjectively* aware that their use of force was unreasonable, or only that the officer's use of that force was *objectively* unreasonable." *Id.* (emphasis in original). The Court concluded that the objectively unreasonable standard was that to be used in excessive force cases, and that an officer's subjective awareness was irrelevant. *Id.* The Court did so, acknowledging and resolving disagreement among the Circuits. *Id.* at 2471-72. The Court flatly wrote "the defendant's state of mind is not a matter that a plaintiff is required to prove." *Id.* at 2472. Instead, "courts must use an objective standard." *Id* at 2472-73. "[A] pretrial detainee must show only that the force purposefully or knowingly used against him was objectively unreasonable." *Id.* at 2473. Thus, the Court required no *mens rea*, no conscious constitutional violation, and no subjective belief or understanding of offending police officers, or jailers, for an episodic claim but instead instructed all federal courts to analyze officers', or jailers', conduct on an objective reasonability standard. Since pretrial detainees' rights to receive reasonable medical and mental health care, to be protected from harm, and not to be punished at all, also arise under the Fourteenth Amendment's Due Process Clause, there is no reason to apply a different standard when analyzing those rights.

106.    Thus, the trail leads to only one place – an objective unreasonableness standard, with no regard for any natural person's subjective belief or understanding, should apply in this case and all pretrial detainee cases arising under the Due Process Clause of the Fourteenth Amendment. The Fifth Circuit, and the district court in this case, should reassess Fifth Circuit law in light of *Kingsley* and apply an objective unreasonableness standard to appropriate constitutional claims in this case. The court should not apply a subjective state of mind and/or deliberate indifference standard. The Supreme Court discarded the idea that a pretrial detainee should have such a burden.

107.     This *Kingsley* section potentially applies, depending on the status of the law at application, only to any claims that ultimately might ever be asserted against natural persons, or any episodic act and/or omissions claims against County. Plaintiff makes no allegation or stipulation that deliberate indifference would necessarily be a requirement in such a situation. Regardless, deliberate indifference is not a requirement to show conditions of confinement claims against County. Further, Plaintiff currently has no intent to seek to add any natural persons as defendants to this case.

### B.     Remedies for Violation of Constitutional Rights

108.     The United States Court of Appeals for the Fifth Circuit has held that using a state's wrongful death and survival statutes creates an effective remedy for civil rights claims pursuant to 42 U.S.C. § 1983.  Therefore, Plaintiff seeks, for causes of action asserted in this complaint, all remedies and damages available pursuant to Texas and federal law, including but not necessarily limited to the Texas wrongful death statute (Tex. Civ. Prac. & Rem. Code § 71.002 *et seq.*), the Texas survival statute (Tex. Civ. Prac. & Rem. Code § 71.021), the Texas Constitution, common law, and all related and/or supporting case law.  If the decedent had lived, the decedent would have been entitled to bring a 42 U.S.C. § 1983 action for violation of the United States Constitution and obtain remedies and damages provided by Texas and federal law.  Plaintiff incorporates this remedies section into all sections in this complaint asserting cause(s) of action.

### C.     Cause of Action Against Webb County Under 42 U.S.C. § 1983 for Violation of Constitutional Rights

109.     In the alternative, without waiving any other causes of action pled herein, without waiving any procedural, contractual, statutory, or common-law right, and incorporating all other allegations herein (including all allegations in the "Factual Allegations" section above) to the extent they are not inconsistent with the cause of action pled here, Webb County is liable to

Plaintiff, Wrongful Death Beneficiaries, and Claimant Heirs, pursuant to 42 U.S.C. § 1983, for violating the decedent's constitutional rights including but not necessarily limited to those to receive reasonable medical/mental health care, to be protected, and/or not to be punished as a pre-trial detainee. These rights are guaranteed by at least the Fourteenth Amendment to the United States Constitution. Pretrial detainees are entitled to be protected and not to be punished at all, since they have not been convicted of any alleged crime resulting in their incarceration. Regardless, Plaintiff relies on the court to apply the correct constitutional guarantee(s) to the facts pled as required by United States Supreme Court precedent.

110. The County's employees and agents acted or failed to act under color of state law at all relevant times. The County's policies, practices, and/or customs were moving forces behind and caused, were producing causes of, and/or were proximate causes of the decedent's suffering, damages, and death, and all damages suffered by Plaintiff, Wrongful Death Beneficiaries, and Claimant Heirs.

111. The Fifth Circuit Court of Appeals has made it clear that Plaintiff need not allege the appropriate chief policymaker(s) at the pleadings stage. Nevertheless, out of an abundance of caution, the sheriff of the County was the County's relevant chief policymaker over matters at issue in this case. Moreover, in addition, and in the alternative, the County's jail administrator was the relevant chief policymaker over matters at issue in this case. Finally, in addition, and in the alternative, the County's commissioners' court was the relevant chief policymaker.

