IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
LAREDO DIVISION

| | | |
|---|---|---|
| MARIA GARCIA, as dependent administrator | § | |
| of and on behalf of the ESTATE OF | § | |
| CHRISTOPHER TORRES-GARCIA, and | § | |
| CHRISTOPHER TORRES-GARCIA's heir(s) | § | |
| -at-law and wrongful death beneficiaries; | § | |
| | § | |
|     Plaintiff, | § | CIVIL ACTION NO. 5-23-CV-00137 |
| | § | |
| v. | § | JURY DEMANDED |
| | § | |
| WEBB COUNTY, TEXAS, | § | |
| | § | |
|     Defendant. | § | |

<u>PLAINTIFF'S RESPONSE TO DEFENDANT WEBB COUNTY, TEXAS'
MOTION FOR SUMMARY JUDGMENT</u>

Attorney-in-charge:

T. Dean Malone
Texas State Bar No. 24003265
Southern District of Texas Bar No. 37893
dean@deanmalone.com
Law Offices of Dean Malone, P.C.
900 Jackson Street, Suite 730
Dallas, Texas 75202
Telephone: (214) 670-9989
Telefax:    (214) 670-9904

Of Counsel:

Jennifer Kingaard
Texas State Bar No. 24048593
Southern District of Texas Bar No. 589455
jennifer.kingaard@deanmalone.com
Alexandra W. Payne
Texas State Bar No. 24118939
Southern District of Texas Bar No. 3799983
alexandra.payne@deanmalone.com
Law Offices of Dean Malone, P.C.
900 Jackson Street, Suite 730
Dallas, Texas 75202
Telephone: (214) 670-9989
Telefax:    (214) 670-9904

Attorneys for Plaintiff

TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................... ii

I.    Overview and Statement of Issues ................................................................... 1

II.   Facts................................................................................................................. 3

III.  Summary Judgment Standards ........................................................................ 6

IV.   Standards for Liability Pursuant to Section 1983........................................... 6

V.    Elements of *Monell* Claims ............................................................................. 7

VI.   Conditions of Confinement and Episodic Acts or Omissions......................... 9

VII.  County Policies, Practices, and Customs Were Moving Force in Causing
      Constitutional Violations............................................................................... 11

      A.   Failures to Assess and Provide Necessary Medical Care........................ 12

      B.   No Policies to Recognize and Respond to Serious Health Conditions .......... 17

      C.   Policymaker Knowledge ....................................................................... 19

      D.   Post-Incident Conduct and Other Incidents Demonstrating County Policy,
           Practice, and Custom............................................................................ 20

      E.   The County's Deliberate Indifference .................................................... 23

VIII.     Conclusion................................................................................................ 24

TABLE OF AUTHORITIES

**Cases**

*Arenas v. Calhoun*,
　922 F.3d 616 (5th Cir. 2019) ................................................................. 7

*Austin v. Johnson*,
　328 F.3d 204, 206 (5th Cir. 2003) ........................................................ 11

*Bell v. Wolfish*,
　441 U.S. 520 (1979) .......................................................................... 7, 9

*Bonnet-Pritchett v. Washington Cnty.*,
　No. 1:21-CV-149-RP, 2023 WL 8421180 (W.D. Tex. Dec. 4, 2023) ........................ 9

*Bryant v. Military Dep't of Miss.*,
　597 F.3d 678 (5th Cir. 2010) ................................................................. 6

*Cadenhead v. Collin Cnty. Det. Facility*,
　No. 4:22CV596, 2023 WL 4981609 (E.D. Tex. June 1, 2023), *report and recommendation
　adopted*, No. 4:22CV596, 2023 WL 4980126 (E.D. Tex. Aug. 3, 2023) ..................... 9

*City of Canton v. Harris*,
　489 U.S. 378 (1989) ...................................................................... 11, 24

*Connick v. Thompson*,
　563 U.S. 51 (2011) ............................................................................ 7

*Converse v. City of Kemah*,
　961 F.3d 771 (5th Cir. 2020) ................................................................. 7

*Cope v. Coleman Cnty.*,
　No. 23-10414, 2024 WL 3177781 (5th Cir. June 26, 2024) ......................... 8, 9, 10

*Doe v. Dallas I.S.D.*,
　153 F.3d 211 (5th Cir. 1998) ........................................................... 11, 24

*Fairchild v. Coryell Cnty.*,
　40 F.4th 359 (5th Cir. 2022) ................................................................. 6

*Farmer v. Brennan*,
　511 U.S. 825 (1994) ..................................................................... 10, 11

*Feliz v. El Paso Cnty.*,
　441 F. Supp. 3d 488 (W.D. Tex. 2020) ....................................................... 9

*Ford v. Anderson Cnty.*,
　102 F.4th 292 (5th Cir. 2024) ................................................. 11, 15, 23, 24

*Garcia v. Salt Lake Cnty.*,
　768 F.2d 303 (10th Cir. 1985) .............................................................. 10

*Grandstaff v. City of Borger*,
　767 F.2d 161 (5th Cir. 1985) ....................................................... 8, 20, 23

*Hare v. City of Corinth*,
  74 F.3d 633 (5th Cir. 1996) (en banc) ............................................................. 7, 9

*Herrera v. Webb County*,
  Civ. A. No. 5:17-CV-00237 (S.D. Tex. Feb. 15, 2022)
  (Saldana, J. "Order & Memorandum") (P-Appx __) ..................................... 2, 5, 23

*Kingsley v. Hendrickson*,
  576 U.S. 389 (2015) ............................................................................................. 10

*Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination Unit*,
  507 U.S. 163 (1993) ............................................................................................... 6

*Ledesma v. Swartz*,
  134 F.3d 369 (5th Cir. 1997) ............................................................................... 11

*Lee v. Offshore Logistical and Transport, L.L.C.*,
  859 F.3d 353 (5th Cir. 2017) ................................................................................. 6

*Mandel v. Doe*,
  888 F.2d 783 (11th Cir. 1989) ............................................................................. 11

*Monell v. New York City Dept. of Soc. Servs.*,
  436 U.S. 658 (1978) ........................................................................................... 6, 7

*Moore v. LaSalle Mgmt. Co.*,
  41 F.4th 493 (5th Cir. 2022) ....................................................................... 7, 8, 20

*Montano v. Orange Cnty.*,
  842 F.3d 865 (5th Cir. 2016) ............................................................................... 20

*Newbury v. City of Windcrest*,
  991 F.3d 672 (5th Cir. 2021) ....................................................................... 7, 8, 19

*Piotrowski v. City of Houston*,
  237 F.3d 567 (5th Cir. 2001) ................................................................................. 8

*Sanchez v. Oliver*,
  995 F.3d 461 (5th Cir. 2021) ......................................................................... 10, 11

*Sanchez v. Young Cnty.*,
  866 F.3d 274 (5th Cir. 2017) ....................................................................... 7, 8, 10

