United States District Court
Southern District of Texas
**ENTERED**
September 26, 2025
Nathan Ochsner, Clerk

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF TEXAS
# LAREDO DIVISION

| | | |
|---|---|---|
| MARIA GARCIA, AS DEPENDENT ADMINISTRATOR OF AND ON BEHALF OF THE ESTATE OF CHRISTOPHER TORRES-GARCIA, AND CHRISTOPHER TORRES-GARCIA'S HEIR(S)-AT-LAW AND WRONGFUL DEATH BENEFICIARIES, | § § § § § § § § § | |
| **Plaintiff,** | § § | CIVIL ACTION NO. 5:23-CV-137 |
| v. | § § | |
| WEBB COUNTY, TEXAS, | § § | |
| **Defendant.** | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendant Webb County's Motion for Summary Judgment, (Dkt. No. 18). Plaintiff Maria Garcia brings this suit as the administrator of the Estate of Christopher Torres-Garcia, who died after being held in pretrial custody at the Webb County Jail. (Dkt. No. 18-1 at 51). Garcia argues that Webb County had a *de facto* policy of not providing sufficient medical care to inmates, asserting claims for unconstitutional conditions of confinement and episodic acts or omissions under 42 U.S.C. § 1983. (Dkt. No. 27 at 12, 14). The Court held a hearing on August 26, 2025. (Min. Entry for Aug. 26, 2025). Also pending before the Court are Defendant's Motion to Strike and Exclude Plaintiffs' Expert Cameron Lindsay, (Dkt. No. 16), and Defendant's Motion to Strike and Exclude Plaintiffs' Expert Ralph D. Scott, Jr., (Dkt. No. 19). For the reasons discussed below, the motion for summary judgment will be granted, and the motions to strike experts will be denied as moot.

# I. BACKGROUND

On December 1, 2021, Christopher Torres-Garcia was arrested and booked at the Webb County Jail. (Dkt. No. 18-1 at 5).[1] Medical staff conducted an intake process that required Torres-Garcia to self-report medical information and history. (*Id.* at 89–94). During the booking process, he admitted to using heroin daily, including that morning. (*Id.* at 71–72). Unbeknownst to jail officials, Torres-Garcia had been hospitalized for a heroin overdose just days prior. (*Id.* at 132). Torres-Garcia requested placement in a detoxification cell, where he would be closely monitored. (*Id.* at 89, 91, 103; Dkt. No. 27-2 at 11–13). There, he received medicine to ease the detoxification process. (Dkt. No. 18-1 at 102, 105). Correctional officers checked his cell several times every hour. (*Id.* at 87).

On the morning of December 7, 2021, during a routine medication pass, Torres-Garcia complained of arm pain. (*Id.* at 65). He told the nurse, Marina Sarquiz-Ortega, that he had "shot up wrong" and had an infection in his arm. (*Id.*). She didn't see an open abscess and did not touch his arm or otherwise physically examine him during the evaluation. (*Id.*). After Torres-Garcia reported arm pain, she went back to the medical unit to consult her supervisors. (Dkt. No. 27-2 at 97). Sarquiz-Ortega and her supervisor, EMT Javier Rivera, decided that they would start Torres-Garcia on an antibiotic regimen pursuant to a standing order from the jail's contract physician, Dr. Arturo Garza-Gongora. (*Id.* at 99; Dkt. No. 18-1 at 97). The standing order called for Bactrim and Clindamycin, which Sarquiz-Ortega ordered. (Dkt. No. 18-1 at 105–06). He took one dose that evening. (*Id.* at 66).

On December 8, 2021, during pill pass around 8 a.m., Torres-Garcia took his antibiotic without complaint. (*Id.* at 65, 72). But later that morning, at 10:40 a.m., Torres-Garcia reported that he could not breathe and complained of left arm pain. (*Id.* at 72, 76). Officers took Torres-Garcia from Cell 110 to the medical unit, where he told EMT Rivera that his infection had worsened and "was getting to the bone." (*Id.* at 72). He was struggling to breathe and was afraid because of an abscess on his arm and shoulder area. (*Id.* at 72, 103). He requested anxiety medication, but the paramedic calmed him down

---

[1] Based on the record and statements by the parties at the hearing on August 26, 2025, the following facts are uncontested. When citing to the page numbers of any document in the record, the Court will cite to the page numbering of the Court's internal CM/ECF docket system, and not to the page numbers in the underlying documents.

and advised that he would schedule him for a mental health appointment. (*Id.* at 75, 103). After Torres-Garcia calmed down, the paramedic checked his vital signs, which were normal, and noted that he had already been prescribed antibiotics. (*Id.* at 75). Although Torres-Garcia's arm was red and swollen, it wasn't hot to the touch. (*Id.*). Before Torres-Garcia returned to his cell, the paramedic assured him that the medication would be continued until the infection healed. (*Id.*).

At 11:14 a.m., Torres-Garcia returned to Cell 110. (*Id.* at 76). During the next two hours, he received medication and a meal. (*Id.*). He was moving periodically throughout that time. (*Id.*). At 1:16 p.m., Torres-Garcia reported to Officer Gonzalez that he was not feeling well and had chest pains. (*Id.* at 44–47). Correctional officers Molina, Gonzalez, and Aguilera were present for roll call. (*Id.*). They opened the cell so that Torres-Garcia could walk to the medical unit with Officer Gonzalez, but Torres-Garcia stumbled and collapsed. (*Id.*). Gonzalez and Molina helped stabilize him, and Aguilera went to get a wheelchair and advise medical staff that assistance was needed. (*Id.*).

At 1:18 p.m., medical staff arrived at Cell 110. (*Id.* at 76). The officers and medical staff put Torres-Garcia in a wheelchair to take him to the medical unit. (*Id.* at 44–47). Torres-Garcia's breathing was rapid. (*Id.* at 72, 99). His oxygen saturation fell to 65%, while his heart rate rose to 245 beats per minute. (*Id.* at 99). He quickly became nonresponsive. (*Id.* at 99–100). Sarquiz-Ortega and Ramiro Elizondo, another nurse, provided medical care in an attempt to stabilize Torres-Garcia, and they called Emergency Medical Services at 1:30 p.m. (*Id.* at 74, 99–100).

EMS arrived at 1:37 p.m. and took Torres-Garcia by ambulance to the Laredo Medical Center at 1:53 p.m. (*Id.* at 48–49, 74). Hospital staff resuscitated Torres-Garcia twice, but during surgery he developed complications. (*Id.* at 48–49). At 4:15 p.m., the operating physician ordered hospital staff to cease all treatment and declared Torres-Garcia dead. (*Id.*). Torres-Garcia's medical transport team then reported the death to the Webb County Sheriff's Office. (*Id.*).

After Torres-Garcia died, the Webb County Medical Examiner performed an autopsy. (*Id.* at 134). She found a pus-filled abscess under a patch of red, hard skin on Torres-Garcia's shoulder, and another on his forearm. (Dkt. No. 27-1 at 5). Ultimately,

the Chief Medical Examiner determined that Torres-Garcia "died from sepsis due to infected drug injection sites." (Dkt. No. 18-1 at 134).

Over the next two years, the Texas Rangers from the Department of Public Safety investigated Torres-Garcia's death. (*Id.* at 51–85). Upon completing the investigation, they submitted a report to the Webb County District Attorney's Office, which declined to file criminal charges in connection with Torres-Garcia's death. (*Id.* at 80). The Texas Commission on Jail Standards ("TCJS") also investigated and determined that Webb County had not violated minimum jail standards. (*Id.* at 137).

## II. LEGAL STANDARDS

### A. Summary Judgment

A "court shall grant summary judgment if the movant shows that there is no genuine dispute of any material fact, and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must consider the record as a whole to determine whether a genuine dispute exists. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). However, the Court must view the facts in the light most favorable to the nonmoving party. *Valderas v. City of Lubbock*, 937 F.3d 384, 389 (5th Cir. 2019). Once a party has properly moved for summary judgment under Rule 56, the non-movant must demonstrate which "specific facts" show that there is a genuine dispute. *Celotex*, 477 U.S. at 324. A genuine dispute exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Accordingly, the Court must construe all facts and draw all inferences in the light most favorable to the non-movant. *Id.* at 255. However, the presence of a mere scintilla of evidence is not sufficient to overcome a motion for summary judgment. *Id.* at 252.

