United States District Court
Southern District of Texas
**ENTERED**
June 01, 2026
Nathan Ochsner, Clerk

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**LAREDO DIVISION**

| | | |
|---|---|---|
| **MARIA GARCIA, AS DEPENDENT ADMINISTRATOR OF AND ON BEHALF OF THE ESTATE OF CHRISTOPHER TORRES-GARCIA, AND CHRISTOPHER TORRES-GARCIA'S HEIR(S)-AT-LAW AND WRONGFUL DEATH BENEFICIARIES,** | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | |
| | § | |
| **Plaintiff,** | §<br>§ | **CIVIL ACTION NO. 5:23-CV-137** |
| **V.** | §<br>§<br>§ | |
| **WEBB COUNTY, TEXAS,** | §<br>§<br>§ | |
| **Defendant.** | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Plaintiff's Motion for Reconsideration of Memorandum Opinion and Order Granting Motion for Summary Judgment and Final Judgment. (Dkt. No. 40). Plaintiff Maria Garcia brought this suit as the administrator of the Estate of Christopher Torres-Garcia, who died after being held in pretrial custody at the Webb County Jail. (Dkt. No. 18-1 at 51).[1] Garcia argued that Webb County had a de facto policy of not providing sufficient medical care to inmates, asserting claims for unconstitutional conditions of confinement and episodic acts or omissions under 42 U.S.C. § 1983. (Dkt. No. 27 at 12, 14). Webb County moved for summary judgment on all claims. (Dkt. No. 18).

The Court held a hearing on August 26, 2025. (Min. Entry for Aug. 26, 2025). Following the hearing, the Court granted Webb County's motion for summary judgment, finding that there was no genuine dispute of material fact and that Webb County was entitled to judgment as a matter of law. (Dkt. No. 38). Plaintiff now moves for

---

[1] When citing to the page numbers of any document in the record, the Court will cite to the page numbering of the Court's internal CM/ECF docket system, and not to the page numbers in the underlying documents.

reconsideration under Federal Rule of Civil Procedure 59(e), arguing that the Court should reconsider its motion to correct manifest errors of law and fact. (Dkt. No. 40). For the reasons discussed below, the motion to reconsider will be denied.

## I. BACKGROUND

On December 1, 2021, Christopher Torres-Garcia was arrested and booked at the Webb County Jail. (Dkt. No. 18-1 at 5).[2] Medical staff conducted an intake process that required Torres-Garcia to self-report medical information and history. (*Id.* at 89–94). During the booking process, he admitted to using heroin daily, including that morning. (*Id.* at 71–72). Unbeknownst to jail officials, Torres-Garcia had been hospitalized for a heroin overdose just days prior. (*Id.* at 132). Torres-Garcia requested placement in a detoxification cell, where he would be closely monitored. (*Id.* at 89, 91, 103; Dkt. No. 27-2 at 11–13). There, he received medicine to ease the detoxification process. (Dkt. No. 18-1 at 102, 105). Correctional officers checked his cell several times every hour. (*Id.* at 87).

On the morning of December 7, 2021, during a routine medication pass, Torres-Garcia complained of arm pain. (*Id.* at 65). He told the nurse, Marina Sarquiz-Ortega, that he had "shot up wrong" and had an infection in his arm. (*Id.*). She didn't see an open abscess, but did not touch his arm or otherwise physically examine him during the evaluation. (*Id.*). She then went back to the medical unit to consult her supervisors. (Dkt. No. 27-2 at 97). Sarquiz-Ortega and her supervisor, EMT Javier Rivera, decided that they would start Torres-Garcia on an antibiotic regimen pursuant to a standing order from the jail's contract physician, Dr. Arturo Garza-Gongora. (*Id.* at 99; Dkt. No. 18-1 at 97). The standing order called for administering Bactrim and Clindamycin, which Sarquiz-Ortega ordered. (Dkt. No. 18-1 at 105–06). Torres-Garcia took one dose that evening. (*Id.* at 66).