112. The County was deliberately indifferent regarding policies, practices, and/or customs developed and/or used with regard to issues addressed by allegations set forth above, for any facts which are ultimately determined to support episodic act and/or omissions claims, to the extent deliberate indifference is a necessary element or prerequisite to such claims at the time the

court makes the determination. Deliberate indifference is not an element of a conditions of confinement claim. The County also acted in an objectively unreasonable manner. Policies, practices, and/or customs referenced above, as well as the failure to adopt appropriate policies, were moving forces behind and caused violation of the decedent's rights and showed deliberate indifference to the known or obvious consequences that constitutional violations would occur. Once again, by including the "deliberate indifference" allegation, Plaintiff is not conceding or alleging that deliberate indifference is a necessary element of a conditions of confinement claim. It is not. The County's relevant policies, practices, and/or customs, whether written or not, were also objectively unreasonable as applied to the decedent.

113.    Therefore, the decedent's estate and/or his heirs at law (Claimant Heirs) suffered the following damages, for which they seek recovery, through the estate administrator, from County:

- the decedent's conscious physical pain, suffering, and mental anguish;

- the decedent's loss of life and/or loss of enjoyment of life;

- the decedent's medical expenses; and

- the decedent's funeral expenses.

114.    Maria Garcia, individually, and as estate administrator asserting claims on behalf of Wrongful Death Beneficiary, also seeks recovery from County for all remedies and damages available to each Wrongful Death Beneficiary individually for claims asserted in this pleading. Ms. Garcia seeks such damages as a result of the wrongful death of her son, and Mr. Torres-Garcia's father and wife are entitled to damages as a result of the wrongful death of their son and husband respectively. The County's policies, practices, and/or customs caused, were proximate and/or producing causes of, and/or were moving forces behind and caused the following damages

suffered by these people, for which each individually seeks compensation, whether as a party to this case or through another party asserting claims for such relief in some representative or other legally-appropriate capacity:

- past mental anguish and emotional distress suffered by each resulting from and caused by the decedent's death;

- future mental anguish and emotional distress suffered by each resulting from and caused by the decedent's death; and

- loss of companionship, society, and/or consortium, as applicable, that each would have received from the decedent.

Plaintiff also seeks reasonable and necessary attorneys' fees available pursuant to 42 U.S.C. §§ 1983 and 1988.

IV.    Concluding Allegations and Prayer

A.    Conditions Precedent

115.    All conditions precedent to assertion of all claims herein have occurred.

B.    Use of Documents at Trial or Pretrial Proceedings

116.    Plaintiff intends to use at one or more pretrial proceedings and/or at trial all documents produced by Defendant in this case in response to written discovery requests, with initial disclosures (and any supplements or amendments to same), and in response to Public Information Act request(s).

C.    Jury Demand

117.    Plaintiff demands a jury trial on all issues which may be tried to a jury.

D.    Prayer

118.    For these reasons, Plaintiff asks that Defendant be cited to appear and answer, and that Plaintiff, Wrongful Death Beneficiaries, and Claimant Heirs have judgment for damages

within the jurisdictional limits of the court and against Defendant for all damages referenced above and/or below in this pleading:

a)    actual damages and including but not necessarily limited to for:

- the decedent's conscious physical pain, suffering, and mental anguish;

- the decedent's loss of life and/or loss of enjoyment of life;

- the decedent's medical expenses;

- the decedent's funeral expenses;

- past mental anguish and emotional distress suffered by each Wrongful Death Beneficiary resulting from and caused by the decedent's death;

- future mental anguish and emotional distress suffered by each Wrongful Death Beneficiary resulting from and caused by the decedent's death; and

- loss of companionship, society, and/or consortium, as appropriate, with the decedent suffered by each Wrongful Death Beneficiary resulting from and caused by the decedent's death;

b)    reasonable and necessary attorneys' fees through trial and any appeals and other appellate proceedings, pursuant to 42 U.S.C. §§ 1983 and 1988;

c)    court costs and all other recoverable costs;

d)    prejudgment and postjudgment interest at the highest allowable rates; and

e)    all other relief, legal and equitable, general and special, to which Plaintiff, Wrongful Death Beneficiaries, and Claimant Heirs are entitled.

Respectfully submitted:


_____/s/ T. Dean Malone_____
T. Dean Malone

T. Dean Malone
Attorney-in-charge
dean@deanmalone.com
Texas State Bar No. 24003265
Southern District of Texas Bar No. 37893
Law Offices of Dean Malone, P.C.
900 Jackson Street, Suite 730
Dallas, Texas 75202
Telephone:    (214) 670-9989
Telefax:        (214) 670-9904

Of Counsel:

Michael T. O'Connor
Texas State Bar No. 24032922
Southern District of Texas Bar No. 37991
michael.oconnor@deanmalone.com
Jennifer Kingaard
Texas State Bar No. 24048593
Southern District of Texas Bar No. 589455
jennifer.kingaard@gmail.com
Alexandra W. Payne
Texas State Bar No. 24118939
Southern District of Texas Bar No. 3799983
alexandra.payne@deanmalone.com
Abrielle Perry
Texas State Bar No. 24124419
Southern District of Texas Bar No. 3861640
abrielle.perry@deanmalone.com
Angelika Anderson
Texas State Bar No. 24136709
Southern District of Texas Bar No. 3861735
angelika.anderson@deanmalone.com
Law Offices of Dean Malone, P.C.
900 Jackson Street, Suite 730
Dallas, Texas 75202
Telephone:      (214) 670-9989
Telefax:        (214) 670-9904

Attorneys for Plaintiff