*Sanchez v. Young Cnty.*,
  956 F.3d 785 (5th Cir. 2020) ........................................................................ passim

*Shepherd v. Dallas Cnty.*,
  591 F.3d 445 (5th Cir. 2009) ........................................................................ passim

*Sims v. Griffin*,
  35 F.4th 945 (5th Cir. 2022) ............................................................................... 10

*Tolan v. Cotton*,
  572 U.S. 650 (2014) ............................................................................................... 6

*Winzer v. Kaufman Cnty.*,
  916 F.3d 464 (5th Cir. 2019) ................................................................................. 6

**Rules**

Fed. R. Civ. P. 56.................................................................................................................. 6

TO THE HONORABLE UNITED STATES DISTRICT COURT:

## I.     Overview and Statement of Issues

"Sepsis is the body's extreme response to an infection. It is a life-threatening medical emergency. Sepsis happens when an infection you already have triggers a chain reaction throughout your body. . . . Without timely treatment, sepsis can rapidly lead to tissue damage, organ failure and death."[1]

The dangers of sepsis are well understood by the healthcare community, particularly in institutional settings. When someone visits nearly any hospital, including Laredo Medical Center, they are likely to see a poster similar to this reminding staff of the ever present dangers of sepsis:[2]



---

[1]     United States Centers for Disease Control and Prevention, available at https://www.cdc.gov/sepsis/about/?CDC_AAref_Val=https://www.cdc.gov/sepsis/what-is-sepsis.html.

[2]     United States Centers for Disease Control and Prevention, available at https://www.cdc.gov/sepsis/media/pdfs/poster-protect-your-patients-from-sepsis-508.pdf (*see also* P-Appx 341).

Medical personnel universally recognize that if a sepsis patient is to be treated successfully, it is critically important to "act fast":[3]



And statistics show that prisoners die at a much higher rate from sepsis than the general population:



**Figure 1 Comparison of sepsis mortality rates between prisoners and nonprisoners.[4]**

Despite the well-known and established dangers of sepsis, this is not the first time Defendant Webb County, Texas let a detainee die from sepsis in the County jail. The County still has no sepsis prevention policies.[5] The County's total lack of sepsis prevention and detection

---

[3]   United States Centers for Disease Control and Prevention, available at https://www.cdc.gov/sepsis/media/pdfs/poster-protect-your-patients-from-sepsis-508.pdf.

[4] Chertoff, Stevenson, & Alnuaimat, "Prisoners in the United States Likely to Have Higher Odds of Death From Sepsis," American College of Chest Physicians 2017, available at https://journal.chestnet.org/article/S0012-3692(17)31210-2/fulltext.

[5] *See Herrera v. Webb County*, Civ. A. No. 5:17-CV-00237, at *13-14 (S.D. Tex. Feb. 15, 2022) (Saldana, J. "Order & Memorandum") (P-Appx 481-82).

policies yet again allowed County employees to send a detainee, this time Christopher Torres-Garcia, to his cell to die, despite being in an acute medical emergency and exhibiting commonly known sepsis symptoms. Approximately two hours after Christopher was sent back to his cell after seeing medical personnel, his heart rate had risen to an unbelievable 245, he was breathing rapidly, and his oxygen saturation level fell to an abysmal 65%. Had he received more than a cursory medical evaluation, Christopher would be more likely than not to a reasonable degree of medical certainty alive today. Instead, Christopher's death resulted from a total lack of treatment consistent with County policies, practices, and customs.

## II.    Facts

Christopher was booked into the Webb County jail on December 1, 2021. (P-Appx 489) County officials knew then that the 34-year-old was an intravenous heroin user. (P-Appx 9, 215-16, 492, 498, 502, 506) County officials also knew drug use was a significant issue among detainees. (P-Appx 222-23) As for Christopher, he had "infected injection sites due to intravenous drug use" that caused him to become septic and develop pneumonia. (P-Appx 264, 281) A nurse gave Christopher antibiotics on December 7, and then he only received two doses, which was not after he saw a doctor but pursuant to a doctor's standing order that was not for a specific patient. (P-Appx 198-99, 276, 496, 503) But sepsis is an emergency condition and must be treated in a hospital. (P-Appx 115, 205, 353-55) A detainee suffering from sepsis should be taken to a hospital emergency room as soon as possible. (P-Appx 353-55) Thus, oral antibiotics did nothing to address Christopher's sepsis and amounted to no medical care at all. He died the next day. (P-Appx 4, 489) That morning, he had complained of chest pain. (P-Appx 258) After a cursory review that amounted to no medical care, he was "cleared" to return to his cell, despite having told County jail medical personnel that he was unable to breathe, was scared because of an obvious abscess on his shoulder, and thought the infection was getting to the bone. (P-Appx 258, 275, 502) By 2:00 p.m.,

3

Christopher was unsteady on his feet. (P-Appx 258, 488) So much so that he passed out. (P-Appx 258, 488) His heart rate was highly elevated at 245, and he had a deadly low oxygen saturation level of 65%. (P-Appx 269, 366)[6] He was transported to a Laredo hospital where he died "from sepsis due to infected drug injection sites." (P-Appx 4)

County jail medical personnel were County employees, but they had no correctional training. (P-Appx 189, 220) And shockingly, a licensed vocational nurse supervised registered nurses who medically assessed detainees. (P-Appx 109, 188, 197-99, 221) The County's medical director and only MD on staff, Dr. Garza-Gongora, came to the jail only twice a week to see patients. (P-Appx 161, 193, 226-27) But he allowed nurses and paramedics to diagnose and treat detainees at the County jail based on standing orders he created for this purpose. (P-Appx 191-92, 206-07) Thus, unqualified medical personnel were allowed to unlawfully diagnose and treat patients. (P-Appx 227, 408-09) This was true as far back as at least 2015. (P-Appx 227, 408-09) This ongoing County policy, practice, and custom resulted in County jail detainees not receiving needed medical care and not being properly assessed for their medical needs, which were both moving forces behind Christopher's suffering and death. (P-Appx 251)

Before Christopher's death, Mario Alberto Andrade, Jr. also suffered and died from sepsis in the County jail on November 23, 2015. (P-Appx 416) Upon intake, Andrade suffered from knee pain and swelling. (P-Appx 339, 398, 411, 450) Needle marks were visible on his thigh near his knee. (P-Appx 417) Paramedic Orlando Villanueva, still an employee at the County jail when Christopher died, evaluated Andrade for admission to the jail. (P-Appx 410-13) Despite Andrade having an elevated heartrate of 132, slurred speech, and knee pain, Villanueva did not examine

---

[6] *See also* Mayo Clinic online, available at https://www.mayoclinic.org/healthy-lifestyle/fitness/expertanswers/heart-rate/faq-20057979 ("A normal resting heart rate for adults ranges from 60 to 100 beats per minute."), and https://www.mayoclinic.org/symptoms/hypoxemia/basics/definition/sym-20050930 ("Healthy pulse oximeter values often range from 95% to 100%. Values under 90% are considered low.").