### B. Theories of Liability under 42 U.S.C. § 1983

"[W]hen the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—*e.g.*, food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by the [Constitution]." *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 200

(1989). For pretrial detainees, this obligation arises from the Due Process Clause of the Fourteenth Amendment. *Hare v. City of Corinth*, 74 F.3d 633, 639 (5th Cir. 1996) (citing *Bell v. Wolfish*, 441 U.S. 520, 535 (1979)). Among other things, it requires that governmental entities must provide pretrial detainees with medical care. *Id*. Pretrial detainees may bring Fourteenth Amendment claims under two theories: (1) conditions of confinement and (2) episodic acts or omissions. *Shepherd v. Dallas County*, 591 F.3d 445, 452 (5th Cir. 2009). When these claims are brought against municipalities, a plaintiff must properly assert a *Monell* claim alleging an unconstitutional policy. *See Monell v. N.Y.C. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978).

### 1. *Municipal Liability Under* Monell

Claims under 42 U.S.C. § 1983 may be brought against governmental entities if a violation of plaintiff's constitutional rights occurred as the result of a municipal policy. *See id*. at 690. "To succeed on a *Monell* claim, plaintiffs must show (1) an official policy (or custom), of which (2) a policy maker with charged with actual or constructive knowledge, and (3) a constitutional violation whose moving force is that policy (or custom)." *Langiano v. City of Fort Worth*, 131 F.4th 285, 294 (5th Cir. 2025) (citation modified).

First, a plaintiff may establish an official policy by showing "written policy statements, ordinances, or regulations," a widespread and well-settled practice or custom that fairly represents county policy, or by showing that the policymaker committed the underlying constitutional violation. *Webb v. Town of Saint Joseph*, 925 F.3d 209, 215 (5th Cir. 2019).

Second, a plaintiff must establish a policymaker with final responsibility "for making law or setting policy" in an area of county business. *Robinson v. Hunt County*, 921 F.3d 440, 448 (5th Cir. 2019) (citation modified). "The identity of the policymaker is a question of law, not of fact—specifically, a question of state law." *Id*. (citation modified). In Texas, county sheriffs are "final policymakers in the area of law enforcement." *Williams v. Kaufman County*, 352 F.3d 994, 1013 (5th Cir. 2003) (citation modified). This includes jails. *See Moreno v. Aransas Cnty. Sheriff's Off.*, No. 2:23-CV-00213, 2024 WL 3926962, at *6 n.3 (S.D. Tex. Feb. 16, 2024) (quoting Tex. Loc. Gov't Code § 351.041(a)),

*report and recommendation adopted sub nom. Moreno v. Mills*, No. 2:23-CV-00213, 2024 WL 3929889 (S.D. Tex. Aug. 22, 2024).

Third, a plaintiff must show that the constitutional violation was caused by the policy or custom. To prove this, a plaintiff must establish a "direct causal link between the [county's] action and the deprivation of federal rights." *Valle v. City of Houston*, 613 F.3d 536, 542 (5th Cir. 2010). The decision must demonstrate the county's "deliberate indifference to the risk that a violation of a particular constitutional or statutory right" would follow. *Id.* "Deliberate indifference is a high standard" that exceeds "even heightened negligence." *Id.*

### 2. Conditions of Confinement

Plaintiffs who challenge conditions of confinement are attacking the "general conditions, practices, rules, or restrictions of pretrial confinement." *Ford v. Anderson County*, 102 F.4th 292, 320 n.16 (5th Cir. 2024) (citation modified). To challenge a condition of confinement, detainees "must demonstrate a pervasive pattern of serious deficiencies in providing for [their] basic human needs." *Est. of Bonilla v. Orange County*, 982 F.3d 298, 309 (citation modified). To prevail on such a claim, a plaintiff must establish three elements: (1) a condition; (2) that the condition wasn't "reasonably related to a legitimate governmental objective"; and (3) that the condition caused a constitutional violation. *Id.*, 983 F.3d at 308–09. "[T]he proper inquiry is whether those conditions amount to punishment of the detainee." *Cadena v. El Paso County*, 946 F.3d 717, 727 (5th Cir. 2020) (quoting *Bell*, 441 U.S. at 535).

First, a plaintiff must identify a "condition," which can be "a rule, a restriction, an identifiable intended condition or practice, or acts or omissions by a jail official that are sufficiently extended or pervasive." *Cadena*, 946 F.3d at 727 (citation modified). "In some cases, a condition may reflect an unstated or *de facto* policy, as evidenced by a pattern of acts or omissions sufficiently extended or pervasive, or otherwise typical of extended or pervasive misconduct by jail officials, to prove an intended condition or practice." *Id.* (citation modified). Even so, "isolated examples of illness, injury, or even death, standing alone, cannot prove that conditions of confinement are constitutionally inadequate." *Shepherd*, 591 F.3d at 452. Likewise, "the Constitution is not concerned with a *de*

*minimis* level of imposition on pretrial detainees." *Collins v. Ainsworth*, 382 F.3d 529, 540 (5th Cir. 2004). "Proving a pattern is a heavy burden . . . that has rarely been met." *Bonilla*, 982 F.3d at 309 (citation modified).

Second, a plaintiff must show that the challenged condition "is not reasonably related to a legitimate, non-punitive governmental objective." *See Cadena*, 946 F.3d at 727 (5th Cir. 2020) (citation modified). Once accomplished, a court may infer that the county maintained the condition to punish detainees. *Garza v. City of Donna*, 922 F.3d 626, 632 (5th Cir. 2019). As a result, when challenging conditions of confinement, plaintiffs are "relieved from the burden of demonstrating a municipal entity's or individual jail official's actual intent to punish." *Ford*, 102 F.4th at 320 n.16 (quoting *Shepherd*, 591 F.3d at 452).

Third, a plaintiff must prove that the challenged condition caused the alleged violation. *Bonilla*, 982 F.3d at 309. This causation standard mirrors the "moving force" and "direct causal link" required by *Monell*. *Id.* at 309, 311–12.

### 3. Episodic Acts or Omissions

In the alternative, Garcia asserts episodic-act-or-omission claims, which arise when "the complained-of-harm is a particular act or omission of one or more officials." *Bonilla*, 982 F.3d at 304. "To establish municipal liability in an episodic-act case, a plaintiff must show (1) that the municipal employee violated the pretrial detainee's clearly established constitutional rights with subjective deliberate indifference; and (2) that this violation resulted from a municipal policy or custom adopted and maintained with objective deliberate indifference." *Cadena*, 946 F.3d at 727 (citation modified).

A detainee has the right to medical care to address a serious medical need, defined as "one for which treatment has been recommended or for which the need is so apparent that even laymen would recognize that care is required." *Gobert v. Caldwell*, 463 F.3d 339, 345 n.12 (5th Cir. 2006). A municipal employee acting with deliberate indifference acts with "something more than mere negligence" but less than actual intent to cause harm. *Farmer v. Brennan*, 511 U.S. 825, 835 (1994). This "is an extremely high standard to meet." *Domino v. Tex. Dep't of Crim. Just.*, 239 F.3d 752, 756 (5th Cir. 2001). At its root, subjective deliberate indifference amounts to recklessness. *Farmer*, 511 U.S. at 635.

Finally, an episodic-act claim against a municipality requires that the alleged constitutional violation have resulted "from a municipal policy or custom adopted and maintained with objective deliberate indifference." *Brumfield v. Hollins*, 551 F.3d 322, 331 (5th Cir. 2008). This standard considers the policymakers actual and constructive knowledge, i.e., "what he should have known, given the facts and circumstances surrounding the official policy and its impact on the pretrial detainee's rights." *Lawson v. Dallas County*, 286 F.3d 257, 264 (5th Cir. 2002).