On December 8, 2021, during pill pass around 8 a.m., Torres-Garcia took his antibiotic without complaint. (*Id.* at 65, 72). But later that morning, at 10:40 a.m., Torres-Garcia reported that he could not breathe and complained of left arm pain. (*Id.* at 72, 76). Officers took Torres-Garcia from Cell 110 to the medical unit, where he told EMT Rivera

---

[2] Based on the record and statements by the parties at the hearing on August 26, 2025, the following facts are uncontested. The Court relied on these same facts in ruling on the motion for summary judgment. (Dkt. No. 38). Any objection or basis for reconsideration based on a factual dispute is addressed below.

that his infection had worsened and "was getting to the bone." (*Id.* at 72). He was struggling to breathe and was afraid because of an abscess on his arm and shoulder area. (*Id.* at 72, 103). He requested anxiety medication, but the paramedic calmed him down and advised that he would schedule him for a mental health appointment. (*Id.* at 75, 103). After Torres-Garcia calmed down, the paramedic checked his vital signs, which were normal, and noted that he had already been prescribed antibiotics. (*Id.* at 75). Although Torres-Garcia's arm was red and swollen, it wasn't hot to the touch. (*Id.*). Before Torres-Garcia returned to his cell, the paramedic assured him that the medication would be continued until the infection healed. (*Id.*).

At 11:14 a.m., Torres-Garcia returned to Cell 110. (*Id.* at 76). During the next two hours, he received medication and a meal. (*Id.*). He was moving periodically throughout that time. (*Id.*). At 1:16 p.m., Torres-Garcia reported to Officer Gonzalez that he was not feeling well and had chest pains. (*Id.* at 44–47). Correctional officers Molina, Gonzalez, and Aguilera were present for roll call. (*Id.*). They opened the cell so that Torres-Garcia could walk to the medical unit with Officer Gonzalez, but Torres-Garcia stumbled and collapsed. (*Id.*). Gonzalez and Molina helped stabilize him, and Aguilera went to get a wheelchair and advise medical staff that assistance was needed. (*Id.*).

At 1:18 p.m., medical staff arrived at Cell 110. (*Id.* at 76). The officers and medical staff put Torres-Garcia in a wheelchair to take him to the medical unit. (*Id.* at 44–47). Torres-Garcia's breathing was rapid. (*Id.* at 72, 99). His oxygen saturation fell to 65%, while his heart rate rose to 245 beats per minute. (*Id.* at 99). He quickly became nonresponsive. (*Id.* at 99–100). Sarquiz-Ortega and Ramiro Elizondo, another nurse, provided medical care in an attempt to stabilize Torres-Garcia, and they called Emergency Medical Services (EMS) at 1:30 p.m. (*Id.* at 74, 99–100).

EMS arrived at 1:37 p.m. and took Torres-Garcia by ambulance to the Laredo Medical Center at 1:53 p.m. (*Id.* at 48–49, 74). Hospital staff resuscitated Torres-Garcia twice, but during surgery he developed complications. (*Id.* at 48–49). At 4:15 p.m., the operating physician ordered hospital staff to cease all treatment and declared Torres-Garcia dead. (*Id.*). Torres-Garcia's medical transport team then reported the death to the Webb County Sheriff's Office. (*Id.*).

After Torres-Garcia died, the Webb County Medical Examiner performed an

autopsy. (*Id.* at 134). She found a pus-filled abscess under a patch of red, hard skin on Torres-Garcia's shoulder, and another on his forearm. (Dkt. No. 27-1 at 5). Ultimately, the Chief Medical Examiner determined that Torres-Garcia "died from sepsis due to infected drug injection sites." (Dkt. No. 18-1 at 134).

Over the next two years, the Texas Rangers from the Department of Public Safety investigated Torres-Garcia's death. (*Id.* at 51–85). Upon completing the investigation, they submitted a report to the Webb County District Attorney's Office, which declined to file criminal charges in connection with Torres-Garcia's death. (*Id.* at 80). The Texas Commission on Jail Standards (TCJS) also investigated and determined that Webb County had not violated minimum jail standards. (*Id.* at 137).

## II. LEGAL STANDARDS

Under Rule 59(e), a court may "alter or amend" a final judgment. Fed. R. Civ. P. 59(e). There are three grounds for reconsideration under Rule 59(e): "(1) an intervening change in controlling law; (2) the availability of new evidence not previously available; or (3) the need to correct a clear error of law or prevent manifest injustice." *In re Benjamin Moore & Co.*, 318 F.3d 626, 629 (5th Cir. 2002).