Andrade's knee or order any medical tests to ascertain the cause of Andrade's symptoms. (P-Appx 445, 451-52) Medical personnel informed Officer Arriaga that Andrade could be moved upstairs for housing, even though Andrade was limping and had a swollen knee. (P-Appx 339-40) Approximately 55 hours after he was detained in the County jail, Andrade was discovered dead. (P-Appx 442) The County agreed that "everything that occurred with regard to Mario during the incident was consistent with and complied with Webb County policies, practices, and customs." (P-Appx 368-69) A court in this district concluded in Andrade's case that a reasonable jury could find the County had official and de facto policies that deprived Andrade of "essential medical care" that caused his death from sepsis. *See Herrera v. Webb County*, Civ. A. No. 5:17-CV-00237, at *17 (S.D. Tex. Feb. 15, 2022) (Saldana, J. "Order & Memorandum") (P-Appx 485). Those policies have not changed to this date.

Despite Andrade's untimely death and the deaths of many others in the County jail referenced below, including a third detainee who died from sepsis, the County chose not to develop any policy or protocol for its employees to recognize or treat sepsis, even though the deadly consequences of this emergency condition are well-known and very common in jails. (P-Appx 116, 216-17, 219) Dr. Garza-Gongora is familiar with sepsis and agrees that it is an emergency condition and that a detainee suffering from sepsis should be taken to a hospital emergency room as soon as possible. (P-Appx 353-55) In his personal office practice, he has also called 911 to send suspected sepsis patients to a hospital ER, which he agreed needs to happen as soon as possible. (P-Appx 354-55) Dr. Garza-Gongora is also familiar with sepsis protocols used in hospital ERs, having himself formerly been an emergency room doctor for approximately 12 years, ending approximately 30 years ago, and having dealt with sepsis at that time. (P-Appx 343-44, 355-57) He further acknowledged that if a patient presents to an ER meeting certain parameters for sepsis,

the ER calls a "sepsis alert" and that this has "been going on for a few years." (P-Appx 356-57) Against this backdrop of County policies, practices, and customs of failing to provide necessary medical care or to assess detainees' medical needs, Christopher's untimely death from sepsis was just business as usual in the County jail.

### III.    Summary Judgment Standards

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). All disputed facts must be construed in the light most favorable to the nonmovant. *Fairchild v. Coryell Cnty.*, 40 F.4th 359, 363-64 (5th Cir. 2022) (citing Fed. R. Civ. P. 56)); *Winzer v. Kaufman Cnty.*, 916 F.3d 464, 474 (5th Cir. 2019). In other words, courts must "not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Winzer*, 916 F.3d at 473-74 (citing *Tolan v. Cotton*, 572 U.S. 650, 656 (2014)). Material relied on for summary judgment purposes need not be presented in admissible form, provided that the substance or content of the evidence can be reduced to admissible form at trial. *See, e.g., Lee v. Offshore Logistical and Transport, L.L.C.*, 859 F.3d 353, 354-55 (5th Cir. 2017) (citing Fed. R. Civ. P. 56(c)(1) & Advisory Comm. Note (2010)). Plaintiff's counsel reasonably anticipates that the substance of all evidence referred to herein can be reduced to admissible form for trial.

### IV.    Standards for Liability Pursuant to Section 1983

"To state a claim under § 1983, a plaintiff must allege facts showing that a person, acting under color of state law, deprived the plaintiff of a right, privilege or immunity secured by the United States Constitution or the laws of the United States." *Bryant v. Military Dep't of Miss.*, 597 F.3d 678, 686 (5th Cir. 2010). Although local governments have no respondeat superior liability, they are liable for a policy, practice, or custom that causes a constitutional injury. *Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 166-69 (1993); *see also*

*Monell v. New York City Dept. of Soc. Servs.*, 436 U.S. 658, 691 (1978). "The constitutional rights of a pretrial detainee . . . flow from both the procedural and substantive due process guarantees of the Fourteenth Amendment." *Hare v. City of Corinth*, 74 F.3d 633, 639 (5th Cir. 1996) (citing *Bell v. Wolfish*, 441 U.S. 520 (1979)). This includes rights to "basic human needs, including medical care and protection from harm." *Id.* at 650; *Sanchez v. Young Cnty. (Sanchez I)*, 866 F.3d 274, 279 (5th Cir. 2017); *Converse v. City of Kemah*, 961 F.3d 771, 775 (5th Cir. 2020); *Arenas v. Calhoun*, 922 F.3d 616, 621 (5th Cir. 2019).

## V.    Elements of *Monell* Claims

Plaintiff must show (1) "an official policy (or custom)," (2) that "a policy maker can be charged with actual or constructive knowledge," and (3) "a constitutional violation whose 'moving force' is that policy (or custom)." *Newbury v. City of Windcrest*, 991 F.3d 672, 680 (5th Cir. 2021).

The first element requires showing that an official policy or custom existed that led to a constitutional violation. *Id.* A custom may give rise to liability under *Monell* if the practice is "so persistent and widespread as to practically have the force of law." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). But plaintiffs are not required to provide specific examples to meet this element. *Moore v. LaSalle Mgmt. Co.*, 41 F.4th 493, 509 (5th Cir. 2022). Moreover, "[i]f a municipality condones an unlawful custom, it cannot avoid liability by claiming that it did not authorize its agents in writing to break the law in the course of their duties." *Id.*

As the Fifth Circuit acknowledged:

> It is virtually always the case that, when an unwritten custom is challenged under *Monell*, that custom conflicts with some governing written policy or law. If a municipality condones an unlawful custom, it cannot avoid liability by claiming that it did not authorize its agents in writing to break the law in the course of their duties.

*Id.* at 511.

The second element requires Plaintiff to demonstrate a policymaker constructively or

7

actually knew of the policy, custom, or practice.[7] *See Newbury*, 991 F.3d at 680. "Constructive knowledge can be attributed to . . . policymaker[s] 'on the ground that [they] would have known of the violations if [they] had properly exercised [their] responsibilities, as, for example, where the violations were so persistent and widespread that they were the subject of prolonged public discussion." *Moore*, 41 F.4th at 511. Likewise, "policymakers failing to take corrective action after subordinates violate the constitution is some evidence" of their actual knowledge. *Id*. at 510 & n.56 (citing *Grandstaff v. City of Borger*, 767 F.2d 161, 171 (5th Cir. 1985)).

Under the third element, the policy must have been a moving force behind the constitutional violation, meaning that "there must be a direct causal link" between the policy and the violation. *Id*. at 511-12; *Piotrowski v. City of Houston*, 237 F.3d 567, 580 (5th Cir. 2001).