## III. DISCUSSION

At bottom, both the conditions-of-confinement claim and the episodic-acts-or-omissions claim require Garcia to show a constitutional violation as the result of some policy or custom that caused Torres-Garcia's death. Importantly, each claim should be classified as a condition of confinement or an episodic act or omission. *Hare*, 74 F.3d 633, 644–45. Garcia alleges the following policies and conditions:

1. "Webb County failed to monitor or in the alternative had inadequate monitoring of detainees";

2. "Webb County failed to reprimand and/or take remedial action against employees and/or agents as a result of action and/or inaction related to the decedent's suffering and death";

3. "Webb County, while knowing that detainees needed immediate emergency medical care, would continue incarcerating such detainees in lieu of obtaining such needed care";

4. "Webb County, in the alternative, while monitoring detainees, failed to take action based upon material information obtained during such monitoring regarding serious health issues . . . to attempt to save costs";

5. "Webb County would take actions designed to save Webb County costs, by failing and/or refusing to transport to a local emergency room detainees who vitally needed emergency medical care";

6. "Webb County failed to provide and/or delayed providing medical treatment to detainees";

7. "Webb County may [have] treated detainees without apparent health insurance, Medicare coverage, or Medicaid coverage differently than those with such coverage";

8. "Webb County may have only contacted EMS and/or transported a person to a local hospital if the person appeared to be near death or had become nonresponsive";

9. "Webb County employees may not have responded, or in the alternative not responded appropriately, to serious medical and/or mental health situations";

10. The "schedule and the services of only one physician were woefully inadequate";

11. "Webb County had no policy and provided no training regarding recognition of pneumonia in detainees";

12. "Webb County had no policy and provided no training regarding recognition of sepsis in detainees";

13. "Webb County had no policy and provided no training regarding recognition of IV drug user–specific healthcare issues";

14. "Webb County had no policy and provided no training regarding obtaining blood tests for detainees who were known IV drug users, and/or had known infections";

15. "Webb County had a policy of not obtaining a medical clearance at a local hospital for known heroin/IV drug users";

16. "Webb County had a custom or practice, but not a written policy, to simply take detainees to 'medical' when they complained, not conduct any evaluation of any substance, and then return such detainees to their cells, just so that figurative 'boxes could be checked.'"

17. "Webb County may have had a custom or practice, but not a written policy, to not conduct evaluations of detainees with serious medical issues but instead simply to provide medication based upon standing orders and not based on a detainee's specific medical needs."

(Dkt. No. 1 at 36–39).

As a preliminary matter, the Court determines that Policy No. 2, alleging that the County failed to reprimand or take remedial action against employees as a result of Torres-Garcia's death, does not give rise to a § 1983 claim. While it is true that employees were not reprimanded, (Dkt. No. 27-3 at 25), the Court finds that these facts do not support a condition of confinement or episodic act or omission. The failure was not the moving force behind Torres-Garcia's death nor was it a constitutional violation of his

rights because the failure occurred after his death. Regardless, this evidence remains relevant to the analysis of *Monell* liability with respect to other claims.

The Court will address each remaining policy and condition, individually and collectively,[2] beginning with conditions of confinement and then turning to episodic acts or omissions.

### 1. Conditions-of-Confinement Claims

Garcia contends that Webb County had "a de facto policy of grossly inadequate" medical care. (Dkt. No. 27 at 17). To support her conditions-of-confinement claims, Garcia attacks various County practices. She also argues that these policies had a "mutually enforcing effect" that collectively violated Garcia's right to medical care. (*Id.* at 16) (quoting *Sanchez v. Young County (Sanchez II)*, 956 F.3d 785, 795 (5th Cir. 2020).

Of the specific policies pleaded in Garcia's complaint and discussed in her response to the instant motion, most can be classified as conditions of confinement. These include failure to monitor detainees; continuing to incarcerate detainees in lieu of providing medical care for known medical emergencies; failure to act on material information to save costs; failure to transport detainees for medical treatment to save costs; failure to provide or delay medical care; insurance discrimination; only contacting EMS if detainee was near death or nonresponsive; failure to respond to serious medical situations; inadequate medical staffing arrangement; not obtaining medical clearance at booking for IV-drug users; only taking detainees to 'medical' when they complained, not conducting any evaluation of any substance, and then returning such detainees to their cells; and not conducting evaluations of detainees with serious medical issues but instead only providing medication based upon standing orders. (Dkt. No. 1 at 36–39; Dkt. No. 27 at 9, 17, 19, 21–24).

These claims require proof of (1) a condition; (2) that the condition wasn't "reasonably related to a legitimate governmental objective"; and (3) that the condition caused a constitutional violation. *Bonilla*, 983 F.3d at 308–09. Importantly, the analysis of *Monell* liability is inextricably linked with the analysis of conditions-of-confinement

---

[2] As Garcia notes, the Court should analyze each policy individually and collectively to determine whether the policies had a "'mutually enforcing effect that deprived' Christopher of his constitutional rights." (Dkt. No. 27 at 28 (quoting *Sanchez II*, 956 F.3d at 796 (citation modified)).

claims. As the Fifth Circuit has held, there is no "meaningful difference" between the required showing of a policy, pattern, or practice under *Monell* and a pervasive condition or practice under a conditions-of-confinement claim. *Duvall*, 631 F.3d at 208.

### a. Policies Related to Cost Savings

First, Garcia fails to create a fact issue with respect to various policies alleged in the complaint. Once a party has moved for summary judgment under Rule 56, the non-movant must demonstrate which "specific facts" show that there is a genuine dispute. *Celotex*, 477 U.S. at 324. Insufficient and uncorroborated evidence of a municipal policy does not support a denial of summary judgment. *See Ford*, 102 F.4th at 322–23 (affirming summary judgment when only one jailer could testify about an allegedly existing policy). Specifically, Garcia fails to present even a scintilla of evidence in support of the allegations that Webb County failed to act on material information to save costs, failed to transport detainees for medical treatment to save costs, discriminated against detainees based on insurance coverage, and only contacted EMS or transported detainees to the hospital when they were near death or nonresponsive. (Dkt. No. 1 at 36–37).

As for the first two policies with respect to saving costs, the only evidence Garcia references is Webb County's contract with the jail physician and that the county paid for medical transport. (Dkt. No. 27 at 21; Dkt. No. 27-3 at 26). Garcia cites contract provisions that the physician will provide "guidance and preparation of the annual medical budget," including "the development of a billing process as to reduce the costs to the county in situations where the detainee qualifies or has existing medical coverage by third party payers," and that the physician is reimbursed for "any and all hospital bills, ambulance service, and other reasonable and necessary expenses for services rendered." (Dkt. No. 27-1 at 14–15). These facts, taken in the light most favorable to Garcia, do not sufficiently allege a conditions-of-confinement claim. Even if these provisions amounted to a condition, Garcia presents no evidence that the condition is not reasonably related to a legitimate governmental objective nor that the policy denies pretrial detainees at Webb County Jail the right to medical care, amounting to a constitutional violation. Because Garcia fails to create a genuine dispute of material fact as to these cost-saving policies, the Court finds that the claims do not survive summary judgment.

The alleged insurance discrimination policy is also unsubstantiated by the summary judgment evidence. The only reference to insurance coverage in the record is the contract provision quoted above. *Id.* Webb County's initiative to "reduce the costs to the county in situations where the detainee qualifies or has existing medical coverage by third party payers" alone does not sufficiently support or explain the existence of a pervasive policy to discriminate between detainees based on healthcare insurance coverage. *See id.* Without additional evidence that this discrimination was a Webb County policy, this claim fails.

The EMS-transport policy is also unsubstantiated. In her complaint, Garcia claims that Webb County only contacted EMS or took detainees to the hospital when they were near death or nonresponsive. (Dkt. No. 1 at 37). However, Garcia's Response to the Motion for Summary Judgment does not address this claim. (*See* Dkt. No. 27). Likewise, the summary judgment evidence does not support the existence of this policy or a pervasive pattern of this conduct sufficient to establish a *de facto* policy.

### b. *Remaining Conditions-of-Confinement Claims*

Second, Garcia argues that Webb County had a *de facto* policy of grossly inadequate evaluation, monitoring, and treatment. (*Id.* at 17). Collectively, this argument includes various policies identified in Garcia's complaint, analyzed individually and collectively below, as claims for failures to monitor, failures to assess, and failures to provide necessary medical care.

### i. *Failure to Monitor*

Garcia alleges that Webb County had a *de facto* policy of failing to adequately monitor detainees. (Dkt. No. 1 at 36). Garcia must establish that Webb County failed to monitor detainees "as evidenced by a pattern of acts or omissions sufficiently extended or pervasive." *Cadena*, 946 F.3d at 727 (citation modified). For example, the Fifth Circuit found that there was a fact issue on a failure-to-monitor claim when the plaintiff offered evidence of unreliable electronic wand system records, cell-check logs, and video recordings. *Sanchez II*, 956 F.3d at 793. This evidence created a credibility issue and, when combined with other factors, precluded summary judgment.