Granting relief under Rule 59(e) is an extraordinary measure, often used sparingly. *See* 11 Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice & Procedure § 2810.1, at 124 (2d ed. 1995). Rule 59(e) motions "must clearly establish either a manifest error of law or fact or must present newly discovered evidence." *Simon v. United States*, 891 F.2d 1154, 1159 (5th Cir. 1990). Due to the nature of this remedy, the Fifth Circuit has held that the Rule 59(e) standard "favors denial of motions to alter or amend a judgment." *S. Constructors Grp., Inc. v. Dynalectric Co.*, 2 F.3d 606, 611 (5th Cir. 1993).

## III. DISCUSSION

Plaintiff asks the Court to reconsider its order dismissing her claims based on manifest errors of law and fact. She challenges the Court's rulings on her Section 1983 municipal liability claims for conditions of confinement and episodic acts or omissions. The Court will address each of her arguments below. Plaintiff also filed an advisory with supplemental legal authority, which the Court will address as well. (Dkt. No. 41).

### A. The Court Finds No Manifest Errors of Fact or Law

Plaintiff does not separately list each alleged error of fact or law in her motion. However, the Court has identified these arguments as to asserted errors of law or fact: the lack of a sepsis policy was a moving force behind a constitutional violation; a failure to train does not require a pattern; the county's lack of a policy satisfies deliberate indifference; the county was on notice about sepsis and the failure to implement a policy was sufficient for this claim; Torres-Garcia's medical care was cursory as it related to sepsis treatment; the sheriff did know about issues with assessing detainees; the lack of sepsis policies at the jail were not reasonably related to a legitimate goal; and Torres-Garcia's death was a highly predictable consequence of the county's actions, satisfies the single prior incident exception, and creates fact questions about whether the conduct meets the legal standard. These can be divided into challenges to the Court's rulings on each claim: conditions of confinement and episodic acts or omissions.

### 1. There Are No Manifest Errors with Respect to the Conditions-of-Confinement Claims

In defending her claims against the motion for summary judgment, Garcia contended that Webb County had "a de facto policy of grossly inadequate" medical care. (Dkt. No. 27 at 16). To support her conditions-of-confinement claims, she challenged various County practices and also alleged that there was a "mutually enforcing effect" that collectively violated Torres-Garcia's right to medical care. (*Id.*).

The Court considered each of the policies she challenged and their mutually enforcing effect, and it ultimately granted summary judgment for the county. Based on the summary judgment evidence, Garcia failed to establish a genuine dispute of material fact that there was a pattern or practice of failing to monitor or assess inmates or deny them medical care, so her conditions-of-confinement claims failed. Plaintiff challenges this conclusion.

First, Plaintiff argues that the Court erred in requiring Plaintiff to "connect evidence of other deaths at the jail to deficient medical care of policies to 'show a systematic policy or failure.'" (Dkt. No. 40 at 6). Plaintiff instead argues that this is a "no policy" case, where the absence of any policy at all is the condition. (*Id.*). While the lack of a policy could be a condition, the evidence must show "more than a *de minimis*

violation," in other words, the evidence must still be "sufficient to prove that the violations were serious, extensive and extended." *Duvall v. Dall. Cnty., Tex.*, 631 F.3d 203, 208 (5th Cir. 2011). "[T]he incidence of diseases or infection, standing alone, [cannot] imply unconstitutional confinement conditions." *Id.* (quoting *Shepherd v. Dall. Cnty.*, 591 F.3d 445, 454 (5th Cir. 2009).

In *Duvall*, the Fifth Circuit explained that "[i]n some cases, a condition may reflect an unstated or *de facto* policy, as evidenced by a pattern of acts or *omissions* 'sufficiently extended or pervasive, or otherwise typical of extended or pervasive misconduct by [jail] officials, to prove an intended condition or practice.'" *Id.* (emphasis added). There, the jail experienced more than two hundred MRSA[3] infections per month and had been experiencing these outbreaks for over three years. *Id.* The court found that there was sufficient evidence that this exceeded a *de minimis* violation to support a finding of liability. *Id.* Here, Plaintiff is essentially alleging that the county's longstanding omission in failing to create a sepsis policy is the condition. However, the Court still concludes that Plaintiff's alleged violations were not sufficiently pervasive to establish an unconstitutional condition or create a genuine dispute of material fact on this element. These reasons are explained in the Court's prior Order, and the Court does not find them to be erroneous. (Dkt. No. 38 at 13–15, 20–21, 23–24).