Plaintiff has brought conditions of confinement and episodic acts or omissions claims in the alternative against the County. It is firmly established in the Fifth Circuit that a plaintiff has the right to do so. *Sanchez I*, 866 F.3d at 279 n.3 ("[P]laintiffs can bring a pretrial detainee case . . . under alternative theories of episodic acts and omissions by individual defendants or unconstitutional conditions of confinement."); *Cope v. Coleman Cnty*., No. 23-10414, 2024 WL 3177781, at *5, 8-9 (5th Cir. June 26, 2024) (same). As the Fifth Circuit recently reiterated, a court should not second guess a plaintiff's decision to assert conditions of confinement theories. *Cope*, 2024 WL 3177781, at *8 n.14. Failure to consider a plaintiff's conditions-of-confinement theories is thus error. *Sanchez I*, 866 F.3d at 279 (remand for consideration of conditions-of-confinement theory); *Cope*, 2024 WL 3177781, at *9 (same).

District courts are required to meaningfully analyze each *Monell* claim to determine whether it is an episodic or conditions claim. *Sanchez I*, 866 F.3d at 279 ("Because the district

---

[7] The parties agree that Webb County Sheriff Martin Cuellar was the County's policymaker at the time of the incident made the basis of this lawsuit. (P-Appx 236)

court focused only on the plaintiffs' claim that episodic acts and omissions of the jail personnel could be imputed to the County, it did not analyze their unconstitutional condition of confinement claim at all."); *see also Sanchez v. Young Cnty.* (*Sanchez II*), 956 F.3d 785, 789 (5th Cir. 2020) ("[W]e held that the district court erred in failing to consider Plaintiff's alternative conditions-of-confinement theory and, therefore, remanded for the district court to consider whether a genuine dispute of material fact existed under that theory."). Claims that focus on systemic shortcomings involve conditions of confinement. *See, e.g., Bonnet-Pritchett v. Washington Cnty.*, No. 1:21-CV-149-RP, 2023 WL 8421180, at *8 (W.D. Tex. Dec. 4, 2023) (citing *Shepherd v. Dallas Cnty.*, 591 F.3d 445, 453 (5th Cir. 2009)); *Feliz v. El Paso Cnty.*, 441 F. Supp. 3d 488, 497 (W.D. Tex. 2020); *Cadenhead v. Collin Cnty. Det. Facility*, No. 4:22CV596, 2023 WL 4981609, at *8 (E.D. Tex. June 1, 2023), *report and recommendation adopted*, No. 4:22CV596, 2023 WL 4980126 (E.D. Tex. Aug. 3, 2023). For both conditions and episodic claims, a plaintiff must show "(1) that a constitutional violation occurred and (2) that a municipal policy was the moving force behind the violation." *See Sanchez II*, 956 F.3d at 791.

## VI.    Conditions of Confinement and Episodic Acts or Omissions

Plaintiff's allegations track the language of a pivotal case addressing conditions of confinement. *Id*. at 791-95. In contrast to episodic claims, conditions claims are not dependent on an event perpetrated by an actor. *Cope*, 2024 WL 3177781, at *9. Instead, "the alleged cause of the harm is the broader 'conditions, practices, rules, or restrictions.'" *Id*.; *see also Sanchez II*, 956 F.3d at 791 (quoting *Hare*, 74 F.3d at 639, and *Bell*, 441 U.S. at 535). A plaintiff must show "a condition—a rule, a restriction, an identifiable intended condition or practice, or sufficiently extended or pervasive acts or omissions of jail officials—that is not reasonably related to a legitimate government objective and that caused the constitutional violation." *Id*. A plaintiff can do so in several ways, including presenting evidence of (1) "practices that are sufficiently extended

or pervasive, or otherwise typical of extended or pervasive misconduct"; (2) "consistent testimony of jail employees"; (3) Texas Commission on Jail Standards (TCJS) reports; (4) failures to reprimand; and (5) a "mutually enforcing effect" of multiple interacting policies.[8] *Id*. at 792-96. Those are all present here. The Fifth Circuit recently reiterated that numerous alleged County policies, practices, and customs properly demonstrated a conditions claim based on a "mutually enforcing effect" that imposed "'durable restraints or impositions on inmates' lives' that transcend a single act or omission by an officer." *Cope*, 2024 WL 3177781, at *8-9 (citing *Sanchez II*, 956 F.3d at 791). Pretrial detainees are not required to demonstrate deliberate indifference for conditions of confinement. "[I]ntent to punish . . . may be inferred from the decision to expose a detainee to an unconstitutional condition." *Shepherd*, 591 F.3d at 452, 454-55.

To establish liability for episodic claims, a plaintiff must show that one or more municipality employees "acting with subjective deliberate indifference, violated [the plaintiff's] constitutional rights [and] the [municipality employee's or] employees' acts resulted from a municipal policy or custom adopted with objective indifference to the detainee's constitutional rights."[9] *Sanchez I*, 866 F.3d at 280. "What a prison official subjectively knew 'is a question of fact subject to demonstration in the usual ways [including inference from circumstantial evidence].'" *Sanchez v. Oliver*, 995 F.3d 461, 473 (5th Cir. 2021) (quoting *Farmer v. Brennan*,

---

[8] "Although the acts or omissions of no one employee may violate an individual's constitutional rights, the combined acts or omissions of several employees acting under a governmental policy or custom may violate an individual's constitutional rights." *E.g., Garcia v. Salt Lake Cnty.*, 768 F.2d 303, 310 (10th Cir. 1985). As for TCJS reports, while there is no "safe harbor" defense to *Monell* claims based on compliance with TCJS standards, the Fifth Circuit has acknowledged that TCJS reports about incidents prior to and after a detainees' death can support a finding of conditions of confinement. *Sanchez II*, 956 F.3d at 792. The County asserts that TCJS did not find wrongdoing at the County jail. (Doc. 18 at 15) But the County's policies, practices, and customs must meet constitutional muster, regardless of the TCJS determination.

[9] Although other circuits disagree, the Fifth Circuit currently applies a subjective deliberate indifference standard to pretrial detainee episodic acts or omissions claims outside the context of excessive force. *Sims v. Griffin*, 35 F.4th 945, 950 n.10 (5th Cir. 2022). Plaintiff asserts that the Supreme Court in *Kingsley v. Hendrickson*, 576 U.S. 389 (2015), changed the standard and now requires courts to apply an objective standard to all pretrial detainee claims under section 1983. Plaintiff seeks to preserve error on this issue.

511 U.S. 825, 842 (1994)). "On the other hand, [w]hether an official's conduct was objectively reasonable is a question of law for the court, not a matter of fact for the jury." *Id*. Responding to a serious medical condition with a cursory level of care can constitute deliberate indifference. *Ford v. Anderson Cnty.*, 102 F.4th 292, 308 n.7 (5th Cir. 2024).[10] Moreover, the failure to adopt a policy can be deliberately indifferent when it is obvious that the likely consequences of not adopting a policy will be a deprivation of constitutional rights. *See City of Canton v. Harris*, 489 U.S. 378, 390 (1989); *see also Doe v. Dallas I.S.D.*, 153 F.3d 211, 217 (5th Cir. 1998).