Other cases demonstrate examples rising closer to a claim of inadequate monitoring, but even still fail to demonstrate a policy. One such case is *Cardenas v. Lee County*, 569 F. App'x 252, 255 (5th Cir. 2014). There, Cardenas fell ill while in jail, was taken to the hospital, but was subsequently returned to the jail. *Cardenas*, 569 F. App'x at 254. Two days later, Cardenas was shaking and had a high pulse and high blood pressure. *Id.* Jail officials did nothing except tell the incoming shift to monitor him. *Id.* During the night, jailers were alerted that Cardenas had vomited a white substance. *Id.* They checked on him later but could not wake him up and did not check his vital signs. *Id.* They checked on him again at 6:00 a.m., but he had died. *Id.* The cause of death was multiple drug toxicity. *Id.* The court found that Cardenas was provided medical care and that "a failure in judgment by the prison officials" is not evidence of a policy of denying medical care to inmates. *Id.* at 256.

The Court must also consider evidence of policymaker acquiescence to determine whether there is genuine issue of material fact about the existence of a policy. Practices that are "sufficiently extended or pervasive, or otherwise typical of extended or pervasive misconduct," can represent official policy. *Hare*, 74 F.3d at 645. "This is because pervasive practices can be evidence that the official policymaker knew of and acquiesced to the misconduct, making the municipality culpable." *Sanchez II*, 956 F.3d at 793 (citing *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001)). In *Sanchez II*, the parties did not dispute that the policymaker knew details of relevant TCJS reports or the detainee's death, so his failure to reprimand employees was proof that the policymaker acquiesced to the policy. *Sanchez II*, 956 F.3d at 793.

Here, the parties agree that Sheriff Martin Cuellar was the relevant policymaker at the time of Torres-Garcia's death. (Dkt. No. 27 at 13; Dkt. No. 27-3 at 36). But Garcia does not identify any evidence that the sheriff read the TCJS reports, knew details of the death, or recognized that there were issues with monitoring detainees. (Dkt. No. 27-1 at 91–93). And even if the sheriff had constructive knowledge of what was in the reports or of what was known by the chiefs and captains that report to him, there is no evidence that would have put the sheriff on notice that a policy of failing to monitor detainees caused Torres-Garcia's death. So the lack remedial action against jail staff fails to establish that the policymaker acquiesced to any policy of failing to monitor detainees.

Ultimately, the evidence does not support a claim that Webb County had a policy of failing to adequately monitor detainees. In Torres-Garcia's case, the Texas Rangers' investigation report and deposition testimony from jailers and medical staff demonstrate that detainees were adequately monitored. Though the Texas Rangers report is not dispositive, it does constitute evidence that jail staff monitored Torres-Garcia while he was in custody and did so to a degree that precludes a fact issue on a failure-to-monitor claim. For example, video footage reflects that Torres-Garcia's interactions with jail staff resulted in timely monitoring on December 8th. (Dkt. No. 18-1 at 73, 76–77). Torres-Garcia was in a close observation cell, except during the times he was being taken to medical. (Dkt. No. 27-2 at 50; Dkt. No. 27-6 at 5). Each of his medical complaints were met with a prompt response from medical staff, as shown by the report and various depositions. (*Id.* at 63–66, 75; Dkt. No. 27-2 at 34, 97–99). Torres-Garcia received closer and more adequate monitoring than the detainee in *Cardenas*. Unlike in *Cardenas*, jail officials continually monitored Torres-Garcia.

Garcia also points to prior incidents resulting in death in Webb County Jail in support of the argument that there was a policy of failing to monitor detainees and provide adequate medical care. (Dkt. No. 27 at 27).[3] Of these, only two detainees—Mario Andrade, Jr., and Luis Alberto Barrientos—died of sepsis. (*Id.*). The others died of a variety of causes including suicide, drug overdoses, and delirium tremors. (*Id.*). Garcia provides evidence of these inmates' deaths (and in some, but not all, cases, ensuing litigation) through different mediums including custodial death reports, a newspaper article, deposition testimony, and, in one case, the complaint from a lawsuit. But she does not point to any evidence that these deaths were determined or confirmed to be the result of inadequate monitoring. Instead, she merely demonstrates that these deaths occurred at the Webb County Jail. Absent any showing that these deaths were caused by—or in any way related to—the policies she alleges create an unconstitutionally deficient medical system, they do not create a genuine dispute of material fact regarding Webb County's policies. Evidence that someone died at the jail, without connecting it to

---

[3] In its Reply, Webb County objected to this evidence of these prior deaths. (Dkt. No. 28 at 1–9). Garcia responded by filing a Sur-reply. (Dkt. No. 31). However, it is not necessary to rule on these objections because, even considering this evidence, there is no genuine dispute of material fact on the failure-to-monitor claim.

deficient medical care or policies, "does not show a systematic policy or failure." *Campos v. Webb County*, 597 F. App'x 787, 792 (5th Cir. 2015).

Garcia does provide evidence of two cases of inmates who died of sepsis—Luis Alberto Barrientos and Mario Andrade, Jr. Garcia provided Barrientos' Custodial Death Report and a news article regarding the settlement of a lawsuit over his death. (Dkt. No. 27-1 at 24, 329). However, the Custodial Death Report provides no detail regarding how Webb County's policies created an unconstitutional condition of confinement. (*Id.* at 24). And the news article regarding the settlement, (*Id.* at 329–31), "is not an indication of the truth of the allegations in a complaint." *Martinez v. Walgreen Co.*, No. 7:17–CV–309, 2018 WL 3241228, at *5 (S.D. Tex. July 3, 2018); *see also* Fed. R. Evid. 408(a)(1) (excluding evidence of a settlement to prove the validity of a claim); *United States v. Hays*, 872 F.2d 582, 588–89 (5th Cir. 1989) (noting that a settlement agreement is inadmissible unless it is provided for a permissible purpose under Rule 408(b)). The news article is also hearsay, and Webb County's objections to its admissibility as summary judgment evidence are sustained.

As for Andrade, Garcia provides significantly more evidence regarding the circumstances of his death, including documents from the litigation surrounding his death, such as the District Court's Order denying a motion for summary judgment on a conditions-of-confinement claim. *Herrera v. Webb County*, No. 5:17-cv-237, slip op. at 18 (S.D. Tex. Feb. 15, 2022). But the case is distinguishable and fails to establish a pervasive pattern.[4] The facts of Andrade's case are as follows: When he was arrested, he was evaluated by an EMT upon booking. *Herrera*, No. 5:17-cv-237, slip op. at 1. He had an elevated pulse and complained of knee pain, but the EMT did not investigate further, except for noting the swelling. *Id.* at 2. The EMT believed him to be under the influence of drugs, so he placed him in a cell where he was supposed to be observed by staff every fifteen minutes. *Id.* No other medical professional visited with Andrade or consulted on his case. *Id.* He was later seen to be unable to stand and having difficulty walking, but jail officials still did nothing. *Id.*

---

[4] Consideration of Andrade's deficient medical treatment also fails to establish a *de facto* policy. Andrade's death from sepsis in 2015 is insufficient to support the existence of a pervasive pattern for the purposes of a conditions-of-confinement claim. These deaths are more similar to "isolated examples," which fall short of a *de facto* policy. *See Shepherd*, 591 F.3d at 452.

Over the next two days, Andrade was allegedly observed by staff who continually reported that he was "laying down," "asleep," or "ok." *Id.* at 3. No staff member ever inquired about Andrade's injury or verbally communicated with him in any way. *Id.* Late one evening, a guard noticed that he was lying on the floor and did nothing. *Id.* Thirty minutes later, he tried to wake Andrade up but was unsuccessful, so medical personnel were called resuscitate him. *Id.* It was later determined that he had died of sepsis one to two hours before, casting serious doubt on the jail officials' claims that they checked on him every fifteen minutes. *Id.*

The facts of the present case are plainly distinguishable from the Andrade case. Andrade received essentially no medical care or monitoring whatsoever. He was simply placed in an observation cell until he died. In contrast, Torres-Garcia continually received medical care as a result of timely monitoring, regardless of whether the medical treatment he received was ultimately deficient. After considering the summary judgment evidence, the Court finds that there is no genuine dispute of material fact with respect to a policy of failing to adequately monitor pretrial detainees.