Second, Plaintiff argues that the Court erred in finding that Torres-Garcia's medical care was not cursory as it related to sepsis treatment. Plaintiff's support for the claim that he received cursory care was narrow, and the Court distinguished those cases. First, the analysis in those decisions considered deliberate indifference, which is not relevant for conditions-of-confinement claims. Second, those cases describe situations where nominal medical care was provided in spite of *knowledge* that there was a serious medical need. (*See* Dkt. No. 38 at 17) (distinguishing the cases cited in *Ford v. Anderson*). The Court does not find this analysis erroneous.

Third, Plaintiff argues that the Court erred in finding that the sheriff did not know about issues with assessing detainees because the sheriff knew about prior sepsis deaths. The Court found that Garcia did not identify evidence that the sheriff knew specifically

---

[3] MRSA, or Methicillin–Resistant Staphylococcus Aureus, is "a staph infection resistant to usual penicillin-type antibiotics." *Duvall*, 631 F.3d at 206.

of issues with jail staff's ability to assess detainees. Garcia responds that he knew of two past sepsis deaths. These are different things. Even though the sheriff had prior knowledge of deaths in custody, that knowledge alone does not show that the sheriff was on notice of any widespread failures to assess detainees. The Court's prior Order explains the effects of these prior deaths on the Court's analysis, and the Court does not find it erroneous. (Dkt. No. 38 at 15–16, 20).

Finally, Plaintiff argues that the Court erred in "fault[ing] Plaintiff for failing to 'identify and support cognizable practices unrelated to a legitimate government objective through jail staff testimony or prior incidents.'" (Dkt. No. 40 at 8). She argues that "Plaintiff need not rely on such evidence in light of the County's undisputed failure to have sepsis policies or training." (*Id.*).

The case law shows that establishing each element is Plaintiff's burden, and Plaintiff's failure to establish this element means that she has failed to carry her burden.[4] "To prevail on a conditions-of-confinement claim, a *plaintiff must show* a condition . . . that is not reasonably related to a legitimate government objective and that caused the constitutional violation." *Sanchez v. Young Cnty.*, 956 F.3d 785, 791 (5th Cir. 2020); *see also Shepherd*, 591 F.3d at 455 ("The district court properly instructed the jury on this point. [Plaintiff], the jury was charged, had the burden of 'demonstrat[ing] the existence of an identifiable intended condition or practice' that was 'not reasonably related to a legitimate governmental objective.'"). Plaintiff's argument that she need not show that the alleged practices are unrelated to a legitimate government objective because there is no policy related to sepsis is unfounded and unsupported by case law, both in the briefing on summary judgment and the motion to reconsider.

Plaintiff also seems to argue that the county's policies or practices were in fact unreasonable or unrelated to a legitimate purpose: "It is not reasonable to withhold emergency medical care from a known IV-drug user with obvious signs of sepsis, especially when, as here, that detainee notified County jail medical personnel that he

---

[4] Plaintiff states that "the burden rests with the County to show 'that any legitimate governmental objective justified its alleged failures.'" (Dkt. No. 40 at 10) (citing *Galvan v. Rockwell Cnty., Tex.*, No. 3:24-CV-2388, 2025 WL 2773814, at *7 (N.D. Tex. Sep. 29, 2025)). However, the legal standard cited in that case confirms that the burden is on plaintiff to "show that the condition at issue has no reasonable relationship to a legitimate government interest." *Galvan*, No. 3:24-CV-2388, 2025 WL 2773814, at *7 (citing *Duvall*, 631 F.3d at 207).

had shot up wrong and his arm was infected and later notified them that he was unable to breathe, was scared because of an obvious abscess on his shoulder, and thought the infection was getting to the bone." (Dkt. No. 40 at 9–10). But this argument conflates her claims. Whether a policy or practice—like the absence of a sepsis policy—is related to a legitimate government objective is part of a conditions-of-confinement claim. Plaintiff's argument above reads as a critique of specific choices made in providing medical care to Torres-Garcia, which is instead properly characterized as an episodic act or omission. Essentially, her argument here is not applicable to the relevant analysis the Court conducted. After reviewing the record and the briefing submitted by Plaintiff, the Court does not find there to be a manifest error in its holdings on the relation between the County's policies or practices and their relationship to legitimate government objectives.