### VII. County Policies, Practices, and Customs Were Moving Force in Causing Constitutional Violations

Plaintiff presents evidence showing unconstitutional conditions of confinement or in the alternative episodic acts or omissions, which the Court should analyze individually and collectively. As in this case, a municipality can have a de facto policy of grossly inadequate "evaluation, monitoring, and treatment" of detainees based on "poor or non-existent procedures." *See, e.g., Shepherd*, 591 F.3d at 453. Plaintiff also presents evidence that the County failed to make any post-incident changes or reprimands, which is further evidence of the existence of the alleged policies, practices, and customs. The evidence, when considered in the light most favorable to Plaintiff, shows that the County had conditions of confinement, or alternatively episodic acts or omissions, based on "different, compounding ways that [the County's] alleged policies might interact, [from which] a jury could reasonably conclude that they had a 'mutually enforcing effect' that deprived" Christopher of his constitutional rights to be protected and to receive medical care. *See Sanchez II*, 956 F.3d at 796. County policies, practices, and customs were promulgated by or

---

[10] Citing *Austin v. Johnson*, 328 F.3d 204, 206, 210 (5th Cir. 2003) (finding that a nearly two-hour delay in calling an ambulance could constitute deliberate indifference, even though a defendant had administered first aid), *Ledesma v. Swartz*, 134 F.3d 369 (5th Cir. 1997) (finding that treating complaints of a broken jaw with only over-the-counter pain medication and a liquid diet could constitute deliberate indifference), and *Mandel v. Doe*, 888 F.2d 783, 789 (11th Cir. 1989) ("When the need for treatment is obvious, medical care which is so cursory as to amount to no treatment at all may amount to deliberate indifference.").

known, actually or constructively, by the County policymaker, and they were a moving force behind the violation of Christopher's constitutional rights leading to his suffering and death.

### A.  Failures to Assess and Provide Necessary Medical Care

The County failed to provide necessary medical care, so that detainees like Christopher could suffer and die from a treatable condition like sepsis. *See e.g., Shepherd*, 591 F.3d at 453. As mentioned, a municipality can have a de facto policy of grossly inadequate "evaluation, monitoring, and treatment" of detainees based on "poor or non-existent procedures." *Id*.; *see also Sanchez II*, 956 F.3d at 795 (discussing failure to assess medical needs as a condition of confinement). County officials might take detainees to the medical unit if they complained but would then return them to their cells so boxes could be checked. Detainees routinely received inadequate, cursory medical care that amounted to no care at all. This failure to receive adequate, necessary medical care for sepsis was a moving force behind Christopher's suffering and death.

Christopher was feeling anxious on the morning of his death, so Officer Molina took him to the medical unit. (P-Appx 166, 502) Christopher was seen by paramedic Guadalupe Javier Rivera. (P-Appx 257, 278) The County had a policy as far back as 2015 of using paramedics as a substitute for both RNs and LVNs. (P-Appx 408-09) Christopher complained of left arm pain and anxiety and said that he was unable to breathe, scared because of an obvious abscess on his shoulder, and afraid the infection was "getting to the bone." (P-Appx 258, 275, 278, 502) Rivera observed that Christopher's arm was swollen and red but did nothing for Christopher. (P-Appx 278) Rivera did not examine Christopher in more than an ineffectual, cursory manner. (P-Appx 249-51) He did not take Christopher's temperature. (P-Appx 251) He noted that Christopher had low blood pressure, but did not recognize that low blood pressure is a sign of septic shock, not simply sepsis. (P-Appx 251) Rivera had never diagnosed or recognized sepsis before and did not understand the difference between sepsis and septic shock. (P-Appx 251)

Molina just took Chrisopher back to his cell. (P-Appx 167) Plaintiff's medical expert Steven B. Bird, MD, explains in detail that if Christopher had been taken to an emergency department that morning instead of taken back to his cell, he more than likely would have survived. (P-Appx 249-50)

Christopher collapsed later in the day around 1:00 p.m. (P-Appx 167-68, 269) When Molina took him back to the medical unit, he was still expressing anxiety. (P-Appx 167-69) By this point, his heart rate was 245, and his oxygen saturation was at 65%. (P-Appx 248, 269, 503) Only then did medical personnel decide to send Christopher for emergency care. (P-Appx 269) By the time Christopher arrived at the emergency department, he could not be saved. (P-Appx 251) The inaction of medical personnel in failing to evaluate Christopher's abscesses and failing to transfer him to the hospital in a timely manner was a moving force behind and proximately caused his suffering and untimely death. (P-Appx 251)

Regarding County policy, practice, and custom, although Molina said he would typically transfer detainees who made medical complaints to the medical unit, he relied only on medical personnel to let him know if there was "pertinent information" and would transfer the person back to the cell unless told otherwise. (P-Appx 176-78) Another officer testified that medical needs were "not my responsibility." (P-Appx 126-27) Nurse Sarquiz-Ortega testified that officers would only transfer patients to the medical unit if there was an emergency or they were "really, really sick." (P-Appx 195)

Sepsis and infections cannot be diagnosed just by looking at someone. (P-Appx 206) Sepsis can only be diagnosed through bloodwork. (P-Appx 115, 270) But bloodwork could not be done at the County jail. (P-Appx 115) Sepsis likewise could not be treated at the jail. (P-Appx 204-05) "Sepsis is critical," must be treated in a hospital, and requires "[v]ery strong antibiotics." (P-Appx

115, 205) The "number one risk factor [for sepsis is] an existing infection." (P-Appx 205) Despite this, the only thing medical personnel would do at the jail to treat an infection, according to policy, was to follow standing orders and prescribe antibiotics. (P-Appx 206-07) They would not conduct physical examinations of detainees but instead would rely on a detainee making a statement about being an intravenous drug user during admission to the jail and also correctly identifying abscesses on their own body. (P-Appx 206)

The medical provider for the County jail, Dr. Arturo G. Garza-Gongora, in 2015 testified that detainees will actively conceal conditions, especially related to illicit drug use. (P-Appx 348-53) "Normally they don't tell you. So symptoms . . . can be from nothing to a great variety of symptoms." (P-Appx 349) Accordingly, medical personnel should employ the SOAP technique, which stands for "[s]ubjective, objective, assessment, and plan." (P-Appx 350) In addition to listening to the patient, who might hide the fact that they are addicted to drugs, medical personnel should make an objective, independent determination that might include a physical examination. (P-Appx 350)  But six years after Mario Andrade, Jr. died of sepsis in the County jail, medical personnel still would not do anything to help detainees unless an abscess was visible to the naked eye without a physical evaluation. (P-Appx 207)