### ii.    *Failure to Assess*

Garcia alleges that Webb County had various policies with respect to failures in evaluating detainees' health conditions, which the Court construes as failing to adequately assess detainees. (Dkt. No. 1 at 36–39). These include a failure to assess and respond to serious medical conditions; conducting only cursory examinations; using an inadequate staffing arrangement where nonphysicians assess detainees; and failures to conduct evaluations of detainees with serious medical issues and instead rely on standing orders. (*Id.*). These claims collectively and individually allege that Webb County had a policy of failing to assess medical conditions in pretrial detainees.

First, the Court will address Webb County's staffing arrangement and standing orders. The County retained Dr. Garza-Gongora as the jail physician, and he visited the jail a few times per week. (Dkt. No. 27-1 at 12–18; Dkt. No. 27-2 at 94; Dkt. No. 27-3 at 26–27). The rest of the medical staff was comprised of licensed vocational nurses ("LVN"), paramedics ("EMT"), and registered nurses ("RN"). (*See* 27-2 at 48; Dkt. No. 27-3 at 21). When confronted with different medical conditions, these nurses and EMTs would

implement standing orders, or protocols, approved by Dr. Garza-Gongora. (Dkt. No. 27-2 at 91–92; Dkt. No. 27-3 at 6). For example, there were standing orders for commonly required treatments, like prescribing medications for drug detoxification and antibiotics for infection. (*Id.*). Based on the evidence, these were clearly policies and customs employed by the county to provide medical care to detainees. *See Montano v. Orange County*, 842 F.3d 865, 875 (5th Cir. 2016) ("consistent testimony of jail employees is sufficient to prove an established *de facto* policy").

Garcia argues that the generalized nature of standing orders and the lack of a standing order for abscesses amounted to cursory care. (Dkt. No. 27 at 10). Garcia directs the Court to *Ford v. Anderson* as authority that "cursory medical care that the Fifth Circuit warned does not pass constitutional muster." (Dkt. No. 27 at 20 (citing *Ford*, 102 F.4th at 308 n.7)). However, the cases cited in *Ford* are distinguishable for two reasons. First, the relevant analysis in those decisions considered deliberate indifference, which is not applicable to conditions-of-confinement claims. *Shepherd*, 591 F.3d at 452. Second, these cases highlight situations where nominal medical care was provided in spite of knowledge that there was a serious medical need. For example, in *Ledesma v. Swartz*, complaints of a broken jaw were met with over-the-counter pain medication and a liquid diet. 328 F.3d 204, 206, 210 (5th Cir. 2003). In *Loosier v. Unknown Medical Doctor*, a doctor knew that the prisoner had injured his neck but "chose not to provide him any treatment or medication for his injury." 435 F. App'x 302, 306 (5th Cir. 2010). These examples differ from the facts of the present case. Torres-Garcia received antibiotics, not because it was known that he had sepsis, which might amount to cursory care; instead, he received antibiotics to treat arm pain and a possible infection. (Dkt. No. 27-2 at 98–100). The fact that medical providers did not know that Torres-Garcia had a more serious condition means that the antibiotics were not inherently cursory care like the cases cited in *Ford*.

Additionally, these same policies, creating a sort of "multi-tiered staffing arrangement" and choosing whether to utilize standing orders, have been upheld as constitutional. *See Est. of Henson v. Wichita County*, 795 F.3d 456, 469 (5th Cir. 2015) (affirming summary judgment on certain policies because the plaintiff failed to establish that the policies were unrelated to a legitimate government objective). In *Henson*, such

policies included a practice of nurses performing day-to-day treatment of detainees while an offsite doctor regularly visited the facility and was on call to provide medical care for the jail. *Id.* at 468. The Fifth Circuit found that this same staffing arrangement had a "reasonable relation to providing medical attention to inmates with varying levels of need." *Id.* at 469. There, the plaintiff argued that the use of LVNs without supervision by a physician and a lack of standing orders created a "woefully inadequate" medical care system. *Id.* The Fifth Circuit rejected this argument, finding that even though the LVNs needed to call the doctor "rather than providing them with standing orders to deal with serious medical problems," the system was constitutional. *Id.* This reasoning suggests that standing orders to provide immediate treatment for serious medical conditions rises above the care in *Henson*, and it is reasonably related to a legitimate governmental objective—providing medical care. *See id.* For these reasons, the staffing arrangement, use of standing orders, and lack of a standing order for abscesses do not form the basis for a conditions-of-confinement claim in this case.

Next, the Court will address other policies potentially demonstrating a failure to assess detainees. Garcia alleges that Webb County employees had a *de facto* policy of failing to adequately assess and evaluate serious medical conditions. (Dkt. No. 1 at 37–39). Namely, that Webb County did not respond appropriately to serious medical needs that were visible and apparent and only took detainees to and from medical so that "boxes could be checked." (*Id.*). Garcia must establish that Webb County failed to assess detainees "as evidenced by a pattern of acts or omissions sufficiently extended or pervasive." *Cadena*, 946 F.3d at 727 (citation modified).

An example of a *de facto* policy where the Court found a pervasive practice of failing to assess is found in *Sanchez II*. 956 F.3d at 794. In *Sanchez II*, Simpson died of a drug overdose as a pretrial detainee. *Id.* at 787. A few weeks earlier, she attempted suicide and told her husband that she would disappear and overdose on pills if she were to attempt suicide again. *Id.* Leading up to her arrest, she was found in her car on the side of the road after her husband reported her missing. *Id.* at 787–88. Police found empty beer cans and pill containers in the car, and she seemed intoxicated. *Id.* After an evaluation by EMS, the police arrested her for public intoxication finding that she would be a danger to herself or others if left alone. *Id.* In the jail, Simpson was placed in a

holding cell to "sleep off" her intoxication before she was booked and screened by medical. *Id.* Sanchez alleged that the jail had a *de facto* policy of "misclassifying and misplacing highly intoxicated pretrial detainees in cells that lacked maximum visual observation at all times." *Id.* at 794. This pattern was established with consistent testimony from employees that the custom was to let detainees "sleep off" their intoxication before conducting intake procedures. *Id.*

Here, the purported policies and evidence are distinguishable from *Sanchez II.* Garcia fails to identify and support cognizable practices unrelated to a legitimate government objective through jail staff testimony or prior incidents. Garcia highlights deposition testimony from Nurse Sarquiz-Ortega stating that the intake procedures were not to conduct "strip searches or assess them physically apart from what we can see." (Dkt. No. 27-2 at 94). But other evidence shows that medical examinations included visual observations, the taking of vitals, and observations about "chills, tremors, fever." (Dkt. No. 27-1 at 11; Dkt. No. 27-3 at 7; Dkt. No. 27-6 at 3). The Fifth Circuit has held that a conditions claim regarding detainees' self-reporting of medical conditions failed where the evidence demonstrated that jail personnel did weigh other factors in their evaluation, in addition to the self-reported information. *See Bonilla*, 982 F.3d 298, at 309. Thus, this deposition testimony fails to create a genuine dispute of material fact about a policy unrelated to a legitimate government objective.

Garcia also alleges that Webb County had a policy of only taking detainees to and from the medical unit so that "boxes could be checked." (Dkt. No. 1 at 38–39). But the summary judgment evidence instead shows that jail staff was quick to take detainees to medical, and that those evaluations were substantive. For example, Oscar Molina, a jailer, testified in his deposition that detainees would be taken to medical for any medical complaint. (Dkt. No. 27-2 at 76). Another jailer, Ivan Gonzalez, said that infected IV-injections sites would be a concern leading the jailer to take a detainee to medical. (Dkt. No. 27-2 at 31). Gonzalez also took Torres-Garcia to medical for flu-like symptoms, even though it did not seem like a medical emergency at the time. (*Id.* at 34). The evidence also supports that visits to medical resulted in actual treatment beyond cursory checks. For example, Nurse Sarquiz-Ortega initially started Torres-Garcia on antibiotics after he complained of arm pain, even though she did not touch his arm, and she conferred

with other medical staff about his condition. (Dkt. No. 27-2 at 97). Additionally, when EMT Rivera met with Torres-Garcia on the morning of December 8, he took Torres-Garcia's vitals, evaluated his arm, and explained that Torres-Garcia would continue on antibiotics. (Dkt. No. 27-6 at 3). These examples undercut the claim that there was a pervasive policy of failing to assess detainees as a condition of confinement. Unlike the consistent testimony supporting the existence of a policy in *Sanchez II*, the evidence here fails to establish such a pervasive pattern.