In sum, none of these asserted issues rise to the level of a manifest error of law or fact that warrant reconsideration. For the above reasons, the motion to reconsider the Court's ruling on the conditions-of-confinement claims is denied.

### 2. There Are No Manifest Errors with Respect to the Episodic-Acts-or-Omissions Claims

For her episodic-acts-or-omissions claims, Garcia contended that jail officials denied Torres-Garcia medical care with deliberate indifference and that the county failed to properly train its employees. The Court analyzed her claims generally as episodic acts or omissions and then analyzed her claims that Webb County failed to train municipal employees under a failure-to-train theory of liability. The Court ultimately granted summary judgment for the county on these claims. Based on the summary judgment evidence, the Court held that Garcia failed to establish deliberate indifference. She challenges this conclusion.

Plaintiff argues that the Court erred in finding that the lack of a sepsis policy was not a moving force behind a constitutional violation. She cites *Canton v. Harris* and *Doe v. Dallas Independent School District* for the proposition that the failure to adopt a policy can be the moving force behind a constitutional violation. 489 U.S. 378, 390 (1989); 153 F.3d 211, 217 (5th Cir. 1998). Specifically, she argues that this "includes the failure to train when a constitutional violation is the 'highly predictable consequence' of the

governmental body's inaction." (Dkt. No. 40 at 5).

However, as the Court found in its Order and as supported by the case law, deliberate indifference must be established. (*See* Dkt. No. 38 at 27–28); *Doe*, 153 F.3d at 217 (explaining that a "failure to adopt an official policy on a given subject may serve as the basis for § 1983 liability *only when* the omission 'amount[s] to an intentional choice, not merely an unintentionally negligent oversight,' and the Supreme Court has held that such an omission is equivalent to an intentional choice only where the entity has acted with deliberate indifference") (emphasis added) (citation modified). "A failure to adopt a policy can be deliberately indifferent when it is obvious that the likely consequences of not adopting a policy will be a deprivation of constitutional rights." *Rhyne v. Henderson Cnty.*, 973 F.2d 386, 392 (5th Cir. 1992).

The Court concluded that Garcia failed to create a fact issue on deliberate indifference, either with proof-by-pattern evidence or as a single incident.[5] Plaintiff's other arguments for reconsideration concern this same analysis. She argues that the county's lack of a policy satisfies deliberate indifference and that Torres-Garcia's death was a highly predictable consequence of the county's actions, satisfies the single prior incident exception, and creates fact questions about whether the conduct meets the legal standard.

After reviewing its holdings and the relevant case law, the Court finds no error in its analysis of deliberate indifference on these claims. First, Garcia failed to establish deliberate indifference with proof-by-pattern evidence as a matter of law: "Under Fifth Circuit precedent, 'the existence of one or two prior incidents' does not establish municipal deliberate indifference." (Dkt. No. 38 at 29) (citing *Armstrong v. Ashley*, 60 F.4th 262, 277 (5th Cir. 2023)). Second, she failed to meet the "exacting" standards set out in the single-incident exception because there is not sufficient evidence to infer deliberate indifference. *See Peña v. City of Rio Grande City*, 879 F.3d 613, 624 (5th Cir. 2018).