In fact, consistent with their training, nurses at the County jail would not do a physical evaluation of detainees during intake and booking. (P-Appx 194-95) They would only rely on detainees to report if they had an abscess or something "concerning" on their skin. (P-Appx 189) They typically would only take vitals of detainees who had hypertension or "another comorbidity like diabetes." (P-Appx 195-96) Correctional officers likewise would not do a physical examination of detainees during booking for any reason. (P-Appx 161) This was the same policy the County had in 2015 of not disrobing detainees or doing a physical examination. (P-Appx 403-

14

04) This policy, practice, and custom is further reinforced by a TCJS report citing the County for jail staff failing to complete detainee health screening forms.[11] (P-Appx 327)

In Christopher's case, he told Nurse Sarquiz-Ortega that he had "shot up wrong" and his arm was infected. (P-Appx 268) He complained of arm pain, but the nurse did nothing, claiming she did not see "anything particularly wrong physically with his arm and [left] it at that." (P-Appx 197) She never even touched Christopher's arm. (P-Appx 268) She knew that Christopher was at risk of having an abscess; still, she chose not to do a physical examination. (P-Appx 200) She reported the incident to paramedic Rivera, but they disregarded Christopher's arm pain. (P-Appx 197) She spoke to Rivera again the next day, and they decided to put Christopher on prophylactic antibiotics pursuant to Dr. Garza-Gongora's standing order. (P-Appx 198-99) But that cursory treatment did nothing to address Christopher's sepsis and amounted to no medical care at all. He should have been sent immediately for emergency treatment at a local hospital. (P-Appx 115, 205, 353-55)

Another County policy, practice, and custom was to provide medications only based on standing orders and not based on specific detainee needs. Standing orders from the doctor were not for specific detainees. (P-Appx 191) They were used for all detainees who had similar complaints. (P-Appx 191) There were different standing orders for detox protocols for different substances. (P-Appx 192) But there were no standing orders for abscesses, like Christopher's. (P-Appx 191) This is the type of cursory medical care that the Fifth Circuit warned does not pass constitutional muster. *See Ford*, 102 F.4th at 308 n.7.

The County had a long-term continuous contract with Dr. Garza-Gongora for at least five

---

[11] The Fifth Circuit has repeatedly held that this type of evidence can support a finding of unconstitutional conditions of confinement. *E.g., Sanchez II*, 956 F.3d at 792 (TCJS reports of inadequate monitoring provided evidence "of other detainees [whom] jailers failed to observe"); *Shepherd*, 591 F.3d at 453 (independent evidence of jail's treatment of detainees showed conditions of confinement).

years. (P-Appx 12-18, 95, 224) He was the "in-house doctor for the jail" and was referred to as the jail's medical director as far back as 2015. (P-Appx 95, 161, 345-46, 392) But he only visited the jail twice per week. (P-Appx 193, 226-27) Shockingly, he was the only medical provider for the jail who was authorized by law to diagnose a patient—there were no other doctors, no physician's assistants, and no nurse practitioners. (P-Appx 227, 408-09)

In addition, the contract provided that Dr. Garza-Gongora would assist the County Sheriff with "guidance and preparation of the annual medical budget" with an eye toward "the development of a billing process as to reduce the costs to the county in situations where the detainee qualifies or has existing medical coverage by third party payers." (P-Appx 13) Dr. Garza-Gongora would also be reimbursed for "any and all hospital bills, ambulance service, and other reasonable and necessary expenses for services rendered." (P-Appx 14-15) The County thus expected Dr. Garza-Gongora to save costs by keeping tight controls over medical expenditures at the expense of inadequate medical care provided to detainees. The above was all also true back in 2015 when Mario Andrade, Jr. died of sepsis and still true when Christopher died of sepsis. (P-Appx 237)

Despite this, the County never took issue with Dr. Garza-Gongora's conduct, medical treatment, or decisions. (P-Appx 224) He was the County's contract medical provider when Andrade died in 2015, and he knew then that sepsis was an emergency condition requiring immediate emergency treatment. (P-Appx 237, 354-55) He was familiar with sepsis protocols used in emergency rooms. (P-Appx 343-44, 355-57) After all, he had 12 years of experience as an emergency room doctor. (P-Appx 343-44, 355-57]) Despite all this, Christopher still only received antibiotics one day before his death from sepsis. (P-Appx 500) This evidence would all support a finding that the County had policies, practices, and customs of failing to assess detainees' medical

16

needs, particularly regarding sepsis, and failing to provide medical care, which was a moving force behind the violation of Christopher's constitutional rights and caused his suffering and death.

### B.  No Policies to Recognize and Respond to Serious Health Conditions

The County prioritized detainee booking efficiency by taking shortcuts that sacrificed the health and safety of its detainees. Nurses instead of doctors were used to diagnose detainees' serious health problems. And jailers were not informed regarding how to recognize serious health issues such as abscesses that could lead to sepsis. The County did not have any signs or posters, like the one referenced above or otherwise, addressing detainees' health needs. (P-Appx 220) County jailers also did not know how to recognize the signs and symptoms of pneumonia. (P-Appx 135-36, 173)

Similarly, the County did not have any policies regarding how to recognize sepsis or signs or posters on how to recognize sepsis. (P-Appx 216-17, 219) This is despite the fact that untreated sepsis leads to death and is a "well-known risk in healthcare." (P-Appx 116) "Once you become septic, it was very hard to cure." (P-Appx 270) The County has been aware of the risk of sepsis in jails since at least 2015 when Mario Andrade, Jr. died from sepsis. (P-Appx 237) Yet it chose to do nothing. The County Sheriff and County jail captain—who did not change after 2015—did not create a policy even after Andrade's death that would teach jail employees (1) how to recognize sepsis or infection, (2) that sepsis is a medical emergency, and (3) that someone with sepsis should be sent to the emergency room as soon as possible. (P-Appx 216-17, 237, 353-55, 358, 372-73) Likewise, there were no protocols for dealing with sepsis in the jail. (P-Appx 209)

Correctional staff had not even heard of sepsis and thus did not know what it was. (P-Appx 70-71, 132) They were not told how to recognize infection, much less the signs and symptoms of sepsis. (P-Appx 94, 217) Jailers were not told that sepsis is a medical emergency. (P-Appx 134]) The only conditions considered "medical emergencies" were "heart, breath, and excessive

bleeding." (P-Appx 134) Jailers and nurses alike were not taught signs or symptoms of serious infection or sepsis. (P-Appx 116, 164)

The County also did not have a policy for recognizing or responding to health issues common to intravenous drug users. Jailers and nurses interact with drug users in jail "every day." (P-Appx 110-11, 129, 162) "[A]lmost all heroin addicts had abscesses from injecting." (P-Appx 270) Yet the County had no policy to identify intravenous drug users. (P-Appx 217) Correctional officers did not know how to identify such detainees, and it fell only to medical personnel to notify correctional officers if someone was an intravenous drug user. (P-Appx 69-70, 129-30, 162) But nurses were not informed to look for any signs or symptoms to determine whether someone was a drug user. (P-Appx 110, 217) Nothing would be done differently for someone who was an intravenous drug user versus a detainee who was not. (P-Appx 165)