Garcia does include an expert report from Dr. Steven Bird, a medical doctor with expertise in emergency medicine and toxicology. (Dkt. No. 27-3 at 44). He opines generally that medical staff failed to assess Torres-Garcia by "not evaluating his skin at the sites where Mr. Torres-Garcia was concerned about an infection." (Dkt. No. 27-4 at 1). However, this evidence, even in the light most favorable to Garcia, does not show that the County had a pervasive pattern of failing to evaluate detainees because it is not "sufficiently extended or pervasive." *Cadena*, 946 F.3d at 727. Evidence of failing to assess one pretrial detainee will not establish that Webb County failed to assess detainees generally as a condition of confinement, even if that failure applied to the decedent.

Garcia also relies on prior incidents resulting in death in Webb County Jail. (Dkt. No. 27 at 27).[5] Similar to the failure-to-monitor claim, she does not point to any evidence that these deaths were determined or confirmed to be the result of inadequate medical evaluation. Instead, she merely demonstrates that these deaths occurred at the Webb County Jail. Absent any showing that these deaths were caused by the evaluation policies she alleges create an unconstitutionally deficient medical system, they do not create a genuine dispute of material fact regarding Webb County's policies. Evidence that someone died at the jail, without connecting it to deficient medical care or policies, "does not show a systematic policy or failure." *See Campos*, 597 F. App'x at 792.

As discussed in the prior section, the Court also considers evidence of policymaker acquiescence to determine whether there is genuine issue of material fact about the

---

[5] In its Reply, Webb County objected to the evidence of these prior deaths. (Dkt. No. 28 at 1–9). Garcia responded by filing a Sur-reply. (Dkt. No. 31). However, it is not necessary to rule on these objections because, even considering this evidence, there is no genuine dispute of material fact on the failure-to-assess claim.

existence of a policy. Again, the parties agree that Sheriff Martin Cuellar was the relevant policymaker at the time of Torres-Garcia's death. (Dkt. No. 27 at 13; Dkt. No. 27-3 at 36). But there is no evidence Garcia points to that the sheriff had knowledge of issues with assessing detainees. (*See* Dkt. No. 27-1 at 91–93). So the lack remedial action against jail staff fails to establish that the policymaker acquiesced to any policy of failing to evaluate detainees.

Ultimately, considering all of the summary judgment evidence, the Court finds that Garcia cannot support a claim that Webb County had a pervasive pattern of failing to assess detainees. The Texas Rangers report and depositions from jailers and medical staff demonstrate that detainees were assessed by medical staff. The expert testimony and prior incidents fail to establish a *de facto* policy, and policies that were established are not shown to be unrelated to legitimate government objectives. The Court finds that there is no genuine dispute of material fact with respect to a policy of failing to adequately assess pretrial detainees.

### iii.    *Failure to Provide Necessary Medical Care*

The Court will address the remaining conditions of confinement as general failures to provide medical care. The remaining alleged policies include claims that Webb County: "while knowing that detainees needed immediate emergency medical care, would continue incarcerating such detainees in lieu of obtaining such needed care"; failed to obtain medical clearance at a hospital during booking for IV-drug users; and "failed to provide and/or delayed providing medical treatment to detainees." (Dkt. No. 1 at 36–38).

First, the evidence does not support the claim that Webb County knew detainees needed immediate emergency medical care and continued incarcerating detainees anyway. There is no evidence that Garcia points to that Webb County had a practice of withholding medical care when it *knew* that pretrial detainees were in need of emergency medical attention. The evidence instead supports the opposite. When medical staff first realized that Torres-Garcia needed emergency medical care, jail staff and medical staff worked together to get a wheelchair, assess Torres-Garcia, call EMS, and facilitate his transfer to the hospital. (Dkt. No. 27-5 at 2, 4–5; Dkt. No. 27-6 at 5). Garcia does not identify evidence, before that point, that Webb County knew he needed emergency

medical care. His interactions with medical staff prior to that point did not rise to the level of actual knowledge that he needed emergency care, which may present another claim, but fails to do so as a pervasive condition of confinement.

Second, Garcia falls short of showing how failing to obtain medical clearance at a hospital during booking for IV-drug users is unrelated to a legitimate government objective. Garcia asserts that Webb County should have had a policy requiring that all IV-drug users be sent to a hospital for medical clearance prior to booking at the jail. Conditions-of-confinement claims require the plaintiff to show that policies are unrelated to legitimate government objectives. *Henson*, 795 F.3d at 467. "[T]he effective management of the detention facility . . . is a valid objective that may justify imposition of conditions and restrictions of pretrial detention." *Id.* (quoting *Bell*, 441 U.S. at 540). Here, Garcia provides no evidence and makes no argument that this policy is unrelated to the legitimate governmental objective of the effective management of the county jail. For this reason, this claim fails.

Finally, Garcia alleges directly that Webb County had a *de facto* policy of "fail[ing] to provide and/or delay[ing] medical treatment to detainees." (Dkt. No. 1 at 37). While jails must provide detainees with constitutionally sufficient, minimum levels of medical care, they are not required to provide detainees with the best possible care. *Shaw v. TDCJ-CID*, 540 F. Supp. 834, 839 (S.D. Tex. 2008). "Where 'medical treatment was provided, even if it was negligent, disagreed-with, and based on a perfunctory and inadequate evaluation, it was not denied.'" *Alexander v. Philip R. Taft Psy D & Assocs., P.L.L.C.*, 143 F.4th 569, 587 (5th Cir. 2025) (quoting *Petzold v. Rostollan*, 946 F.3d 242, 250 (5th Cir. 2019)). "[I]mperfect treatment does not equal denied treatment." *Petzold*, 946 F.3d at 250. While courts must review the decisions and practices of jail officials, they "must not become enmeshed in the minutiae of prison operations." *Henson*, 795 F.3d at 468.

In Garcia's expert report from Dr. Bird, he opines that Webb County's failure to treat sepsis or take Torres-Garcia to the hospital proximately caused his death. (Dkt. No. 27-3 at 44). However, this evidence, even in the light most favorable to Garcia, does not show that the County had a pervasive pattern of failing to provide medical care to detainees because it is not "sufficiently extended or pervasive." *Cadena*, 946 F.3d at 727.

This expert's limited review and opinion about the cause of Torres-Garcia's death is insufficient to establish a *de facto* policy that the jail denied medical care to detainees pervasively.

In *Estate of Henson v. Wichita County*, Henson alerted jail officials when he was booked that he had emphysema and pneumonia. 795 F.3d at 460. He repeatedly complained of difficulty breathing and was repeatedly given only an albuterol inhaler and antibiotics. *Id.* Later, he was given breathing treatments and cough drops, but his condition continued to deteriorate. *Id.* at 460–61. He was not visited by a doctor because the day the doctor was scheduled to visit his area of the prison fell on Thanksgiving. *Id.* at 460. He was eventually taken to "medical solitary" where his condition continued to worsen until—24 hours after being placed there—he pushed the emergency button, gasping for air. *Id.* at 461. Jail officials called an ambulance, but he was pronounced dead at the hospital. *Id.* The Fifth Circuit affirmed the grant of summary judgment for the defendants, finding that this was simply an isolated incident rather than a pervasive pattern of deficiencies. *Id.* at 469.

By comparison, Torres-Garcia received better care than Henson. When he first complained of arm pain, he was provided with an antibiotic. (Dkt. No. 27-2 at 97). The next morning, when he complained that the pain had worsened, he was seen by EMT Rivera and was given continued antibiotics. (Dkt. No. 27-6 at 3). When he collapsed in his cell, jail officials immediately provided emergency medical care and sent him to the hospital. (Dkt. No. 27-5 at 2, 4–5; Dkt. No. 27-6 at 5). In *Henson*, jail officials *knew* that he was suffering from emphysema and pneumonia and still delayed escalating medical treatment for several days. 795 F.3d at 460. Despite these lapses, the Fifth Circuit affirmed summary judgment because none of the jails' staffing or medical practices at issue would "inevitabl[y] result" in serious injury or death. *Id.* at 469.

Each alleged policy here, and the mutually enforcing effect of these alleged conditions, fails to survive summary judgment for the same reason. While the paramedic in this case arguably should have caught the sepsis earlier, failure to do so was an isolated incident rather than a pervasive deprivation of medical care needed to establish

a constitutional violation.[6] TCJS investigated his death and found that "there appears to be no violation of minimum standards." (Dkt. No. 18-1 at 137). Even if Webb County could have taken steps to improve medical care, it is not clear that these policies would have made a difference. Medical staff *did* know about sepsis and that it had to be treated at the hospital. (Dkt. No. 27-2 at 15–16, 64). Any failures by medical staff to properly monitor, assess, or treat Torres-Garcia here are not enough to establish a pervasive pattern of denying sufficient medical care to pretrial detainees for a conditions-of-confinement claim.