With respect to the exception, "[s]uch an inference is possible in only very narrow circumstances: The municipal entity must have 'fail[ed] to train its employees concerning

---

[5] Garcia also argues that a failure-to-train claim does not require a pattern. The Court agrees, which is why the Court also considered the single incident exception in its Order and finds no error in that analysis.

a clear constitutional duty implicated in recurrent situations that a particular employee is certain to face.'" *Littell v. Hous. Indep. Sch. Dist.*, 894 F.3d 616, 624–25 (5th Cir. 2018) (first citing *Canton*, 489 U.S. at 396 (O'Connor, J., concurring); then citing *Peña*, 879 F.3d at 624). The Fifth Circuit interprets *Peña* as "suggesting that, without proof of a pattern of constitutional violations, the failure to train generally must be 'complete,' rather than merely deficient in a particular narrow respect." *Littell*, 894 F.3d at 625. The Court found that the failure to train or create a policy concerning sepsis is a limited or narrow area, which is not sufficient to establish deliberate indifference as a matter of law. *See id.* at 625 n.5. The Court further found that there was no genuine dispute of material fact as to whether the alleged violations were "obvious" or "a highly predictable consequence." (Dkt. No. 38 at 30).

None of these asserted issues rise to the level of a manifest error that warrant reconsideration. For the above reasons, the motion to reconsider the Court's ruling on the episodic-acts-or-omissions claims is denied.

### B. *Cope v. Coleman County* Is Distinguishable

Plaintiff filed a separate advisory notifying the Court of a district court decision in *Cope v. Coleman County*, No. 6:18-CV-015, slip op. (N.D. Tex. Oct. 27, 2025). That order denies the defendant municipality's motion for summary judgment after the Fifth Circuit found that the plaintiff properly asserted a conditions-of-confinement claim. *See Cope v. Coleman County (Cope II)*, No. 23-10414, 2024 WL 3177781 (5th Cir. June 26, 2024), *cert. denied*, 145 S. Ct. 1061 (Jan. 13, 2025). The Court considers this case for its persuasive value on the conditions-of-confinement claims in this case in the context of Plaintiff's motion to reconsider.

In *Cope*, the plaintiffs' claims arose from detainee Derrek Monroe's suicide in the Coleman County Jail in 2017. *Id.* at *1. During intake, Monroe underwent a medical screening and indicated that he had suicidal thoughts, had recently attempted suicide, and was previously diagnosed with schizophrenia. *Id.* He also told an officer, "I want you to shoot me!" *Id.* Coleman County Jail has a "Mental Disabilities and Suicide Prevention Plan," which establishes guidelines for detainee supervision based on varying levels of risk. *Id.* Monroe was initially supervised as a low-risk detainee. *Id.* After intake, an officer contacted mental health services, but Monroe had a seizure on the way to meet

with them. *Id.* Monroe was taken to the hospital, released the next day, and then returned to the jail. *Id.*

Upon Monroe's return, he was placed in a cell with at least one other person. *Id.* Shortly after, he attempted to hang himself using a bed sheet. *Id.* Monroe was then moved by three jail officers to another cell, where he was dressed in a safety smock. *Id.* After he was evaluated by mental health services, it was recommended that he be supervised at the highest risk level, one hundred percent of the time. *Id.* at *2. The jail did not have the capacity to provide that much supervision, so he was observed every fifteen minutes, consistent with a moderate-risk detainee. *Id.*

The next day, there was one officer working in the jail, as was the policy for nights and weekends. *Id.* Another detainee testified that he heard Monroe saying that he was going to kill himself for over an hour that morning and heard the officer on duty trying to calm Monroe. *Id.* Later that morning, after returning from a shower, Monroe began to overflow his toilet, so the officer shut off the water to his cell. *Id.* As the officer was cleaning up the water, Monroe wrapped the phone cord in his cell around his neck. *Id.* The officer continued to mop up the water, but he reported that he "tried to talk [Monroe] down" and notified his superiors of the incident. *Id.* "[The officer] did not enter Monroe's cell, obtain a rescue breathing device, or call [EMS]." *Id.* He testified that this was consistent with his training and jail policy. *Id.* Once the officer's supervisor arrived from offsite, the two officers entered the cell together, called EMS, and retrieved a breathing mask. *Id.* After EMS arrived, they transported Monroe to the hospital. *Id.* He died the following day. *Id.*

The plaintiffs filed suit against the county and jail officers under Section 1983. *Cope*, No. 6:18-CV-015, slip op. at 1. The claims against the officers were dismissed under qualified immunity after appeal of the district court's first opinion to the Fifth Circuit. *See Cope v. Cogdill (Cope I)*, 3 F.4th 198 (5th Cir. 2021). Upon remand, Coleman County moved for summary judgment on the municipal liability claims. *Cope*, No. 6:18-CV-015, slip op. at 2. The district court granted the motion as to both conditions-of-confinement and episodic-acts-or-omissions claims. *See id.* The Fifth Circuit affirmed the district court's dismissal of the episodic-acts claims, but it vacated and remanded the ruling on the conditions-of-confinement claims. *Cope II*, No. 23-10414, 2024 WL 3177781, at *9.