Even though untreated abscesses lead to sepsis, the County had no policy for how to identify abscesses on the skin and no standing orders for nurses encountering this situation. (P-Appx 114, 191, 202, 218) And yet abscesses were quite common in the County jail. (P-Appx 116, 131, 163) An abscess that led to sepsis could not be treated in the jail. (P-Appx 115) The nurse who assessed Christopher was unaware of the risks of untreated abscesses when she worked at the jail. (P-Appx 201-02) Infected needle sites were also an issue at the jail, but the County had no policy for recognizing infections. (P-Appx 130-31, 219-20) Jailers did not even know the signs or symptoms of infection. (P-Appx 69-70, 72)

The County also did not have a policy for obtaining blood tests for intravenous drug users or anyone for that matter. (P-Appx 227-28) There was no policy for this as far back as 2009. (P-Appx 228) In addition, the County had no policy addressing when to medically clear detainees at a local hospital prior to booking them in at the jail. (P-Appx 228) And CBC bloodwork, which

was necessary to diagnose sepsis, was not taken even if a detainee was sent for medical clearance. (P-Appx 270) In Christopher's case, he was not sent for medical clearance and only had a medical questionnaire completed, which did not reveal his dangerous abscess. (P-Appx 270) All this evidence would support a finding that the County's failure to adopt policies to recognize and respond to detainees' serious health issues deprived Christopher of his constitutional rights and caused his suffering and death.

### C. Policymaker Knowledge

County Sheriff Martin Cuellar, as the County policymaker, had been in that position for approximately 16 years at the time of his deposition in April 2024. (P-Appx 230) He is "very involved" in running the jail. (P-Appx 230) He knows what goes on there and knows jail policies. (P-Appx 231) He reviews TCJS inspection reports.[12] (P-Appx 97-98) Certain responsibilities are delegated to chiefs and captains, such as speaking to TCJS or the Department of Public Safety (DPS) after the death of a detainee, reviewing incident reports after a death in the jail, and speaking to Dr. Garza-Gongora. (P-Appx 90-91, 96-97) Chief, captains, and commanders implement necessary changes after TCJS inspections. (P-Appx 98) Although Cuellar stated he does not review incident reports, and did not review the incident report involving Christopher, or DPS Ranger reports, or meet or speak with Dr. Garza-Gongora often, Cuellar is charged with constructive knowledge of what is in the jail's files (P-Appx 96-100). *See Newbury*, 991 F.3d at 680. He also testified that he relies on chiefs and captains to tell him important information from incident reports: "I ask the questions and I get the answers." (P-Appx 98-99) He considers implementing new policies or procedures when someone "doesn't do their job correctly" and has "several ways" of becoming aware of "someone not doing their job correctly." (P-Appx 88-89) Plaintiff has thus

---

[12] Cuellar's last name is misspelled in his deposition transcript as "Cuilar." (P-Appx 78)

presented abundant evidence to demonstrate the County policymaker constructively or actually knew of the policies, practices, and customs that were a moving force behind the violation of Christopher's constitutional rights.

### D. Post-Incident Conduct and Other Incidents Demonstrating County Policy, Practice, and Custom

In *Grandstaff*, the Fifth Circuit acknowledged even when there are no examples of prior misconduct, a municipality's unconstitutional policy, practice, or custom can "be inferred circumstantially from conduct of the officers and of the policymaker." 767 F.2d at 171. Following the incident of excessive force in *Grandstaff*, the policymaker made "no reprimands, no discharges, and no admissions of error." *Id*. The jury thus was entitled to "conclude that it was accepted as the way things are done and have been done in the City of Borger." *Id*. Since *Grandstaff*, the Fifth Circuit has affirmed this principle at least three times in other contexts. *E.g., Moore*, 41 F.3d at 509-11 & n.56 (holding jury could infer "that it was customary for guards . . . to punish detainees out of view of cameras" when warden "took no disciplinary action against anyone involved"); *Sanchez II*, 956 F.3d at 792-93 (holding jury could infer policy, practice, or custom of "placing highly intoxicated detainees into holding or detox cells to 'sleep it off' without proper medical or risk-of-suicide assessment or treatment" when "the sheriff neither punished any jailers involved nor took any action to correct the jail's alleged deficiencies"); *Montano v. Orange Cnty.*, 842 F.3d 865, 867 (5th Cir. 2016) ("[P]laintiffs did not provide specific examples of other instances of detainees who suffered Mr. Montano's fate as a result of the de facto policy. [S]uch . . . examples are not required to meet the 'condition or practice' element.").

The County Sheriff, as the County's policymaker, was responsible for determining what policies or procedures to implement at the jail along with the chiefs and the captains. (P-Appx 88) He only considers TCJS minimum standards and policies of Laredo College to determine what

policies or procedures to implement. (P-Appx 88) He considers implementing new policies or procedures "when someone doesn't do their job correctly." (P-Appx 88-89) He had several ways of discovering when someone did not do their job correctly. (P-Appx 89) He chose not to make any post-incident policy changes after Christopher's death and not to reprimand the jailers or medical personnel on duty while Christopher was incarcerated, which is supported by consistent testimony of the jailers.

No policies or procedures were changed. (P-Appx 93, 152, 225) No additional notices were posted in the jail regarding detainee health and safety. (P-Appx 225-26) Jail operations, including intake and booking and the observation process, stayed the same. (P-Appx 170, 226) Likewise, no changes in policy were made after Andrade died of sepsis in 2015. (P-Appx 370-71)

Also, the County did not reprimand any jailers or medical personnel. No one was fired. (P-Appx 92) No disciplinary action was taken at all, such as by demotion, reduction in pay, or additional training. (P-Appx 73-74, 93, 117-18, 138, 147, 174-75, 208, 225) Like the Sheriff, the jail administrator did not recommend any disciplinary action. (P-Appx 146-48, 150) No additional training or education was required after Christopher died or in 2015 after Andrade died. (P-Appx 117, 151-52, 203, 370-71) No one was disciplined after Andrade died either. (P-Appx 370-71) In fact, with regard to Andrade in 2015, the County took the position that "everything that occurred with regarding to Mario during the incident . . . was consistent with and complied with Webb County policies, practices, and customs." (P-Appx 368-69)

The County's failure to reprimand any jailers or medical personnel or make post-incident policy changes supports a finding that the County knew about and "acquiesce[ed] to the misconduct such that a jury could conclude that it represents official policy." *Sanchez II*, 956 F.3d

at 793. "[C]onsistent testimony of jail employees," present in abundance here, also supports a finding of official policy. *See id*. at 794.