Even if these policies caused some delay in treatment, Garcia presents no evidence that Webb County's medical care was *so* deficient that it amounted to punishment, which is a central issue for conditions of confinement. *See Bell*, 441 U.S. at 535. Garcia must "demonstrate a pervasive pattern of serious deficiencies in providing for [] basic human needs." *Shepherd*, 591 F.3d at 454. Such examples of grossly inadequate medical care involve extreme, repeated disregard for detainees' health, such as when a jail pharmacist testified that the medical care in a jail was so inadequate that "half or more of inmates did not receive their prescription medications." *Id.* at 456. Or, when jail officials ignored a "bizarrely high" number of bacterial infections and refused to take "feasible [steps] to control the outbreak." *Duvall*, 631 F.3d at 208–09.

Considering Garcia's claims collectively, the summary judgment evidence shows that Torres-Garcia continually received medical care. When he complained to jail officials, he consistently received treatment. Even if this medical care could have been improved or fell short of applicable standards of care, it was not unconstitutionally inadequate. *See, e.g.*, *Cadena*, 946 F.3d at 728–29 (affirming summary judgment when a plaintiff could only point to one prior incident regarding a similar issue and the county took reasonable steps to provide medical care even though it "was not the best that money could buy"); *contra Sims v. City of Jasper*, 543 F. Supp. 3d 428, 449–51 (E.D. Tex. 2021) (denying summary judgment on a conditions-of-confinement claim when the jail officials

---

[6] The Court recognizes that the death of Mario Andrade, Jr., is a relevant prior incident in the analysis of a pervasive pattern and overrules Defendant's objection to this evidence. (Dkt. No. 28 at 7–8). Even considering Andrade's death in 2015, the fact that Andrade died from sepsis is insufficient to support the existence of a *pervasive* pattern for the purposes of a conditions-of-confinement claim. These cases are more similar to "isolated examples," which fall short of *de facto* policies. *See Shepherd*, 591 F.3d at 452.

put the inmate in a detox cell and ignored him until he died). Based on the evidence, Garcia has failed to establish a genuine dispute of material fact that there was a pattern or practice of denying medical care to inmates, so her conditions-of-confinement claims fail.

### 2. Episodic-Acts-or-Omissions Claims

For her episodic-acts-or-omissions claims, Garcia contends that the jail officials denied Torres-Garcia medical care with deliberate indifference. Each alleged policy listed in Garcia's complaint is also pleaded as an episodic act or omission, which she maintains in her response to the motion for summary judgment. (Dkt. No. 1 at 36–39; Dkt. No. 27 at 16). The Court first analyzes these claims generally as episodic acts or omissions, and then analyzes her claims that Webb County failed to train municipal employees under a failure-to-train theory of liability.

### a. General Episodic Acts or Omissions

The key difference between conditions of confinement and episodic acts or omissions is deliberate indifference. This "is an extremely high standard to meet." *Domino*, 239 F.3d at 756. Garcia's general episodic-acts-or-omissions claims here fail because a plaintiff must show that jail officials violated Torres-Garcia's constitutional rights while acting with deliberate indifference, which is more than mere negligence. Garcia supports her claim with various allegations of constitutional violations demonstrating deliberate indifference: officials provided only cursory care; officials did not examine Torres-Garcia's arm after his complaints of arm pain; officials did not take his temperature; and officials did not enact specific policies regarding how to recognize and treat sepsis or abscesses after past deaths in the facility. (Dkt. No. 27 at 23–24).

A plaintiff must establish that a violation of constitutional rights was committed with subjective deliberate indifference and that the violation resulted from a policy maintained with objective deliberate indifference. *Cadena*, 946 F.3d at 727.[7] As for the

---

[7] Plaintiff asserts that the Supreme Court in *Kingsley v. Hendrickson*, 576 U.S. 389 (2015), changed the standard and now requires courts to apply an objective standard to all pretrial detainee claims under section 1983. (Dkt. No. 27 at 10). The Court interprets *Kingsley* to squarely apply to excessive force claims, not to claims of inadequate medical treatment, and it is thus inapplicable here. *See Kingsley*, 576 U.S. at 396 ("In deciding whether the force deliberately used is, constitutionally speaking, 'excessive,' should courts

violation, a plaintiff must show that jail officials "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Perniciaro v. Lea*, 901 F.3d 241, 258 (5th Cir. 2018) (citation modified). Even in the light most favorable to Garcia, Torres-Garcia's treatment does not rise to this level because officials did not refuse him treatment, each of his complaints led to an interaction with a medical staff member, and there is no evidence that he was intentionally treated poorly. The summary judgment evidence fails to create a fact issue that any such conduct occurred under the standard theory of episodic acts or omissions.

Furthermore, this violation must result "from a county policy or custom adopted and maintained with objective deliberate indifference." *Baughman v. Hickman*, 935 F.3d 302, 307 (5th Cir. 2019). "Unsuccessful medical treatment, acts of negligence, or medical malpractice do not constitute deliberate indifference . . . ." *Gobert*, 463 F.3d at 346. At most, Webb County's actions do not rise to the level of deliberate indifference because Torres-Garcia's complaints were addressed by jail officials and he received treatment, even if it was imperfect. As reasoned above, Garcia has failed to create a genuine dispute of material fact that "any lapses in medical care amounted to constitutional violations." *Cadena*, 946 F.3d at 729. Garcia's general claims for episodic acts or omissions do not survive summary judgment.

### b. Failure to Train

The remaining claims concern failures to train, which should be construed as episodic acts or omissions. *Sanchez II*, 956 F.3d at 792. Garcia identifies four areas in which Webb County allegedly failed to properly train municipal employees: recognition of and response to pneumonia; recognition of and response to sepsis; recognition of and response to IV-drug users; and obtaining blood tests for known IV-drug users. (Dkt. No. 1 at 38).

---

use an objective standard only, or instead a subjective standard that takes into account a defendant's state of mind? It is with respect to *this* question that we hold that courts must use an objective standard."); *see also Acosta v. Williamson County*, No. 23-50777, 2024 WL 3833303, at *4–5, *8 (5th Cir. Aug. 15, 2024) (applying different standards for deliberate indifference and subjective awareness for excessive force).

A failure-to-train theory of liability must be treated as a type of episodic act or omission. *See Sanchez II*, 956 F.3d at 792. The Supreme Court has held that in "limited circumstances," a municipality's failure to train its employees on avoiding constitutional violations may lead to municipal liability. *Connick v. Thompson*, 563 U.S. 51, 61 (2011). To prevail on a failure-to-train claim, a plaintiff must prove that (1) the training procedures of the municipality's policymaker were inadequate, (2) the policymaker was deliberately indifferent to the training policy's inadequacies, and (3) the inadequate training directly caused the plaintiff's injury. *Conner v. Travis County*, 209 F.3d 794, 796 (5th Cir. 2000).

The second element, deliberate indifference, is a "stringent standard, requiring proof that a municipal actor disregarded a known or obvious consequence of his action" for which a "showing of simple or even heightened negligence will not suffice." *Valle*, 613 F.3d at 542, 547 (citation modified); *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986) (holding municipal liability "attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives by the official . . . responsible for establishing final policy with respect to the subject matter in question").

For failures to train, "[d]eliberate indifference may be proven in one of two ways." *Jackson v. Valdez*, 852 F. App'x 129, 136 (5th Cir. 2021). First, a plaintiff can point to a pattern of similar constitutional violations. *Id.* By pointing to a pattern of similar incidents, the factfinder can infer the need for more training was obvious. *Id.* If the factfinder makes this inference, the factfinder can also find a municipality was deliberately indifferent to the constitutional right at issue. *Id.* This proof-by-pattern method is "ordinarily necessary" to show deliberate indifference in a failure-to-train case. *Littell v. Hou. Indep. Sch. Dist.*, 894 F.3d 616, 624 (5th Cir. 2018).