11 / 13

The district court's order after the remand in *Cope II* is the order attached to Plaintiff's advisory. (Dkt. No. 41-1).

The district court ultimately denied the county's motion for summary judgment on the conditions-of-confinement claim. *Cope*, No. 6:18-CV-015, slip op. at 18. The specific claim at issue was that the county deprived all pretrial detainees of their constitutional right to medical care due to the mutually enforcing effect of these policies: "(1) staffing only one jailer on nights and weekends (Staffing Policy); (2) instructing jailers not to enter an occupied cell alone and to wait to intervene until backup arrived (Do Not Enter Policy); and (3) maintaining lengthy phone cords in jail cells (Phone Cord Policy)." *Id.* at 8. Specifically, the court found that "[a] jury may find that Coleman County was clearly aware of Monroe's medical needs related to suicide but failed to change anything about the three policies at issue, knowing their own policies could prohibit intervention if further suicide efforts occurred on the weekend," and "[a] jury could find such a decision was not reasonably related to a legitimate goal and resulted in a violation of Monroe's constitutional rights when all the County's policies are considered together under the circumstances." *Id.* at 18.

The instant case is distinguishable from *Cope*. In *Cope*, the key analysis turned on the plaintiff's arguments about the conditions' reasonable relationship to legitimate government objectives. *Id.* at 11–17. As directed by the Fifth Circuit in *Cope II*, "[i]f Plaintiffs can show the conditions at issue are not reasonably related to a legitimate government objective, the court 'permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees *qua* detainees.'" *Cope II*, No. 23-10414, 2024 WL 3177781, at *9 n.16 (citation modified). The district court then analyzed the plaintiffs' arguments and evidence that the policies were not reasonably related to legitimate government purposes, finding them sufficient to create genuine disputes of material fact. *Cope*, No. 6:18-CV-015, slip op. at 11–17.

Unlike in *Cope*, Plaintiff has failed to create a genuine dispute of material fact on this element. In her filings with the Court, she makes no argument, nor points to any evidence, that the county's policies or practices were unrelated to legitimate government objectives. (Dkt. No. 27 at 9) (referencing the term "legitimate government objective" only

once in the response and only as a statement of the legal standard); (Dkt. No. 31) (making no reference to this element); (Dkt. No. 1) (same). The only application of this standard to the facts of the instant case is found in the motion to reconsider. (Dkt. No. 40 at 9).[6] As the Court explained above in its analysis of this argument, Plaintiff's argument here seems to address episodic acts or omissions—not the reasonableness of the relationship between a *policy* and a legitimate government objective. Though the Court did not reach this element on each of her claims in its prior Order, (Dkt. No. 38), the Court further finds that this element is unsatisfied for each of her conditions-of-confinement claims. *See Sanchez*, 956 F.3d 785, 791 (5th Cir. 2020) (explaining the plaintiff's burden on these claims); *see also Shepherd*, 591 F.3d at 455 (same).

Even considering this additional authority provided by Plaintiff, the Court finds reconsideration of its judgment in this case is not warranted.

## IV. CONCLUSION

Accordingly, finding no manifest errors of law or fact, Plaintiff's Motion for Reconsideration of Memorandum Opinion and Order Granting Motion for Summary Judgment and Final Judgment, (Dkt. No. 40), is **DENIED**.

It is so **ORDERED**.

**SIGNED** on June 1, 2026.

_____
John A. Kazen
United States District Judge

---

[6] Plaintiff's only apparent application of this element states: "It is not reasonable to withhold emergency medical care from a known IV-drug user with obvious signs of sepsis, especially when, as here, that detainee notified County jail medical personnel that he had shot up wrong and his arm was infected and later notified them that he was unable to breathe, was scared because of an obvious abscess on his shoulder, and thought the infection was getting to the bone." (Dkt. No. 40 at 9–10).