Other deaths at the County jail also support a finding of County policy, practice, and custom. Before and after Christopher's death, several detainees died in the County jail, but the County changed no policies in response. Discussed in detail above, in 2015 Mario Andrade, Jr. died of sepsis in the jail, like Christopher. Shortly before Andrade died, Gary Spaulding died of delirium tremors, and Luis Bravo-Garcia died from suicide. (P-Appx 289, 377-78) And before that, Rodolfo Moreno, Jr. died in 2009 of a drug overdose after his mother alerted LVN Elizondo that he was extremely ill. (P-Appx 463-64) In 2016, Pedro Cadena, Jr. died after having seizures in the jail, and Federic Reyes committed suicide. (P-Appx 26, 30-31, 52, 56) In 2018, Luis Alberto Barrientos also died of sepsis, like Christopher and Andrade. (P-Appx 20-21) According to a news article referencing the settlement, Barrientos "died of a treatable infection while in pre-trial detention at the jail after his medical needs were ignored for days." (P-Appx 329) The County settled a lawsuit over his death for $1,325,0000. (P-Appx 329) Pedro Serna died less than 24 hours after Barrientos. (P-Appx 58-59) In 2021, Ashley Castro died after being found unresponsive in her cell. (P-Appx 33-34) In 2022, Brian McQuarrie died following several incidents resulting in injuries while incarcerated. (P-Appx 45, 49) In 2023, Jorge Duenas was found unresponsive in his cell and later pronounced dead. (P-Appx 39-40, 43) Despite exhibiting signs of medical problems, Duenas had not been receiving medical treatment. (P-Appx 40, 42)

This evidence reinforces a finding that the County had policies, practices, and customs of failing to assess detainees for their medical conditions and failing to provide medical care, in addition to failing to adopt policies to recognize and respond to detainees' serious health issues. All the evidence also demonstrates "different compounding ways that [the County's] alleged

policies might interact, [from which] a jury could reasonably conclude that they had a 'mutually enforcing effect' that deprived" Christopher of his constitutional rights. *Sanchez II*, 956 F.3d at 796. Not only did medical personnel fail to provide lifesaving medical treatment for Christopher's abscess, pneumonia, and ultimately sepsis, medical personnel and jailers also failed to assess Christopher's medical needs. But County employees were just acting according to how "things are done and have been done in" Webb County pursuant to County policy, practice, and custom. *See Grandstaff*, 767 F.2d at 171; *see also Herrera*, Civ. A. No. 5:17-CV-00237, at *14 (P-Appx 482).

### E.  The County's Deliberate Indifference

County officials knew that Christopher had a serious medical condition and responded to him with a cursory level of care that amounted to no care at all. That was deliberate indifference. *See Ford*, 102 F.4th at 308 n.7. First, correctional officers refused to take any responsibility for the medical needs of detainees and would only transfer patients to the medical unit if they were "really, really sick." (P-Appx 126-27, 176-78, 195) Second, paramedic Rivera knew that Christopher was suffering from arm pain and anxiety and that Christopher's arm was swollen and red. (P-Appx 278) But Rivera did not examine Christopher in more than an ineffectual, cursory manner, choosing not to even take Christopher's temperature. (P-Appx __ 249-51) If he had done so and sent Christopher to the ER, as he should have, Christopher more than likely would have survived. (P-Appx 249-50) Instead, Christopher collapsed later that day and ultimately died. (P-Appx 167-68, 251) Third, Nurse Sarquiz-Ortega knew that Christopher thought he had "shot up wrong" and his arm was infected. (P-Appx 268) She also ignored his complaints of arm pain. (P-Appx 197) She and Rivera both decided that Christopher needed nothing more than oral antibiotics pursuant to a generalized standing order, despite the fact that Sarquiz-Ortega knew Christopher was at risk of having an abscess. (P-Appx 198-99) She also refused to do a physical examination or even touch Christopher's arm. (P-Appx 200, 268)

The County Sheriff, as County chief policymaker, also repeatedly chose not to protect County jail detainees from serious medical conditions, despite numerous deaths in County jail from sepsis and other treatable health conditions, addressed above. Choosing to provide medications based only on standing orders that were not specific to detainees is deliberate indifference, particularly in light of the fact that no standing orders addressed abscesses that were so common in the jail. (P-Appx 191) Withholding all but cursory medical care to save costs is another County policy, practice, or custom that reflects deliberate indifference to detainees in need of serious medical care. (P-Appx 13-15) Above all, failing to create a policy even after multiple detainees died from sepsis that would teach jail employees to recognize sepsis or infection, that sepsis is a medical emergency, and that someone with sepsis should be sent to the ER is deliberate indifference. (P-Appx 216-17, 237, 353-55, 358, 372-73) County policies, practices, and customs of providing cursory medical care—if any at all—and failing to assess detainees' medical conditions, present here, thus constitute deliberate indifference. *See Ford*, 102 F.4th at 308 n.7; *see also Sanchez II*, 956 F.3d at 795. It was also obvious that the likely consequence of the County's failure to adopt policies for medical personnel and correctional officers to identify and respond to serious health conditions would be a deprivation of detainees' constitutional rights, which would support a finding of deliberate indifference. *See Harris*, 489 U.S. at 390; *see also Doe*, 153 F.3d at 217.

### VIII.   Conclusion

Plaintiff has presented evidence raising fact questions on each element of her conditions of confinement and alternative episodic acts or omissions claims. For the foregoing reasons, the County's motion for summary judgment should be denied. Plaintiff further prays for such other or further relief to which she is entitled.

Respectfully submitted,

/s/ Jennifer Kingaard
Jennifer Kingaard

Attorney-in-charge:

T. Dean Malone
Texas State Bar No. 24003265
Southern District of Texas Bar No. 37893
dean@deanmalone.com
Law Offices of Dean Malone, P.C.
900 Jackson Street Suite 730
Dallas, Texas 75202
Telephone: (214) 670-9989
Telefax:     (214) 670-9904

Of Counsel:

Jennifer Kingaard
Texas State Bar No. 24048593
Southern District of Texas Bar No. 589455
jennifer.kingaard@deanmalone.com
Alexandra W. Payne
Texas State Bar No. 24118939
Southern District of Texas Bar No. 3799983
alexandra.payne@deanmalone.com
Law Offices of Dean Malone, P.C.
900 Jackson Street Suite 730
Dallas, Texas 75202
Telephone:     (214) 670-9989
Telefax:         (214) 670-9904

Attorneys for Plaintiffs

25

<u>CERTIFICATE OF SERVICE</u>

      I hereby certify that on December 20, 2024, I electronically filed the foregoing document with the clerk of the court for the U.S. District Court, Southern District of Texas, using the electronic case filing system of the court, and the electronic case filing system sent a notice of electronic filing to all attorneys of record.


                     /s/ Jennifer Kingaard
                     Jennifer Kingaard