Second, a single incident can also establish deliberate indifference. *See City of Canton v. Harris*, 489 U.S. 378, 390 (1989); *Littell*, 894 F.3d at 624. This "single-incident exception" is available where a plaintiff shows the risk of the constitutional violation would be "obvious" or "a highly predictable consequence" of a municipality's failure to train. *See Canton*, 489 U.S. at 390; *Littell*, 894 F.3d at 624. Because the single-incident exception is available "in only very narrow circumstances," it is "generally reserved for

when an employee has received no training at all." *Littell*, 894 F.3d at 624 n.5, 626 (teachers received no training on the Constitution's restraints on searches); *Brown v. Bryan County*, 219 F.3d 450, 453, 462 (police officer with violent history did not take state's mandatory program for law enforcement, received no description of job duties, and received no on-the-job training about excessive force).

Three of Garcia's claims for failures to train cannot survive summary judgment because Garcia has not established causation. The allegedly inadequate training must "directly cause[]" the injury. *Conner*, 209 F.3d at 796. First, Garcia claimed that the failure to train employees to recognize pneumonia gives rise to an episodic act or omission. (Dkt. No. 1 at 38; Dkt. No. 27 at 22). However, the evidence cannot support a finding that a failure to recognize pneumonia caused Torres-Garcia's death. According to his autopsy, Torres-Garcia did develop pneumonia prior to his death. (Dkt. No. 27-4 at 14). But no evidence that Garcia identifies shows how this failure to recognize that condition led to his death. For example, there is no evidence that Torres-Garcia presented employees with symptoms of pneumonia or that the failure to recognize it led to his death in custody. Additionally, the failures to train municipal employees about blood tests and IV-drug user healthcare issues, specifically, also lack evidence of causation. (Dkt. No. 1 at 38; Dkt. No. 27 at 23). Garica does not present evidence showing that additional training about blood tests would have prevented Torres-Garcia's death.[8] And Torres-Garcia was already identified as an IV-drug user at intake. (Dkt. No. 27-3 at 15). There is no evidence presented that training on either of these issues, beyond the recognition of sepsis as addressed below, would have prevented Torres-Garcia's death. Without stronger causal connections, these claims fail.

The remaining failure-to-train claim is with respect to the recognition of, and response to, sepsis. Garcia claims that the lack of training about sepsis was an episodic act or omission, which the Court construes as a failure-to-train claim. (*See* Dkt. No. 1 at 7, 36, 38). This claim fails because Garcia has failed to create a fact issue as to whether the policymaker was deliberately indifferent. In addressing deliberate indifference,

---

[8] Garcia's expert, Dr. Bird, does opine that "[h]ad Mr. Torres-Garcia been taken to an emergency department in the morning of December 8, 2021, he would have had blood tests performed" (Dkt. No. 27-3 at 50). But this is insufficient to show that training about blood tests for municipal employees at the jail would have prevented Torres-Garcia's death.

Garcia claims that "failing to create a policy even after multiple detainees died from sepsis that would teach jail employees to recognize sepsis or infection . . . is deliberate indifference." (Dkt. No. 27 at 29). Deliberate indifference, for a failure-to-train claim, may be shown with proof-by-pattern evidence or as a single incident. *Littell*, 894 F.3d at 624.

Here, Garcia cannot establish deliberate indifference with proof-by-pattern evidence. As discussed in the analysis of conditions-of-confinement claims, *supra*, Garcia has offered evidence of two other inmate deaths by sepsis at the Webb County jail. The Court has ruled that the summary judgment evidence related to the death of Luis Alberto Barrientos is inadmissible. That leaves the evidence of the death of Mario Andrade, Jr. This one prior sepsis incident, which occurred six years prior to Torres-Garcia's death, is insufficient to establish a pattern that would have made the need for further training "plainly obvious" to policymakers. Under Fifth Circuit precedent, "the existence of one or two prior incidents" does not establish municipal deliberate indifference. *See Armstrong v. Ashley*, 60 F.4th 262, 277 (5th Cir. 2023) (failure-to-train claim failed when plaintiff failed to establish pattern of constitutional violations); *see also Herrera*, No. 5:17-cv-237, slip op. at 11 (finding that, in the case of Andrade, "[s]uch a lack of training in sepsis recognition, without more evidence of a pattern of similar sepsis-related injuries or deaths, cannot support a finding of municipal deliberate indifference").

For example, in *Henderson v. Killeen Indep. Sch. Dist.*, the court found that allegations of two prior attacks by an untrained police officer failed to show a pattern of violations as a result of the municipality's failure to train officers. No. A-13-CA-471, 2013 WL 6628630, at *4 (W.D. Tex. Dec. 16, 2013) (quoting *Prince v. Curry*, 423 F. App'x 447, 451–52).

And even if the Court were to consider the Barrientos incident in its analysis, the frequency of the three deaths of Andrade, Barrientos, and Torres-Garcia, occurring over a span of six years, fails to establish a pattern. *See, e.g.*, *Pinedo v. City of Dallas, Tex.*, 2015 WL 5021393 (N.D. Tex. Aug. 25, 2015) (holding that ten similar constitutional violations over a six-year period were insufficient to show a pattern or practice). This is particularly so considering the prevalence of detainees in Webb County Jail who are IV-

drug users and may develop sepsis as a result of infected injection sites.[9] *Cf. Moreno v. City of Dallas*, No. 3:13-CV-4106-B, 2015 WL 3890467, at *9 (N.D. Tex. June 18, 2015) ("facts suggesting an average of less than two incidents of excessive force per year over the course of five years are not sufficient to indicate a pattern of abuse" considering the size of the Dallas police force).

Garcia also fails to show deliberate indifference using the narrower, single-incident exception. This "single-incident exception" requires that the risk of the constitutional violation would be "obvious" or "a highly predictable consequence" of a failure to train. *See Canton*, 489 U.S. at 390; *Littell*, 894 F.3d at 624. Courts have held that because "virtually every plaintiff alleging municipal liability can propose *some* training reform that would have prevented the particular injury-causing conduct," and the Fifth Circuit has generally reserved this method for cases where "the policymaker provides no training whatsoever with respect to the relevant constitutional duty, as opposed to training that is inadequate only as to the particular conduct that gave rise to the plaintiff's injury." *Littell*, 894 F.3d at 624–25 (citation modified); *see also Peña v. City of Rio Grande City*, 879 F.3d 613, 624 (5th Cir. 2018) (distinguishing between complete failures to train and failures to train in a limited area).

Here, any failure to train was not obvious, highly predictable, or a complete failure to train employees about the relevant constitutional duty. Unlike cases where officers received no training about excessive force whatsoever, there is insufficient evidence that employees were completely untrained on the provision of medical care to pretrial detainees. *See, e.g.*, *Brown*, 219 F.3d at 453, 462. Rather, a failure to train about sepsis would constitute a limited area "only as to the particular conduct that gave rise to the plaintiff's injury." *See Littell*, 894 F.3d at 624–25 (citation modified). Medical staff members were generally trained about medical care, and staff did have some knowledge of sepsis. (Dkt. No. 27-2 at 14–16, 64, 88). This standard is difficult to meet because is it an "exacting test" and imperfect training alone will not justify deliberate indifference for

---

[9] The evidence and statements from counsel during the hearing show that IV-drug use and the risk of sepsis was prevalent at Webb County Jail. Jail staff testified to working with IV-drug users "every day." (Dkt. No. 27-2 at 11, 29–30). At the hearing, it was conceded by both sides that IV-drug users are regularly booked into the jail. Garcia's expert, Dr. Bird, a medical doctor with expertise in emergency medicine and toxicology, opines that IV-drug use and the presence of infections are conditions that lead to sepsis. (*See* Dkt. No. 27-3 at 44).

a single incident. *See Peña*, 879 F.3d at 624. Accordingly, the Court determines that Garcia has failed to establish the single-incident exception. *See Herrera*, No. 5:17-cv-237, slip op. at 11. Because Garcia cannot show deliberate indifference with either method, the final failure-to-train claim fails.

## IV. CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment, (Dkt. No. 18), is **GRANTED**.

As a result of the dismissal of Plaintiff's claims, Defendant's Motion to Strike and Exclude Plaintiffs' Expert Cameron Lindsay, (Dkt. No. 16), and Defendant's Motion to Strike and Exclude Plaintiffs' Expert Ralph D. Scott, Jr., (Dkt. No. 19), are **DENIED** as moot.

A final judgment will follow.

It is so **ORDERED**.

**SIGNED** on September 26, 2025.

John A. Kazen
United States District Judge